```
                 UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
-----------------------------X

UNITED STATES OF AMERICA


                    v.           Criminal Case 20-165-JEB

KEVIN CLINESMITH,

                    Defendant

-----------------------------X
                                        Washington, D.C
                                Friday, January 29, 2021
                                        11:00 a.m.


              TRANSCRIPT OF SENTENCING HEARING
          BEFORE THE HONORABLE JAMES E. BOASBERG
              UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: Anthony F. Scarpelli, AUSA
                    Neeraj Patel, Special AUSA
                    U.S. ATTORNEY'S OFFICE - D.C.
                    555 Fourth Street, NW
                    Washington, DC 20530
                    (202) 252-7707


For the Defendant:  Justin V. Shur, Esq.
                    Megan Cunniff Church, Esq.
                    MOLOLAMKEN LLP
                    600 New Hampshire Avenue, NW, Suite 660
                    Washington, DC 20037
                    (202) 556-2005




Court Reporter:     Lisa Walker Griffith, RPR
                    U.S. District Courthouse
                    Room 6507
                    Washington, D.C.  20001
                    (202) 354-3247
```

```
ALSO PRESENT
FOR CARTER PAGE:      Leslie McAdoo Gordon, Esq.
                      Lawson Pedigo, Esq.
```

<u>P R O C E E D I N G S</u>

1

2          THE DEPUTY CLERK:  We're here for criminal

3    sentencing in 20-165, the United States of America versus

4    Kevin Clinesmith.

5          Starting with counsel for government, would you

6    please identify yourselves for the record.

7          MR. SCARPELLI:  Good morning, Your Honor.  Anthony

8    Scarpelli on behalf of United States.  Also with me is

9    Assistant United States U.S. Attorney Neeraj Patel and

10   Investigator Timothy Fuhrman.

11         THE COURT:  Welcome to all of you gentlemen.

12         MR. SHUR:  Good morning, Your Honor.  Justin Shur

13   and Megan Church on behalf of Kevin Clinesmith.

14   Mr. Clinesmith is present.

15         THE COURT:  Okay.  Ms. Church, I see you, good

16   morning.

17         And Mr. Shur, Mr. Clinesmith, good morning to you.

18         Then let's have counsel, Ms. McAdoo, I will let

19   you state your appearance.

20         MS. GORDON:  Good morning.  Thank you, Your Honor.

21   This is Leslie McAdoo Gordon and my cocounsel on Lawson

22   Pedigo for Dr. Carter Page who is also the present.

23         THE COURT:  All right.

24         Dr. Page, I see you as well.  Good morning.

25         So Mr. Scarpelli, let me just say before we start,

 1    my intent is to hear from Dr. Page, then from the

 2    government, then from the defense and then from Mr.

 3    Clinesmith.

 4              Is there anything preliminary that the government

 5    wishes to address before we begin?

 6              MR. SCARPELLI:  I just think that we need to put

 7    on the record that Mr. Clinesmith is agreeing to proceed by

 8    way of video with respect to the sentencing.

 9              THE COURT:  Okay.  Thank you.  I'm happy to do

10    that.

11              Mr. Shur or Ms. Church, given the pandemic we're

12    obviously holding most of these court proceedings including

13    pleas and sentencings by video.  Does your client have any

14    objection to proceeding in this manner?

15              MR. SHUR:  No, Your Honor.

16              THE COURT:  Okay.

17              Mr. Scarpelli, anything else preliminary?

18              MR. SCARPELLI:  No, Your Honor.

19              THE COURT:  Okay.  Does the defense have anything

20    preliminary it wishes to raise?

21              MR. SHUR:  No, Your Honor.

22              THE COURT:  Okay.  I will hear then, Dr. Page,

23    from you.

24              DR. PAGE:  Thank you, Judge Boasberg, for allowing

25    me to reintroduce myself.  I am Dr. Carter Page.  In

1  accordance with your order last week, I will precisely focus

2  my remarks during these few minutes on the injury that the

3  fourth FISA application caused, with all the falsehoods

4  about who I am, as submitted to the Foreign Intelligence

5  Surveillance Court in June 2017.

6          I'll try to be brief so as to reserve time at the

7  end of my short statement for any related questions you may

8  have.

9          You have noted the defendant's family life.  My

10 own personal life has been severely impacted by the fourth

11 FISA application too.  As context, consider a recent

12 declassification related to my prior relationship with a

13 former friend in London while I was being illegitimately

14 spied upon.

15         As the lies about me broke, I was told by my close

16 friend that she could no longer be associated with me at

17 all.  She effectively shut her door in my face.  Worse yet,

18 it is no exaggeration that literally each and every member

19 of my family has been severely impacted by the fourth FISA

20 application as well.

21         Consider how members of your family would feel if

22 the lead interview in the A- block on MSNBC prime time went

23 as follows in the wake of these continued crimes and exactly

24 one year later:

25         Rachel Maddow: "They bluntly describe Carter Page

1  as, quote, an agent of a foreign power.  Quote: The FBI

2  believes Page has been the subject of targeted recruitment

3  by the Russian government."

4         Then, David Kris, as part of his answer to Ms.

5  Maddow's first question: "So, FISA is focused on spies and

6  terrorists."

7         With the continued impact stemming from Russian

8  disinformation like this, it's easy to understand why I was

9  frequently harassed on the streets.  And even under the

10  streets, such as in the Washington Metro beneath the

11  Courthouse.  Such buffoonery may seem laughable now as

12  disclosures over the subsequent years began to debunk this

13  complete nonsense associated with the fourth FISA

14  application.  But it was deadly serious at the time.  I

15  received many lurid death threats as a quote-unquote

16  "traitor."

17         To avoid the media and mitigate such complete

18  humiliation upon friends and family, I was forced to change

19  my location in hotels nationwide and worldwide.  This

20  manufactured scandal and associated lies caused me to adopt

21  the lifestyle of an international fugitive for years.

22         The defendant at least has a family life.  I often

23  have felt as if I've been left with no life at all.  If the

24  Court opts for leniency today, I will not dispute it.  In

25  fact, I hope you let this Defendant get back to his family

1    whenever this Court deems appropriate.

2            I have often prayed for this Defendant and have no

3    personal desire to see him suffer, as he has inflicted upon

4    me.  I know what it is like to have your life destroyed,

5    although in my case it didn't happen because of something I

6    myself did.

7            As you know, the criminal false statements in this

8    Defendant's case directly pertained to my years of service

9    to the U.S.  Intelligence Community.  More specifically, the

10   CIA.  Unfortunately, the majority of the current amicus

11   curiae in the FISC have enjoyed their positions since before

12   the historic crimes committed against me in that forum.

13   They never did anything to help me.

14           The deepest disrespect and worst specific

15   associated injuries by this Defendant as well as other

16   Article II, Article III and civilian authorities alike thus

17   cuts directly to the core criminal acts in the instant case

18   as it relates to this fourth, 100-plus page FISA

19   application.

20           More precisely and per the FISA Statute's

21   Subsection (i)(3)(A), the qualifications of Amicus Curiae:

22   "shall be persons who possess expertise in privacy and civil

23   liberties, intelligence collection--" et cetera.

24           The list of current FISC amici with direct

25   expertise in intelligence collection largely consists of

those with Signals Intelligence or SIGINT. The criminal acts
by this Defendant falsely denied my extensive experience and
decades of often life-threatening service to our country in
Human Intelligence or HUMINT.

In the interest of diversity, equity and balance,
I believe that I could help you in that other
intelligence-related forum that's co-located in this same
Prettyman Courthouse.

Contrary to the countless criminal lies from this
Defendant and his politically-motivated colleagues with that
fourth FISA, I have always been entirely trustworthy with
national security secrets which are far more sensitive than
most matters that they once handled at the Bureau.

During my military service, when I had my first
collaboration with the CIA while I worked on U.S.  Nuclear
weapons matters, I was granted a Top Secret clearance with
multiple high-level SCI designations.  But unlike associated
criminal leakers who frequently put my life at risk, I have
never betrayed that trust.

As for expertise in privacy and civil liberties,
perhaps no one on this planet has dedicated as much time and
effort over the course of these many dark years to this very
cause.  Effectively banished as an international fugitive in
the wake of the fourth FISA, I recently completed my LL.M in
the U.K., where the focus of my thesis was on the FISA

1    regime's failure in relation to associated judicial entities

2    across our country and other FVEY's jurisdictions.

3            Your Honor, I believe my own experience as the

4    target of wrongful surveillance based on the criminal acts

5    of this Defendant and others gives me concrete experience

6    that could be invaluable to the FISC.  Because of the

7    secrecy of the FISA process, we simply don't know how many

8    individuals have been subject to wrongful surveillance based

9    on inaccurate FISA requests.

10            (There was a pause for technical difficulties.)

11            DR. PAGE:  I have unsurpassed personal knowledge

12    of the harm that wrongful surveillance can cause.  Such

13    personal experience would give me a unique perspective as an

14    amicus for the FISA Court.

15            To show the value of such experience, here's more

16    detail about the injury that the fourth FISA application

17    caused.  It's essential to recognize the media tactics

18    which occurred during the period of June through the

19    expiration of my final illegitimate warrant in September

20    2017.  Rather than helping to set the record straight, as I

21    had essentially begged this Defendant to assist me with in

22    April 2017, I received countless calls from journalists

23    throughout those months.  They often asked about the deadly

24    disinformation then emanating from the FBI and the Bureau's

25    political allies.

1          For example, on June 26, 2017, the same day that

2     the Acting Assistant AG for NSD Dana Boente received his

3     copy of the fourth false FISA application which he has "no

4     recollection of reading", Devlin Barrett of the Washington

5     Post  published an article titled "FBI has questioned Trump

6     campaign adviser Carter Page at length in Russia probe."

7          As my life continued to spin out of control from

8     these constant leaks relating to the manifold errors and

9     omissions which then emanated from the FBI, including those

10    related to the Defendant's conduct, I spent much of that

11    summer mitigating other such life-threatening disgraceful

12    statements and the public reaction that they precipitated.

13         The FISA warrant application in this case was

14    finished in June 2017, and the resultant surveillance

15    continued until September 2017.  During that period of time

16    and because of the warrant, I had no privacy in any of my

17    communications.  My every email and phone call was monitored

18    by the government.  Worse yet, and as declassified in April

19    2020, footnote 379 of the OIG FISA Abuse Report revealed,

20    that there was also a physical search of my fugitive-escape

21    hotel room on July 13, 2017.  And in a separate incident on

22    July 29, 2017, the FBI took photographs in connection with

23    another search of my living space and belongings.

24         In essence, my offer to help you here and now is

25    in many ways similar to the assistance that I volunteered

1    four years ago to this Defendant, Mr. Comey, Case Agent 1,

2    Case Agent 6 and many other U.S. Government officials.

3    Severe damage could have been avoided if they had only

4    respected my offer.

5          With the FISC's legitimacy still subject to much

6    doubt by millions of Americans, I have had a lifetime of

7    service to our country and had hoped today might mark a

8    turning point with my amicus offer now. While nothing else

9    that may be achieved today can remedy the specific crimes in

10   focus here, it's an honor to finally meet you. I firmly

11   believe that I can be of assistance to you and our country

12   over the longer term.

13          Thank you for the opportunity to make this

14   statement. I would happy to answer any questions you may

15   have. Also, I apologize for the bad acoustics. I would be

16   happy to provide a full transcript for any discrepancies for

17   the record, if will be of any help.

18          THE COURT: Thank you so much for being here.

19   Thank you for explaining what happened to you and the harm

20   you suffered. If you don't mind submitting your written

21   transcript to the court reporter, that might aid her in the

22   event she was unable to accurately transcribe it.

23          MR. SHUR: Yes, Your Honor, we'll do.

24          THE COURT: I have carefully read all the

25   submissions including the submissions by Dr. Page. But

1    I've read the government's submissions.  I have read the

2    defense's submissions including all the letters submitted on

3    behalf of Mr.  Clinesmith.  I've read the presentence

4    investigation report by Ms.  Lustig.

5            Thank you very much, Ms.  Lustig, I know you are

6    here as well.

7            So Mr. Scarpelli, I'll give you now the chance to

8    add anything you would like to your submission.

9            MR. SCARPELLI:  Thank you, Your Honor.  And before

10   I begin, I would like to just state for the record the

11   government has no objection to the presentence report in its

12   final form.

13           The defendant's criminal conduct tarnished and

14   undermined the integrity of the FISA program.  As the Court

15   is well aware, the defendant was a dually licensed attorney

16   for the FBI and had taken an oath of candor.

17           But on June 19, 2017, the defendant altered an

18   e-mail from an other government agency which was material

19   and that changed the content of the e-mail, which in turn,

20   led the FBI, the Department of Justice to submit a FISA

21   application to the FISA Court that failed to disclose

22   relevant and material facts.  In turn the FISA Court did not

23   have all the facts to make a complete and thorough

24   assessment regarding a FISA warrant on a U.S.  Citizen.

25           The government understands that the Court has a

1    full understanding of the facts in this matter,

2    nevertheless, feels compelled to at least address some facts

3    so the Court can both digest those in fashioning the

4    appropriate sentence.  The government has requested a

5    sentence of at least in the mid to upper range of the

6    Guidelines range.

7           The defendant had been a member of the Michigan

8    Bar since 2007, and at the time of the offense was an

9    attorney with the FBI's Office of General Counsel.  He had

10   been an attorney for approximately 10 years, two of those

11   years at the FBI .

12          As part of the defendant's employment, he received

13   periodic training regarding the FISA, as well as government

14   attorney's ethical obligations.  Part of his duties and

15   responsibilities included providing support to FBI agents

16   and working with other of Department of Justice attorneys

17   who submitted applications to the FISA Court, which sought

18   to conduct surveillance on individuals believed to be agents

19   of foreign powers.

20          Additionally, the defendant was assigned some of

21   the FBI's Office of General Counsel's most high-profile and

22   important cases such as the FBI's Mid-year investigation

23   into the former Secretary of State Hillary Clinton's use of

24   a private email server; Crossfire Hurricane investigation

25   into whether individuals associated with former President

1   Trump's presidential campaign were colluding or coordinating

2   with Russian officials to interfere with the 2016

3   presidential election; and he was also part of the Special

4   Counsel investigation headed by Robert Mueller into whether

5   there were links between the Russian government and

6   individuals associated with former President Trump's

7   campaign.

8          Additionally, the defendant had supervisors at the

9   FBI's Office of General Counsel who he communicated with

10  regularly about his assignments, as well as consulted with

11  FBI agents who he was working with on his FISA applications,

12  as well as DOJ national security attorneys and other

13  government agencies.  In short, the defendant had ample

14  training regarding the FISA process, training regarding his

15  ethical obligations, and supervisory support regarding his

16  attorney position with the FBI.

17         Among the FISA applications that the defendant

18  worked on were the four FISA applications with regards to

19  Dr.  Page.

20         In June 2017, prior to the submission of the

21  Fourth and final application, and after Dr.  Page stated

22  publicly that he had assisted the U.S.  Government in the

23  past, the FBI Supervisory Special Agent who was going to be

24  the affiant on the final application, asked the defendant to

25  inquire with the Other Government Agency as to whether Dr.

1  Page had ever been a source for the Other Government Agency.

2          The defendant sent an email to a liaison at the

3  Other Government Agency seeking clarification as to whether

4  Dr.  Page was a source for the Other Government Agency.  And

5  in his email, he recognized the importance of this issue by

6  acknowledging in the email, "This is a fact we need to

7  disclose in our next FISA renewal".

8          The OGA Liaison emailed the defendant a list of

9  documents, including an August 17 Memorandum, that the OGA

10  had previously provided the FBI, which detailed Dr.  Page's

11  relationship with the Other Government Agency as an

12  operational contact and information he had provided to the

13  Other Government Agency concerning his prior contacts with

14  certain Russian intelligence officers.  In that memo, the

15  OGA had assessed that Dr.  Page was candid in describing his

16  contacts to the OGA.

17          The OGA also wrote that the Dr.  Page was a

18  digraph, which meant he was a person who provided reporting

19  to the OGA, and the Liaison indicated that the listed

20  documents will explain the details.  The OGA liaison offered

21  to provide a formal definition for the FISA application.

22          The defendant did not take up the OGA Liaison's

23  offer.  Instead, the defendant forwarded the OGA Liaison's

24  email to the case agent and another FBI supervisory special

25  agent, and later in a separate email to an attorney at

1    Department of Justice's Office of Intelligence who was

2    working on the FISA.  In each email, the defendant removed

3    his initial email that he sent to the OGA Liaison inquiring

4    about Dr. Page's status as a source.  The defendant

5    responded: "Yes, the OGA confirmed explicitly he was never a

6    source."

7            The supervisory Special Agent responded,

8    "interesting."  The defendant said, "but like interesting

9    good, right?  I mean, at least we don't have to have a

10   terrible footnote."  The supervisory Special Agent said,

11   "Sure, just interesting they say not a source.  We thought

12   otherwise based on the writing.  I will reread."

13           The defendant responded.  "At most, it's another

14   person, being the CHS, and you talking to the other person."

15   The Supervisory Special Agent then responded, "Got it, thank

16   you.  Do you have that in writing?"  The defendant

17   responded, "On TS.  I'll forward."

18           As reflected in this conversation, the defendant

19   told the SSA that Dr. Page was never a source and that the

20   OGA had confirmed explicitly that he was never a source.

21   When the Supervisory Special Agent asked if the defendant

22   had it in writing, the defendant responded he did and he

23   would forward the e-mail that the OGA had provided under the

24   top secret e-mail system.

25           Immediately following the conversation, the

1    defendant forwarded to the SSA, the OGA's liaison's June 15,

2    2017 e-mail, which he had altered, and again he omitted the

3    initial e-mail that he had sent to the OGA liaison inquiring

4    about Dr. Page's status as a source.

5        Specifically, he inserted the words, "not a

6    source" into the OGA's liaison's e-mail, which made the

7    altered e-mail a false document that he sent to the FISA

8    affiant.

9        In fact, according to the OGA liaison, Dr. Page

10   had been a source for the OGA and had provided direct

11   reporting to the OGA in the past.

12       Your Honor, in fashioning a sentence, you are to

13   consider 18 USC 3553 factors and first, the nature and

14   circumstance of the offense.

15       The nature and circumstance of the false document,

16   changing Dr. Page's status with the OGA to not a source is

17   incredibly egregious and has had lasting effects on the

18   Department of Justice, the FBI, the FIS, the FISA process

19   and the trust and confidence United States citizens have in

20   their government.

21       In addition, the warrant allowed Dr. Page to be

22   surveilled for another three months. Dr. Page has

23   addressed this Court about the effects on him. The act of

24   altering the e-mail to change its meaning may seem simple in

25   a momentarily lapse of judgment on the part of the

1   defendant.  But the resulting harm is immeasurable.  By

2   altering the OGA's e-mail, the defendant completely changed

3   the meaning of the content.

4         The defendant attributed the false statement to

5   the OGA liaison, which is akin to identity theft by making

6   it appear that the OGA liaison was the author and had stated

7   Dr.  Page was not a source of the OGA.

8         Not surprising, the OGA liaison was adamant that

9   she did not alter the altered e-mail and was troubled by the

10  fact that it was altered.  As she later stated, Dr.  Page

11  was a source for the OGA as the FBI uses that term.

12        Also the altered e-mail provided the FBI SSA

13  without truthful and accurate information he was required to

14  have to do his job.  The FBI SSA knew of his responsibility

15  when preparing a FISA application was to provide the FISC

16  with all relevant and material information regardless if it

17  was helpful to the overall investigation.

18        The FBI Supervisory Special Agent even asked that

19  the defendant provide him the information regarding Dr.

20  Page's status in writing.  He wanted to document his facts.

21  The defendant falsified a document that in turn did not

22  provide the FBI SSA with a fulsome understanding of the Dr.

23  Page's status.  And therefore, put in motion the FBI SSA not

24  providing accurate and material details to the FISC.

25        Furthermore, the altered e-mail misled the FISC

regarding salient and necessary facts it needed to consider

probable cause.  Regardless of whether the FISA application

would have been approved the FIS requires all relevant and

material facts.  And withholding material facts for any

reason is a violation of an attorney's ethical standards in

a criminal offense.

          Additionally, the public deserves better from

attorneys working for the government, assigned to handle

some of the most important and sensitive matters.  And

anything less dilutes the public confidence in our

government.

          The defendant's actions had significant

ramifications.  Among other things, the FBI and DOJ were

appropriately required by the FISC to review all FISA

matters handled by the defendant, and also required the FBI

and DOJ to implement numerous and extensive remedial policy

and procedures.  Dr.  Page has also discussed how the

warrant has impacted.

          Secondly, the Court must consider the history and

characteristics of the defendant.  The government recognizes

that the defendant is 38 years old, has a law degree and has

no criminal history to this point.  The defendant's

character references submitted on his behalf attests to the

defendant's good character.

          Additionally, the defendant has accepted

1    responsibility by pleading guilty, conserved resources of

2    the Court and government.  These all weigh positively for

3    his history and character.

4         However, one aspect of this process the government

5    would like to point out to the Court that weighs against his

6    history and character, is the defendant's explanation as to

7    why the offense occurred.

8         The defendant claims that he was confused and

9    believed at the time he altered the e-mail that his

10   alteration was accurate.  He claims that he later learned

11   that was not true.  This is troubling in many ways.  First,

12   his explanation that he thought it was true and that Dr.

13   Page was a subsource of a source but not a source is

14   fanciful.  The liaison e-mail plainly stated that had Dr.

15   Page provided reporting to us, meaning the OGA.  There is no

16   evidence to support his belief that Dr.  Page was a

17   subsource of a source.

18        And critically important, Your Honor, is, if he

19   thought the OGA liaison's e-mail was clear, that Dr.  Page

20   was not a source, there would be no reason to alter the

21   e-mail.  In other words, if he believed that Dr.  Page was

22   not a source based on the OGA's e-mail, there is absolutely

23   no reason to add the words "not a source."

24        Second, even if he believed it was true, there is

25   no excuse to essentially fabricate an e-mail from an Other

1    Government Agency and mislead another FBI agent, an affiant

2    on an application to the Court who was relying on the

3    information and had him believe that the e-mail was

4    authentic.

5           Third, if the defendant was confused as he

6    suggests, why did he just not go back to the OGA liaison for

7    clarification?  The OGA liaison offered to provide language

8    about Dr. Page's relationship for the FISA.  Clearly the

9    OGA liaison was available and willing to assist the

10   defendant.  She was merely a telephone call away if he was

11   confused.  But that never happened.

12          In addition, the defendant could have addressed

13   his confusion with his supervisor.  That never happened.  He

14   had access to the August 17, OGA memorandum that explained

15   Dr. Page's status; however, he failed to review that.  He

16   could have requested and reviewed the OGA reports.  That

17   never happened.

18          Furthermore, after receiving the e-mail from the

19   OGA liaison on June 15th, and in forwarding the unaltered

20   e-mail to the case agent and then to the Office of

21   Intelligence attorney, he removed his portion of the e-mail

22   asking the OGA about Dr. Page's status as a source.

23          Then on June 19th, when the defendant sent the

24   altered e-mail to the Supervisory Special Agent, he again

25   removed his question to the OGA liaison.  He removed his

1    original question to the OGA liaison, which was crucial to

2    the understanding of the context of the liaison's response.

3            The defendant's explanation that he believed the

4    information was true and that he must have been confused

5    flies in the face of the facts.  And in the end, does not

6    provide an explanation for why he altered an e-mail from an

7    Other Government Agency, therefore, creating a false

8    document.

9            Lastly, on the topic of the defendant's possible

10   motive for alteration, his own words potentially explain why

11   he altered the e-mail.  During the instant message

12   communication on June 19th with his supervisory Special

13   Agent, the defendant stated, "We don't have a terrible

14   footnote."

15           The defendant knew that a footnote in the FISA

16   application would be terrible because then they would have

17   to tell the Court that Dr.  Page was a source, had

18   previously disclosed his -- and would have to previously

19   disclose his previous contacts with the OGA.  They would

20   have to disclose to the FISC that they had this information

21   all along, but omitted this material information in three

22   prior FISA applications on Dr.  Page.

23           In sum, Your Honor, the nature and circumstances

24   of this offense and the harm caused warrant a term of

25   imprisonment.  The defendant's explanation that he was

1  confused and believed that Dr.  Page was not a source is

2  inconsistent with the facts.  The alteration may have been

3  isolated, but the repercussions were extensive.

4         In fashioning a sentence, Your Honor, the

5  government would also ask you to consider the deterrence

6  factor.  Although specific deterrence is minimal here,

7  general deterrence is very important and something the Court

8  should focus on in fashioning a sentence.

9         In sentencing the defendant, the Court has a

10  strong platform to send a message to the community that

11  falsifying relevant and material information, particularly

12  on which the Court must rely, will not be tolerated and will

13  have serious consequences.

14         The case has received media attention and the

15  Court can show the public that the defendant's criminal

16  conduct will be weighed appropriately by the Court and not

17  an insignificant punishment.

18         The defendant has raised several arguments in its

19  sentencing memo and the government would like to just

20  address a few of those.  Specifically, the defendant cites

21  numerous cases where individuals received probationary

22  sentences for the proposition that a probationary sentence

23  would not create a sentencing disparity.

24         The government would point to the Court's

25  sentencing hearing in the *United States versus Papadopoulos*.

1    At the sentencing hearing in *U.S. v. Papadopoulos* on

2    September 7, 2018, Judge Moss sentenced Mr. Papadopoulos to

3    a short term of imprisonment.

4         During Judge Moss' sentencing statement, he stated

5    that he was surprised that, quote, In almost 60 percent of

6    the cases, similar to the Papadopoulos case, those cases

7    received a sentence of probation.  What this means is

8    presumably 40 percent of individuals sentenced on 1001

9    offenses receive a term of imprisonment.  And in the

10   government's estimation, the defendant's conduct was more

11   egregious than Mr. Papadopoulos.

12        Furthermore, Judge Moss considered the sentencing

13   in *United States versus Van Der Zwaan,* who was a lawyer,

14   when he fashioned the sentence for Mr. Papadopoulos.  Judge

15   Moss stated, "In some sense, one might say a lawyer is the

16   last person you would expect should be lying to the

17   government, to the FBI.  And that they know the

18   consequences."  It should be noted that Mr. Van Der Zwaan

19   received a term of imprisonment longer than Mr.

20   Papadopoulos..

21        In the sentencing memo the defendant cites

22   numerous cases where the defendants received probation

23   sentences.  Those cases are not analogous because the harm

24   caused by the defendant's alteration cannot be compared to

25   those cases.  Here, the defendant's actions had a horrendous

1    effect on the FISA Program and confidence in the

2    government's process.

3            In many 1001 cases, the defendants were targets of

4    an FBI investigation, adversaries or individuals who the FBI

5    was supposed to look at with a skeptical eye.  Here,

6    however, Mr. Clinesmith was an FBI employee.  He was

7    someone that the FBI agents should have been able to trust.

8    He betrayed the trust by knowingly altering an e-mail from

9    an Other Government Agency about a key material fact.

10           The defendant also asked the Court to take into

11   consideration the harm a term of imprisonment would cause on

12   his family.  The government is mindful of the impact on his

13   family, and surely understands the impact the sentence will

14   have on them.  However, this consideration is involved in

15   most, if not all, defendants who are sentenced to terms of

16   imprisonment.  The defendant and his family are not unique.

17           It is the defendant's criminal conduct that put

18   his family in this situation.  And the distress a term of

19   imprison would cause is a collateral consequence that flows

20   from his own actions and not something the Court should look

21   to for substitution in sentencing.

22           The sentencing guidelines note that family ties

23   and responsibilities are not ordinarily relevant in

24   determining whether a departure is warranted.

25           The defendant also notes in his sentencing memo

1    that a term of imprisonment is unnecessarily harsh because

2    it would expose him to COVID.

3              THE COURT:  Mr.  Scarpelli, just so we're clear,

4    you mentioned departure.  But the defense is not asking for

5    a departure.

6              MR. SCARPELLI:  That's correct.  I'm just citing

7    that that is at least recognized in the guidelines.

8              THE COURT:  Go ahead.

9              MR. SCARPELLI:  The defendant also cites the COVID

10   ramifications.  The government recognizes the seriousness of

11   the COVID virus, but this should not be a reason to avoid a

12   term of imprisonment.  In every sentence where there is a

13   possibility that the defendant will receive a term of

14   imprisonment, the Court considers the COVID ramifications.

15              As the Court is well aware, the Bureau of Prisons

16   has taken numerous remedial steps and has initiated

17   guidelines for individuals entering a BOP facility.  By way

18   of example, at intake, individuals are tested, and if they

19   are symptomatic, they're put in isolation.  If they are

20   asymptomatic and test negative, they will be placed in

21   quarantine for 14 days.  There are additional remedial steps

22   made with having contact from outside individuals.

23              Lastly, Your Honor, the government would point out

24   that we recognize the United States probation officer's

25   recommendation.  And the government respects the United

1  States Probation's position and routinely agrees with them

2  on numerous matters.

3          However, in this matter, the government believe

4  that for all the reasons outlined in our sentencing memo and

5  during this allocution, a more significant sentence is

6  warranted.  The defendant's conduct is outside the heartland

7  of 1001 cases that the Court sentences.  And a meaningful

8  sentence would take into account the nature and

9  circumstances of the offense and the valuable deterrent

10  effect.

11          For these reasons, Your Honor, the government asks

12  that you sentence the defendant to a term of imprisonment

13  between at least the mid and upper guideline range.

14          Thank you.

15          THE COURT:  Thank you very much, Mr.  Scarpelli.

16          I'll hear now from defense counsel.  And let me

17  say that I have carefully read your submissions which was

18  comprehensive and thorough and so, you don't need to repeat

19  every point therein, nor do you need to feel that you need

20  to speak at the length that the government did or you won't

21  be credited sufficiently.

22          So, Mr.  Shur, with those caveats, I'll hear from

23  you.

24          MR. SHUR:  Understood.  Sure.  Thank you, Your

25  Honor.

1        I want to thank you, Judge, for your time and

2    attention to this matter, and for the care that I know you

3    have taken in reviewing all the submissions.  As Your Honor

4    suggested, I don't intend to rehash all the points we've

5    previously made in support of our request for a sentence of

6    probation.  But there are a few issues I would like to

7    address, as well as respond to some of the arguments that

8    have been made since we filed our sentencing memorandum.

9        First I would like to briefly discuss the various

10    letters that we submitted to the Court.  Counsel for the

11    government had commented to us that they had never seen so

12    many character letters attached to a sentencing memorandum.

13    I can assure you, Your, Honor we weren't looking to break

14    any records here.  And we certainly weren't looking to

15    inundate the Court with paper.

16        But, in sentencing the defendant, I think the

17    Court is well aware, it's important not only to consider

18    transgressions issue but to consider the history and

19    characteristics of the defendant.  Our hope is that, through

20    these letters, it has been able to assist the Court by

21    giving Your Honor some insight on who Kevin Clinesmith is as

22    a person.

23        The reason we submitted so many letters is that,

24    like many of us, Kevin is not defined by a single event or

25    person.  It's the many little things, the every-day moments

1    and interactions that are detailed in each of these letters

2    that give you a real sense of who Kevin is.  How he's lived

3    his life, the decisions he's made and the decisions he's

4    likely to make in the future.

5         These letters are from all sorts of different

6    people and people from different stages of Kevin's life:

7    Members of his family back in Michigan, a college professor,

8    a law school classmate, former FBI colleagues and

9    supervisors, as well as many, many friends.

10         Despite their different backgrounds and the

11   different relationships with Kevin, there's an overwhelming

12   consensus that emerges from these letters about the type of

13   person Kevin is.  Over and over again, they describe him

14   both in his personal and professional life, using words like

15   kind, selfless, honest, thoughtful, dependable,

16   hard-working, and trustworthy.

17         But if there's one single, common theme that

18   stands out, more than anything else, it's this:  Kevin

19   Clinesmith has lived his life in service of others.  His

20   dedication to public service and his significant

21   contributions to Department of Energy, the FBI, and the

22   country are detailed in our submission and speak for

23   themself.  But it goes well beyond that.

24         As these letters demonstrate, Kevin has lived his

25   life putting the needs of others before his own.  He's the

1  person who others reach out to when they need hel,p, who

2  people rely on for advice, or to vent to or to lift their

3  spirits.  And that's because no matter how busy he is, no

4  matter what else is going on in his life, he drops

5  everything to help others, to improve the lives of his

6  family, his friends, his colleagues, and members of his

7  community.  And that remains true today.

8          In fact, I saw it for myself.  When Kevin first

9  learned he may be facing criminal charges, his first concern

10 wasn't for himself or what was going to happen to him.  His

11 concern was for others.  He was worried about his family,

12 about his friends and colleagues and about the FBI.  He was

13 worried about what was going to happen to all of them, how

14 this might affect them, their lives, the work they do.  He

15 put their interests before his because that's who Kevin is.

16         The fact that so many people submitted letters,

17 says something, too.  These folks had absolutely nothing to

18 gain by sticking their necks out and supporting someone

19 convicted of a crime.  But they did.  They chose to stand by

20 Kevin at their own personal and professional risk, which I

21 think speaks volumes about what Kevin means to them and how

22 he has positively impacted their lives.

23         We hope, Your Honor, that these letters have

24 provided an opportunity for you to get to know Kevin

25 because, while it's clear that the alteration of the email

1    that led to this case was inexcusable, it does not represent

2    the person before you.

3          The email incident was clearly an aberration, an

4    aberration in an otherwise honorable and productive life,

5    filled with good deeds, which, when considered with

6    everything else, weighs strongly in favor of a sentence of

7    probation.

8          I recognize that, after talking about what a good

9    person Kevin is, it begs the question: If he's such a good

10    person, why are we here?  How did this happen?

11          It happened because sometimes good people make

12    poor decisions.  Not for any malicious or nefarious reason,

13    but because they're human beings.  And despite wanting to

14    always be at their best, they're not; they make mistakes.

15    And there's no question about it.  Due to stress, due to a

16    significant error in judgment, by altering that email, Kevin

17    made a serious mistake.  In doing so, he failed to live up

18    to the standards we expected of him and that he expected of

19    himself.  And he's paid the price .

20          But I think it's important that, in evaluating the

21    offense conduct for purposes of sentencing,  that we're

22    clear about the nature and the scope of Kevin's conduct.

23          I don't think any disagrees that the facts and

24    circumstances surrounding the various FISA applications are

25    complicated.  You don't have to look beyond the fact that

the IG report concerning this matter is nearly 500 pages
long.

As described in that report, there were many
people involved with these applications.  And there were
many mistakes that were made.  And many of those mistakes
had absolutely nothing to do with Kevin.

Kevin's mistake is that, by forwarding the altered
email, he represented to the recipient, the Supervisory
Special Agent, that the additional words he added,  "not a
source" were contained in the original email when he knew
they weren't.

So while he believed Dr. Page was, in fact, a
subsource and therefore "not a source," he knew those words
were not contained in the original email that he had
received.  That's what the evidence shows.  And that's what
he pled guilty to.

It's been suggested, however, that Kevin
intentionally lied about Dr. Page's prior relationship with
the CIA.  And that he did so to hide it from the Court.
Those allegations are truly unfortunate because they're
simply not true.  And they are not supported by the record
or the evidence.

For one thing, if Kevin's intent had been to lie
about or conceal the fact that Dr. Page had a prior
relationship with the agency, he would have never gone

around describing Dr. Page as a "subsource." After all, a subsource is someone who, in fact, has a relationship with the agency.

And if his intent had been to lie about or conceal Dr. Page's prior relationship with the CIA, he would have never forwarded the original unaltered email to the two people primarily responsible for preparing the application, the case agent and the DOJ attorney. But he did. And, in doing so, he provided them with the list of reports which detail Dr. Page's prior relationship with the agency. That's not something someone would do if they were looking to lie about or conceal that fact.

The same can be said for the altered email he sent to the SSA. Even with the alteration, the email still makes clear that Dr. Page had a prior relationship with the CIA. The forwarded email still says Dr. Page provided reporting to the agency. The forwarded email still includes the CIA's offer to provide language for the application about that prior relationship.

Again, that's not an email Kevin would have sent if his goal had been to lie about or conceal the fact that Dr. Page had a prior relationship with the agency.

The government has questioned whether Kevin believed in good faith that Dr. Page was a subsource and therefore not a source. The record is clear that, when

1  Kevin told his colleagues that he understood Dr. Page was a

2  subsource, he may have been mistaken but he wasn't lying.

3  As reflected by the record, he truly believed that to be the

4  case.

5          To be clear, we're not saying the Agency's email

6  says that Dr. Page is a subsource but that's what Kevin got

7  that understanding from.  Kevin did not precisely remember

8  how he arrived at that incorrect understanding, which, as

9  we've explained in our submission, is not entirely

10  surprising given the fast pace nature of the investigation

11  and the various tasks that he was juggling at the time.  But

12  as we discuss in great detail in our submission, there are a

13  number of factors that may have contributed to him having

14  that understanding.

15          However, the more important point here is that

16  referring to Dr. Page as a "subsource" is contrary to any

17  theory that Kevin intended to conceal the fact that Dr.

18  Page had a relationship with the Agency.

19          The government also talked about the fact that

20  Kevin forwarded the agency's response but not his underlying

21  email.  That fact doesn't change the analysis here.  You

22  don't need to see Kevin's initial email to understand the

23  agency's response.  And what they're talking about.

24          It's clear from the agency's email that they're

25  responding to inquiry about Dr. Page's relationship with

the agency.  The email says: My recollection is Dr.  Page

provided reporting to us.  These reports will explain the

details.

I'd also like to respond to the government's

suggestion that Kevin's clear reference to a terrible

footnote says something about (inaudible).  Firstly, the

reference, we explain this in our submission, but the

reference to terrible footnote related to the fact that

many of the prior applications, there was a one had a half

page long footnote regarding information provided by another

source.

But more important than that is, there is no

reason to think that Mr.  Clinesmith would have faced

personal exposure or embarrassment if the FBI had disclosed

that footnote in the final application Dr.  Page's prior

relationship with the Central Intelligence Agency.  No, the

individuals that would have faced criticism or embarrassment

were the folks that previously had that information,  Dr.

Page's status, that had the August 17th memorandum and

decided not to disclose it.

So that, even it may have been relief not to have

to correct the prior oversight, (unintelligible) then faced

personal exposure or embarrassment or criticism that they

had to make that disclosure, and therefore, had no motive to

lie or submit anything about Dr.  Page's prior relationship.

1              With respect to Dr. Page's alleged harm, I have

2    sat here and listened very carefully. There's nothing he

3    said today that he hasn't said before in his motion which

4    we've already responded to.

5              To be clear, I don't mean to make light of what

6    it's like to be the target of an investigation and what that

7    person goes through. But none of the harm Dr. Page has

8    alleged was the result of any improper conduct by Kevin.

9    And therefore it should not be a factor in the Court's

10   sentencing analysis.

11             Dr. Page, in his filings, also makes factual

12   allegations that are contrary to the record. He suggests,

13   for example, that his status as an operational contact would

14   have been disclosed to the FISC had Kevin not altered the

15   email. And that, if Dr. Page's status had been disclosed,

16   the application would not have been approved.

17             But, as we discuss- in great detail in our

18   submission, based on the record, there is no reason to think

19   that but for the altered email things would have been

20   handled differently.

21             At a minimum, Dr. Page's suggestion that the

22   warrant was improperly approved as a result of Kevin's

23   conduct is pure speculation. The IG identified 16 other

24   significant inaccuracies and omissions relating to these

25   applications. None of them having anything to do with

1    Kevin.

2          Dr.  Page and others have made all sorts of

3    conclusory allegations that are simply not tied to any facts

4    or evidence.  That may be the norm for interviews with cable

5    news networks.  But that's not how we do business here, not

6    in this court or any other --

7          THE COURT:  If I could just interrupt you for one

8    second, Mr.  Shur, that although -- and I understand you are

9    commenting on the submissions.  You had obviously written

10   this up before today.  But Dr.  Page here is not seeking any

11   kind of serious prison sentence in his remarks.  He

12   described the harms, but he talked about he's more

13   interested in mercy than otherwise here.  So, I think that

14   is an important fact to keep in mind.

15         MS. GORDON:  If I might be heard on that also,

16   Your Honor.

17         THE COURT:  I'm sorry, Ms.  Gordon. I appreciate

18   your assistance to the Court and your submissions but I

19   don't permit punitive victim's counsel to also speak here.

20   But thank you very much for being here.

21         Okay, Mr.  Shur.  Back to you.

22         MR. SHUR:  Thank you, Judge.  To be clear what I

23   am referring to are comments that are suggested in the

24   submission but also outside the submissions that there is

25   some nefarious or malicious plot to hide things from the

Court or to unlawfully surveil Dr. Page, which is not the
case.

And to be clear, I don't for a second mean to
minimize the seriousness of the defendant's offense or any
intended consequences and importance of transparency with
the FISC when dealing with the FISA warrants. But the
offense conduct is a factor that the Court needs to evaluate
in sentencing.

I think it is important that we're clear about
the record about what Kevin did and didn't do. By altering
that email, Kevin screwed up. But he didn't act
maliciously. He didn't deliberately lie about Dr. Page's
status. And he didn't intend to hide anything from the
Court.

Finally, I'd like to talk about deterrence because
the Government has argued that a custodial sentence is
necessary to achieve general deterrence. Their argument is
that, because this is a press case, because it's received a
lot of publicity and media coverage, that it's a good
opportunity to send a message to potential violators.

To be honest, I was a bit surprised by this
argument. The notion that this case should be treated
differently, that Kevin should receive a harsher punishment
because this case has received media attention, that doesn't
make sense. And it's not right.

1        For one thing, it undermines the fundamental

2   principle that every defendant be treated equally and

3   fairly.  Meaning, similar defendants who have engaged in

4   similar conduct should be treated in substantially the same

5   way, regardless of how much or little press attention their

6   case receives.

7        Unfortunately, Kevin has not been treated like the

8   average defendant.  His fall from grace has been publicly

9   documented in detail, under the glare of public scrutiny and

10  media coverage.  As a result, I think it's fair to say that

11  the message to potential violators that the Government is

12  talking about has already been sent.  Anyone who has paid

13  any attention to the media coverage of this case understands

14  that if you engage in this type of conduct, there will be

15  significant consequences.

16       Because the consequences that Kevin has suffered

17  have been the subject of national attention, his reputation

18  has been ruined, his career is in shambles.  He has been

19  unable to support his family at a time when he and his wife

20  are expecting their first child.  And he's been publicly

21  shamed and subjected to threats and vicious attacks on

22  social media and elsewhere.

23       These consequences have been devastating for

24  Kevin, personally and professionally.  And they've taken an

25  enormous financial and emotional toll on him and his family.

1    There's no doubt that these consequences, which have been

2    publicly documented, serve as a general deterrent.  A

3    custodial sentence is not needed.

4         It's also worth noting that general deterrence is

5    a sentencing factor in every case.  In every one of the

6    false statement cases we cited in our submission, that was a

7    factor.  And in every one of those cases the Court found

8    that general deterrence was achieved by a sentence of

9    probation.

10        This is the first time we've heard from the

11   government that Kevin should be sentenced to prison because

12   one or more defendants in the Special Counsel Office

13   received a custodial sentence.  That argument is not

14   persuasive.

15        Comparing those cases to this case is like

16   comparing apples to oranges.  In those false statement

17   cases, the defendants lied during investigative interviews.

18   And they did so for some improper benefit, in an attempt to

19   avoid potential exposure to liability.  As we discuss in our

20   submission, that is not the case here.

21        In our submission, we list a number of false

22   statement cases in this district and other courts around the

23   country  where the defendants received a probationary

24   sentence.  As is in those cases, a non-custodial sentence is

25   appropriate here.

1    In this case, the U.S. Probation Office, the

2 experts in this area, who the Court relies on day in and day

3 out in sentencing matters, determined that general

4 deterrence would be achieved by a non-custodial sentence.

5 We ask that the Court adopt that recommendation and impose a

6 within-Guidelines sentence of probation.

7    As a condition of probation, we propose Kevin

8 perform community service. In our submission, we offered

9 two potential organizations where he could do that. Based

10 on Kevin's skill sets, we believe he'll be able to add

11 tremendous value at either one. And both organizations

12 agree, and are excited to have him. That said, if neither

13 organization is acceptable to the Court, we're prepared to

14 sit down with the probation office or anyone else to find an

15 acceptable alternative.

16    A sentence of probation with community service

17 would serve to punish Kevin as well as benefit the public.

18 It would take into account Kevin's life of good deeds and

19 all of his positive contributions, as well as the

20 extraordinary circumstances of this case.

21    As discussed in our submission, a non-custodial

22 sentence is also appropriate given the risks posed by Covid.

23 Because of the pandemic, to the extent the Court is

24 considering a custodial sentence, we'd urge Your Honor to

25 consider a home detention which, as we discuss in our

submission, is consistent with DOJ and BOP guidance.

That said, probation is the appropriate punishment here.  It's a fair punishment, a just punishment, a punishment that is sufficient but not greater than necessary to achieve the goals of sentencing.

Thank you Your Honor.

THE COURT:  All right.  Mr.  Shur, thank you very much.

Mr.  Clinesmith, would you like to say anything before I impose sentence?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Go right ahead.

THE DEFENDANT:  I have a duty to take responsibility for my actions and mistakes.  I believe this is especially true because I was a civil servant.  Civil servants are the backbone of our government and preserve and protect the very principles our nation was founded on.  The responsibility in holding such a position and my personal values--

(There was a pause in the proceedings.)

THE COURT:  I can hear you fine, Mr.  Clinesmith.

THE DEFENDANT:  I'm sorry, Your Honor.

THE COURT:  Take your time.

THE DEFENDANT:  You can hear me, sir?

THE COURT:  Yes, I can hear you fine.  In other

```
 1   words, if the break is because of technical reasons--

 2             THE DEFENDANT:  I'm sorry, Your Honor.  We had a

 3   moment where it signed out of the prior Zoom.

 4             THE COURT:  Okay.

 5             THE DEFENDANT:  I'm sorry.

 6             THE COURT:  I haven't lost connection at all.  I

 7   have seen you the whole time.

 8             THE DEFENDANT:  If I may, Your Honor, may I start

 9   over?

10             THE COURT:  Please.

11             THE DEFENDANT:  I have a duty to take

12   responsibility for my actions and mistakes.  I believe this

13   is especially true because I was a civil servant.  Civil

14   servants are the backbone of our government and preserve and

15   protect the very principles our nation was founded on.  The

16   responsibility in holding such a position and my personal

17   values requires me to hold myself to the highest standard.

18   It is in this spirit that I stand before you now, Your

19   Honor.

20             I am fully aware of the significance of my action

21   and a critical error in judgment I made in altering the

22   e-mail.  I take full responsibility for it.  I let the high

23   standard I believe in slip to an unimaginable degree by

24   taking an unnecessary shortcut.

25             I let the FBI, the Department of Justice, my
```

colleagues, the public and my family down.  I also let
myself down.  I will live with the consequences of my
actions, as well as the deeply held feelings of regret,
shame for the rest of my life.

Beyond my family, my career as a civil servant
meant more to me than anything else.  From a young age, I
was fortunate enough to realize that public service was a
way for me engage in meaningful and interesting work.  But
more importantly, that it was a way for me to give back to
the country that I love.  And I did everything I could to
reach what I considered to be my dream career.

During my 11 years of federal service, I proudly
worked alongside highly intelligent, enthusiastic colleagues
who shared love of public services and love of country.  To
this day, they remain a constant source of inspiration for
me.  Never was this more true than during my time at the
FBI.  Working alongside dedicated men and women of the FBI
to protect the national security of our nation was the
greatest privilege and honor I believe I will ever have.

To me, working at the FBI is not just a job but a
calling and a purpose.  My coworkers were not just
colleagues, but my family.  In my lapse in judgment, I have
permanently lost my career in federal service and my FBI
family.  But even worse, I harmed the very institutions that
I cherish and admire.

1          I am truly ashamed about the harms that I have

2    brought to the FBI and the Department of Justice through my

3    action.  I am sincerely heartbroken for having provided

4    reason for others to question the work of the distinguished

5    professional and hard-working investigators and prosecutors

6    I supported.

7          I witnessed nothing but the highest of integrity

8    in their work, despite having worked during a stressful and

9    turbulent time for the FBI and the DOJ.  My regret does not

10   end there.  Though I am not before the Foreign Intelligence

11   Surveillance Court today, I am before its presiding judge.

12   This is not lost on me as I reaffirm my responsibility for

13   the conduct that brings me before Your Honor today.

14         I am deeply remorseful for any effects my action

15   may have had on the FISC or anyone involved in the process.

16   As an attorney, I know that the government holds strict

17   adherence to the very highest of standards in all aspects of

18   ex parte proceedings, most especially those concerning our

19   national security.  I failed to live up to those standards

20   by altering the e-mail to my colleague.

21         While I thought, albeit incorrectly, that I was

22   accurately representing the truth of Dr.  Page's history

23   with the Other Government Agency, I recognize that altering

24   the e-mail was unacceptable.  For that, I am sincerely

25   sorry.

1          Beyond these immediate circumstances, I am also

2    truly and duplicate deeply ashamed to have necessitated

3    additional reviews that others must now take on concerning

4    my prior work on other FISC proceedings.  I apologize to

5    everyone for that additional burden.

6          My only solace is that I hope these reviews will

7    confirm what I have tried to present to this Court, that

8    while altering the e-mail was an unacceptable mistake that I

9    made, it is truly an aberration of my conduct and my work

10   ethic.  I never intended to mislead my colleagues about Dr.

11   Page's status.  And I most certainly never intended to

12   mislead the FISC, an institution I immensely respect for the

13   service it provides to our nation.  Regardless of my intent,

14   I fully recognize that my action in inexcusable and that I

15   failed my responsibilities as an FBI attorney and as a civil

16   servants.

17         Altering the e-mail has forever changed the course

18   of my life.  With my action, I failed to satisfy the high

19   standard that I have as a civil servant as as an attorney.

20   As a consequence, I've lost the means to provide for my

21   growing family.  I have lost the career I relentlessly

22   sought most of my life.  I have lost my sense of duty and

23   purpose.  And I have lost the ability to give back to our

24   nation in the meaningful way that I've always wanted to.

25         I will continue my self reflection on this

1  incident beyond today.  The shame and regret I feel as a

2  result of my conduct will stay with me forever.  But I

3  pledge to Your Honor that I will never allow myself to show

4  such poor judgment again.  I pledge that I will find another

5  way to continue to serve others albeit in a much different

6  way than I have in the past.

7        Along the way, I will encourage others to learn

8  from my error and not to repeat it.  My path forward is

9  uncertain now.  But I am determined to continue to grow as a

10  person, to stay on the upstanding and compassionate path I

11  traveled previously and to return to doing good for our

12  nation.

13        For failing to reach these highest of standards, I

14  apologize to my former colleagues and also to the FBI and to

15  the Department of Justice, the FISC and to this Court.  I

16  also want to apologize to those in the civil service and to

17  public for letting you down.  Please do not let my error

18  reflect on those who continue to serve our country.

19        Finally, I apologize to my wife, Stephanie, most

20  especially for the stress I added during her pregnancy in

21  these already uncertain times.  I am so grateful for the

22  love and support she has provided me.

23        Thank you for allowing me to speak, Your Honor.

24        THE COURT:  Thank you very much, Mr. Clinesmith.

25        All right.  It's time now for me to pronounce my

sentence and to make clear what is at stake here.  The

sentencing guideline range, everyone agrees, is zero to six

months.  In this case, the government asks for several

months, the defense asks for probation.

Now that I've calculated the guideline range, I

then considered the 3553(a) factors in crafting a sentence.

And I'm very familiar with them and have no need to repeat

them here.

Also, I note that I very rarely give more than the

government asks for and this case is no exception, which

leads again to the question of what is the appropriate

sentence here, probation or, as the government seeks,

several months in jail.

I think we've heard particularly from Mr.

Scarpelli, and I believe he is exactly correct, but we've

also heard this from Dr.  Page, Mr.  Clinesmith, Mr.  Shur.

I think it is critical to repeat that Courts all over the

country rely on representations from the government and

expect them to be correct, whether those are from

prosecutors in court or agents seeking search or arrest

warrants.

The reliance is greatest, of course, where the

government is appearing ex parte, meaning that there is no

defense lawyer to check the government's representation.

Those ex parte representations and appearances are always

1    the case in a Foreign Intelligence Surveillance Court

2    because the surveillance target, of course, is unaware of

3    the FISA application, and thus cannot appear to contest the

4    government's assertions.

5         The Court's expectations of the government are

6    high there, both because the government is acting without

7    contradiction or check, and because the stakes are so high.

8    In other words, the result of a successful application means

9    the search or surveillance of the United States person or

10   non-United States person on American soil.

11        Indeed, Dr. Page has just explained how he has

12   been harmed by that surveillance. That is why we FISC

13   judges require the highest degree of honesty and

14   transparency in the government's dealings.

15        I have been fortunate enough to be a member of the

16   FISC for almost seven years. So I know firsthand how

17   important this is. And indeed, Mr. Scarpelli spoke

18   correctly about how the FISC's reputation has suffered from

19   this incident, and from the public's lack of trust at times

20   when what it has done in necessitating a number of reforms

21   through the FBI and a number of other procedures to enhance

22   transparency.

23        I have been part of that and observed it firsthand

24   over the last year or so. And indeed I mentioned this early

25   on in the case last summer when I asked if either side

1    wished me to recuse myself given my personal involvement in

2    the FISC and neither did.

3          So, the government is correct here where it argues

4    in its sentencing memo that defendant's conduct undermined

5    the integrity of the FISA process and struck at the very

6    core of what the FISC fundamentally relies on in reviewing

7    FISA applications, namely the government's duty and candor.

8          In fact, as one of my FISC colleagues noted in a

9    published opinion, the FISC serves as a check on executive

10   branch decisions to conduct surveillance in order to protect

11   the Fourth Amendment rights of U.S.  Persons.  But it can

12   serve those purposes effectively only if the applicant

13   agency fully and accurately provides information in its

14   possession that is material to whether probable cause

15   exists.

16         Indeed, in my own FISC opinion last March, I noted

17   that only when the government fully and accurately provides

18   all information in its possession that is material to

19   whether probable exists can the Court's review effectively

20   serve as a check on executive branch decisions to conduct

21   surveillance.

22         Without facts that are both accurate and complete,

23   the Court is necessarily hamstrung in its ability to balance

24   the interests of national security with those of personal

25   privacy.  And that's the lense, therefore, through which I

1   must view the defendant's actions as I consider whether a

2   sentence of confinement is appropriate here.  And as we've

3   all agreed, that action is the altering of one e-mail to say

4   that Dr.  Page was not a source of the Other Government

5   Agency.

6        On the other side of the ledger, the defendant

7   presents strong considerations why probation, as opposed to

8   several months in jail, is warranted.  First, he obtained no

9   real personal benefit from his actions and he had no active

10  intent to harm.

11       Although the government has contested this, my

12  view of the evidence is that Mr.  Clinesmith likely believed

13  that what he said about Dr.  Page was true, namely that he

14  was a subsource but not a source of the Other Government

15  Agency.  By altering the e-mail, he was saving himself some

16  work and taking an inappropriate shortcut.  But I do not

17  believe that he was attempting to achieve an end he knew was

18  wrong.

19       Of equal importance, the exhaustive OIG report,

20  also called the Horowitz Report after its principal author,

21  Inspector General Michael Horowitz, determined after a

22  detailed investigation that Mr.  Clinesmith had not acted

23  with any political bias or any desire to harm the Trump

24  campaign, or anyone affiliated with it, in forwarding the

25  e-mail.  I see no reason to disagree with that conclusion.

1          Second, although I have said, and the government

2    has made very clear correctly, that the FISC expects the

3    highest duty of candor and I also recognize the harm Dr.

4    Page explains, it is not at all clear to me that the FISA

5    warrant, meaning the fourth application here, would not have

6    been signed but for this error.

7          In other words, as the OIG report makes clear and

8    Mr.  Shur has emphasized, there were other significant

9    errors and omissions beyond Mr.  Clinesmith's on the face of

10   the fourth application.  As a result, even if Mr.

11   Clinesmith had been accurate about Dr.  Page's relationship

12   with the Other Government Agency, the warrant may well have

13   been signed and the surveillance authorized.

14         Third, this conduct is the only stain on the

15   defendant's character that I've been able to discern.  I'm

16   not sure it is a record in terms of number of letters I've

17   received in his support.  But if it's not, it's pretty close

18   because I received over 50 letters and they were not typical

19   platitudes or bromides about the defendant's character, but

20   they were rather detailed recitations of his acts and his

21   history, both in the office and out of the office.  They

22   speak of his kindness, his dedication to public service and

23   his integrity.

24         The defense has also made clear that Mr.

25   Clinesmith is not coming from a life of privilege, but

1  rather overcame difficult childhood circumstances, stepped

2  out at an early age to care emotionally and financially for

3  his family and to independently support himself, putting

4  himself through college as the first member of his family

5  with a college degree.  I consider that, therefore, I

6  consider his acts in the context of the rest of his life.

7         Finally, I cannot ignore what Mr. Clinesmith has

8  already suffered.  Indeed, Dr. Page, to his own credit, has

9  spoken today of mercy and has not been asking for

10  imprisonment.

11      Mr. Clinesmith has lost his job.  Government

12  service is what has given his life much of its meaning.

13  Indeed, his remorse and his sentencing allocution today

14  speaks well of how much acting as a public servant has meant

15  to him in his life.

16         He was also earning $150,000 a year.  And who

17  knows where his earnings go now.  He may be disbarred or

18  suspended from the practice of law.  He may never be able to

19  to work in the national security field again.  These are

20  substantial penalties.

21         What is more, he went from being an obscure career

22  government lawyer to standing in the eye of a media

23  hurricane.  He has been threatened, vilified and abused on a

24  nationwide scale.  And unlike say other elected officials or

25  political appointees, he is not someone who ever sought the

1  limelight or invited controversy other than by his criminal

2  action here.

3        So I therefore, no doubt that the mental effect,

4  the mental health effects of all of this have been

5  substantial.  I believe therefore, that when Mr.  Scarpelli

6  speaks of general deterrence, I absolutely agree with him

7  that that is a component of sentencing.  But anybody who has

8  watched what Mr.  Clinesmith has suffered is not someone who

9  would readily act in that fashion.  I think the general

10  deterrence is significant.

11        Weighing all of these factors together, both in

12  terms of damage that he caused and what he has suffered and

13  the positives in his own life, I believe that a probationary

14  sentence is appropriate here, and will, therefore, impose

15  it.

16        I will also require 400 hours of community service

17  because I believe that, Mr.  Clinesmith, you, as your memo

18  has stated and as you have stated, you have much to impart

19  to people, talk to them about the value of public service

20  and the risks of those who fail to fulfill its highest aims.

21        Therefore, I will now impose the sentence.  It is

22  the judgment of the Court that you, Kevin Clinesmith, are

23  hereby sentenced to a term of 12 months of probation on

24  Count I.  In addition, you are ordered to pay a special

25  assessment of $100 in accordance with 18 USC Section 3013.

1   You shall follow the general conditions of probation.  I

2   will not order any fine because I determine you do not have

3   the ability to pay that.  Special conditions that you are

4   required to fulfill will be to complete 400 hours of

5   community service within your year of probation.

6          Now, Mr. Clinesmith, pursuant to 18 USC 3742, you

7   do have the right to appeal the sentence imposed by the

8   Court.  If you choose to appeal, you must file any appeal

9   within 14 days after the Court enters judgment.  In

10  addition, you have the right to challenge the conviction

11  entered or sentence imposed if new and currently unavailable

12  information becomes available or if you claim you received

13  ineffective assistance of counsel in connection with the

14  plea or sentencing.

15         Do you understand all of that?

16         THE DEFENDANT:  I do, Your Honor.

17         THE COURT:  Does either counsel have any

18  objections or other matters to raise that have not already

19  been noted?

20         Mr. Scarpelli?

21         MR. SCARPELLI:  No, Your Honor.

22         THE COURT:  Thank you.

23         Mr. Shur?

24         MR. SHUR:  Your Honor, one small point.  To the

25  extent that mandatory drug testing is part of the --

1          THE COURT:  There will be no drug testing

2     required.

3          MR. SHUR:  Thank you, Judge.

4          THE COURT:  Again, thank you, everybody.

5          Dr.  Page, thank you.

6          Ms.  Lustig?

7          THE PROBATION OFFICER:  Just to interject, the 400

8     hours of community services may be difficult for him to

9     complete within a one year period.  We are, our community

10    services sites are limited at this point due to the

11    pandemic.  And hopefully at some point during the year,

12    we'll by back up and running full time.  But he would, even

13    if he starts now, he would have to complete almost 35 hours

14    of community service a month.

15         THE COURT:  Right.  So again, Mr.  Shur has

16    offered several, a couple of options of places where he

17    could perform this.  I approved both of those.  Again, if he

18    can't perform it -- I expect him to perform it within the

19    year.  If there is a problem at the end of the probationary

20    term, I'll hear people and we may extend that as necessary.

21         THE PROBATION OFFICER:  Okay.  Thank you, Your

22    Honor.

23         THE COURT:  Again.  Thank you, everyone for your

24    contribution.

25         Dr.  Page, thank you for being here.

1          Ms. Gordon, thank you for assisting.  I

2    appreciate that help.

3          MS. GORDON:  You're welcome, Your Honor.

4          THE COURT:  Mr. Scarpelli, Mr. Shur, Ms.

5    Church, thank you for your work, your timely and thorough

6    and persuasive submissions.  I appreciate all of that as

7    well.  All counsel have fulfilled their obligations to a

8    very high degree here.  Certainly made the Court's job

9    easier.  So I thank you all.

10          Mr. Clinesmith, best of luck to you.  We are now

11    in recess.

12          (Whereupon, at 12:30 p.m., the hearing concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

        I, Lisa Walker Griffith, certify that the foregoing is a correct transcript from the record of the remotely reported proceedings in the above-entitled matter.

        Please Note: This hearing was held in compliance with the COVID-19 pandemic and the standing orders of this court, and is therefore subject to the technological limitations of court reporting remotely, including static, signal interference and other restrictions.

_____   2-2-2021
Lisa Walker Griffith, RPR            Date