# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

MICHAEL T. FLYNN,

    Defendant.

Case No. 17-cr-232 (EGS)

## BRIEF FOR COURT-APPOINTED *AMICUS CURIAE*

## TABLE OF CONTENTS

IDENTITY AND INTERESTS OF AMICUS CURIAE…………………………………….…1

PRELIMINARY STATEMENT…………………………………………………………….…1

BACKGROUND……………………………………………………………………………….3

ARGUMENT……………………………………………………………………………….…..6

I. THE COURT HAS AUTHORITY TO DENY THE GOVERNMENT'S MOTION FOR LEAVE TO DISMISS…………………………………………………………………...36

II. THE COURT SHOULD DENY THE GOVERNMENT'S MOTION FOR LEAVE TO DISMISS………………………………………………………………………………49

III. THE COURT SHOULD CONSIDER THE DEFENDANT'S PERJURY IN SENTENCING ON THE FALSE STATEMENTS OFFENSE, RATHER THAN ISSUING AN ORDER TO SHOW CAUSE………………………………………………………………………61

CONCLUSION…………………………………………………………………………..71

# TABLE OF AUTHORITIES

## CASES

*Batson v. Kentucky*, 476 U.S. 79 (1986) ............................................................34

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................................................23

*Brady v. United States*, 397 U.S. 742 (1970) ....................................................50

*Brogan v. United States*, 522 U.S. 398 (1998) ..................................................54

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) ................................30

*Clark v. United States*, 289 U.S. 1 (1933) ........................................................66

*Collins v. United States*, 269 F.2d 745 (9th Cir. 1959) ....................................66

*Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019) ...............................34

*Ex Parte Hudgings*, 249 U.S. 378 (1919) ...................................................62, 65

*Foster v. Chatman*, 136 S. Ct. 1737 (2016) ......................................................34

*Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418 (1911) ..........................68

*Greenlaw v. United States*, 554 U.S. 237 (2008) ...............................................1

*Holguin-Hernandez v. United States*, 140 S. Ct. 762 (2020) ............................1

*In re Aiken Cty.*, 725 F.3d 255 (D.C. Cir. 2013) ..............................................31

*In re App. of FBI for an Order Requiring the Prod. of Tangible Things*, No. 13 Br. 158,
   2013 WL 12335411 (FISA Ct. Dec. 18, 2013) .............................................1

*In re Brown*, 454 F.2d 999 (D.C. Cir. 1971) ....................................................65

*In re McConnell*, 370 U.S. 230 (1962) ........................................................60, 65

*In re Michael*, 326 U.S. 224 (1945) ............................................................62, 65

*In re Richards*, 213 F.3d 773 (3d Cir. 2000) ...................................................33

*In re Sealed Case*, 162 F.3d 670 (D.C. Cir. 1998) ...........................................62

*In re Sealed Case*, 627 F.3d 1235 (D.C. Cir. 2010) .........................................69

*In re Slovenec*, 799 F. Supp. 1441 (W.D.N.Y. 1992) .......................................61

*In re Special Proceedings*, 373 F.3d 37 (1st Cir. 2004) ........................................61

*In re United States*, 345 F.3d 450 (7th Cir. 2003) ....................................31, 36

*Jin v. Ministry of State Sec.*, 557 F. Supp. 2d 131 (D.D.C. 2008) ....................1

*Kercheval v. United States*, 274 U.S. 220 (1927) .....................................67

*Laughlin v. United States*, 151 F.2d 281 (D.C. Cir. 1945) ...........................65

*Maryland v. King*, 569 U.S. 435 (2013) ..............................................2

*McComb v. Jacksonville Paper Co.*, 336 U.S. 187 (1949) .............................69

*Mesarosh v. United States*, 352 U.S. 1 (1956) ......................................30

*Michaelson v. United States ex rel. Chicago, St. P., M., & O.R. Co.*, 266 U.S. 42 (1924) ...........68

*Mistretta v. United States*, 488 U.S. 361 (1989) ...................................30

*Newman v. United States*, 382 F.2d 479 (D.C. Cir. 1967) ............................30

*Offutt v. United States*, 348 U.S. 11 (1954) .......................................30

*Okada v. Whitehead*, No. 8:15-cv-01449-JLS-KES, 2017 WL 3442798 (C.D. Cal. July 28, 2017) ...........66

*Pavelic & LeFlore v. Marvel Entm't Grp.*, 493 U.S. 120 (1989) .....................26

*Rinaldi v. United States*, 434 U.S. 22 (1977) ..................................26, 31

*Seidner v. United States*, 260 F.2d 732 (D.C. Cir. 1958) ............................1

*United States v. Adam*, 296 F.3d 327 (5th Cir. 2002) ...............................71

*United States v. Alvarado*, 615 F.3d 916 (8th Cir. 2010) ...........................71

*United States v. Alvarado-Velasquez*, 322 F. Supp. 3d 857, 860 (M.D. Tenn. 2018) ...............35

*United States v. Ammidown*, 497 F.2d 615 (D.C. Cir. 1973) ......................*passim*

*United States v. Appel*, 211 F. 495 (S.D.N.Y. 1913) ................................66

*United States v. Armstrong*, 517 U.S. 456 (1996) ..................................31

*United States v. Arpaio*, 887 F.3d 979 (9th Cir. 2018) .............................61

*United States v. Batchelder*, 442 U.S. 114 (1979) .................................30

*United States v. Becker*, 221 F. Supp. 950 (W.D. Mo. 1963) ........................33

*United States v. Browne*, 318 F.3d 261 (1st Cir. 2003) ......................................................69

*United States v. Carrigan*, 778 F.2d 1454 (10th Cir. 1985) ...............................................36

*United States v. Carroll*, 412 F.3d 787 (7th Cir. 2005) .......................................................71

*United States v. Church*, No. 95 Crim. 173, Dkt. 49 (D.D.C. Dec. 19, 1995)......................1

*United States v. Clarke*, No. 06 Crim. 102, Dkt. 410 (D.D.C. Mar. 20, 2009)......................1

\**United States v. Cowan*, 524 F.2d 504 (5th Cir. 1975)..................................27,29, 31

*United States v. Dale*, 782 F. Supp. 615 (D.D.C. 1991) ......................................................45

*United States v. DeLeon*, 603 F.3d 397 (7th Cir. 2010)........................................................71

*United States v. Derr*, 726 F.2d 617 (10th Cir. 1984) ........................................................33

*United States v. Doody*, No. 01 Crim. 1059, 2002 WL 562644, at *4 (S.D.N.Y. Apr. 16, 2002) .....................................................................................................................................35

*United States v. Fastow*, 300 F. Supp. 2d 479 (S.D. Tex. 2004) .........................................33

*United States v. Florian*, 765 F. Supp. 2d 32 (D.D.C. 2011).............................................35

\**United States v. Fokker Servs. B.V.*, 818 F.3d 733 (D.C. Cir. 2016) ...................*passim*

*United States v. Gaudin*, 515 U.S. 506 (1995).....................................................................44

*United States v. Gonzalez*, 970 F.2d 1095 (2d Cir. 1992) ...................................................51

*United States v. Goodson*, 204 F.3d 508 (4th Cir. 2000).....................................................36

*United States v. Greater Blouse, Skirt & Neckwear Contractors Ass'n*, 228 F. Supp. 483 (S.D.N.Y. 1964) ...................................................................................................................34

*United States v. Hamm*, 659 F.2d 624 (5th Cir. 1981).....................................................29, 36

\**United States v. Hansen*, 772 F.2d 940 (1985) .........................................................*passim*

*United States v. Harrington*, 947 F.2d 956 (D.C. Cir. 1991).................................................1

*United States v. Heaton*, 458 F. Supp. 2d 1271 (D. Utah 2006).........................................33

*United States v. HSBC Bank USA, N.A.*, 863 F.3d 125 (2d Cir. 2017).................................37

*United States v. Jackson-White*, No. 13 Crim. 91 (D.D.C. July 21, 2013) .............................1

*United States v. Jacobo-Zavala*, 241 F.3d 1009 (8th Cir. 2001) .........................................36

*United States v. James*, 861 F. Supp. 151 (D.D.C. 1994) ................................................35

*United States v. Johnson*, 20 F. Supp. 3d 144, 148 (D.D.C. 2013) ................................36

*United States v. Kim*, 808 F. Supp. 2d 44 (D.D.C. 2011) ................................................47

*United States v. Lomack*, 219 F. App'x 574 (7th Cir. 2007) ..........................................70

*United States v. Lupton*, 620 F.3d 790 (7th Cir. 2010) ..................................................47

*United States v. Martinez*, 169 F.3d 1049 (7th Cir. 1999) .............................................71

*United States v. McBane*, 433 F.3d 344 (3d Cir. 2005) ..................................................47

*United States v. McGainey*, 37 F.3d 682 (D.C. Cir. 1994) ............................................62

*\*United States v. Moore*, 612 F.3d 698 (D.C. Cir. 2010) ..............................*41, 43, 47*

*United States v. Moore*, 209 F. Supp. 2d 180 (D.D.C. 2002) ..........................................1

*United States v. N.V. Nederlandsche Combinatie Voor Chemische Industrie*, 75 F.R.D. 473 (S.D.N.Y. 1977) .......................................................................................................31

*United States v. Nixon*, 318 F. Supp. 2d 525 (E.D. Mich. 2004) ..............................34, 37

*United States v. Oberhellmann*, 946 F.2d 50 (7th Cir. 1991) ........................................66

*United States v. Ortlieb*, 274 F.3d 871 (5th Cir. 2001) ............................................66, 70

*United States v. Patel*, No. 18 Crim. 5264, 2018 WL 4144449 (W.D. Wash. Aug. 30, 2018) ...............................................................................................................................36

*United States v. Peoples*, 698 F.3d 185 (4th Cir. 2012) ................................................66

*United States v. Pimentel*, 932 F.2d 1029 (2d Cir. 1991) ..............................................36

*United States v. Pitts*, No. 19 Crim. 49 (D.D.C. July 30, 2019) ......................................1

*United States v. Robertson*, 507 F.2d 1148 (D.C. Cir. 1974) ..........................................1

*United States v. Rojo-Alvarado*, No. 19 Crim. 257, 2019 WL 4482712, at *3 (W.D. Okla. Sept. 18, 2019) ...............................................................................................................35

*United States v. Rosenberg*, 108 F. Supp. 2d 191 (S.D.N.Y. 2000) ..............................34

*\*United States v. Safavian*, 649 F.3d 688, 691-92 (D.C. Cir. 2011) ...................... *passim*

*United States v. Salinas*, 693 F.2d 348 (5th Cir. 1982) ..................................................35

*United States v. Sarihifard*, 155 F.3d 301 (4th Cir. 1998)............................................................46

*United States v. Shanahan*, 168 F. Supp. 225 (S.D. Ind. 1958).................................................33

*United States v. Smith*, 55 F.3d 157 (4th Cir. 1995) ...................................................................36

*United States v. Stadd*, 636 F.3d 630 (D.C. Cir. 2011)...............................................................49

*United States v. Stanchich*, 550 F.2d 1294 (2d Cir. 1977).........................................................39

*United States v. Stewart*, 198 F.3d 984 (7th Cir. 1999)........................................................67, 70

*United States v. Strayer*, 846 F.2d 1262 (10th Cir. 1988) .........................................................36

*United States v. Suggs*, No. 07 Crim. 152 (D.D.C. Nov. 6, 2015)................................................1

*United States v. Tamini*, No. 2:17 Crim. 381, 2018 WL 6978094 (D. Nev. Nov. 29, 2018) ........35

*United States v. Toyota Motor Corp.*, 278 F. Supp. 3d 811 (S.D.N.Y. 2017) .............................35

*United States v. Varela-Rivera*, 551 F. App'x 583 (1st Cir. 2014)..............................................71

*United States v. Vargas-Gutierrez*, 464 F. App'x 492 (6th Cir. 2012)........................................71

*United States v. Verrusio*, 762 F.3d 1 (D.C. Cir. 2014)..............................................................40

*United States v. Wallace*, 848 F.2d 1464 (9th Cir. 1988) ...........................................................36

*United States v. Watt*, 911 F. Supp. 538 (D.D.C. 1995) .............................................................69

*United States v. Wilson*, 421 U.S. 309 (1975) ...........................................................................61

***United States v. Woody*, 2 F.2d 262 (D. Mont. 1924)...................................................27, 36, 37

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) .............................34

*Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015) ................................................................30

*Young v. United States*, 315 U.S. 257 (1942) ............................................................................28

***Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987)...................................60

*Young v. United States*, 212 F.2d 236 (D.C. Cir. 1954)..............................................................62

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ...............................................29

STATUTES

18 U.S.C. § 401 ................................................................................................ *passim*

18 U.S.C. § 1001 ................................................................................. *passim*

18 U.S.C. § 1503 .................................................................................72

18 U.S.C. § 1623 .................................................................................66

Fed. R. Civ. P. 15 ...............................................................................28

Fed. R. Crim. P. 11 ............................................................................53

Fed. R. Crim. P. 42 ............................................................................64

Fed. R. Crim. P. 48 ............................................................................28

**OTHER AUTHORITIES**

*Black's Law Dictionary* (11th ed. 2019) ..............................................26

Br. for Michael T. Flynn, *In re Flynn*, No. 20-5143 (D.C. Cir. May 19, 2020) ..........................26

Br. for the United States, *In re Flynn*, No. 20-5143 (D.C. Cir. June 1, 2020) ................27, 54, 69

Br. for the United States, *United States v. Brettschneider*, No. 19-2423 (2d Cir. May 4, 2020) ........................................................................47

Br. for the United Sttes, *United States v. Cooks*, 589 F.3d 173 (5th Cir. 2009) ..........................43

Br. for the United States, *United States v. McBane*, 433 F.3d 344 (3d Cir. 2005) .....................47

Consolidated Br. for the United States, *United States v. Allen*, No. 19-3034 (10th Cir. May 8, 2020) ........................................................................47

D.D.C. Local Civ. R. 1.1(a) ...............................................................1

D.D.C. Local Civ. R. 7(o) ..................................................................1

Exec. Order No. 13,757, 3 C.F.R. § 13757 (2016) .................................6

Hon. Leon R. Yankwich, *Increasing Judicial Discretion in Criminal Proceedings*, 1 F.R.D. 746 (1941) ........................................................................28

OFFICE OF THE DIR. OF NAT'L INTELLIGENCE, ASSESSING RUSSIAN ACTIVITIES AND INTENTIONS IN RECENT US ELECTIONS (2017), https://perma.cc/8BVK-6E68 .................5, 40

*Statement for the Record, S. Select Comm. on Intelligence*, 115th Cong. 5 (2017) .....................56

Thomas Ward Frampton, *Why Do Rule 48(a) Dismissals Require "Leave of Court"*, 73 STAN. L. REV. ONLINE (forthcoming 2020), https://perma.cc/AJF6-XNS2. ...........2, 28, 32

U.S. Dep't of Justice, Crim. Resource Manual (2020) ............................................................69

U.S. Sentencing Comm'n, Guidelines Manual (2018) ............................................................71

Wright & Miller, 3B *Fed. Prac. & Proc. Crim.* (4th ed. 2020) ....................................................32

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

On May 13, 2020, this Court entered an order appointing me as *amicus curiae* "to present arguments in opposition to the government's Motion to Dismiss" and to "address whether the Court should issue an Order to Show Cause why Mr. Flynn should not be held in criminal contempt for perjury pursuant to 18 U.S.C. § 401, Federal Rule of Criminal Procedure 42, the Court's inherent authority, and any other applicable statutes, rules or controlling law." ECF No. 205 (citing *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 740 (D.C. Cir. 2016); *Jin v. Ministry of State Sec.*, 557 F. Supp. 2d 131, 136 (D.D.C. 2008)). This order was consistent with settled law and practice respecting the appointment of *amici* in criminal cases.[2]

## PRELIMINARY STATEMENT

The Government seeks leave of court to dismiss its false statements charge against Defendant Michael T. Flynn. *See* ECF No. 198. Federal Rule of Criminal Procedure 48(a)

---

[1] No party or party's counsel authored this brief in whole or in part or contributed funding that was intended for preparing or submitting it. No person other than the *amicus curiae* and his counsel contributed money to fund the preparation or submission of this brief.

[2] *E.g.*, *Holguin-Hernandez v. United States*, 140 S. Ct. 762, 765 (2020); *Greenlaw v. United States*, 554 U.S. 237, 243 (2008); *United States v. Harrington*, 947 F.2d 956, 960 & n.7 (D.C. Cir. 1991); *United States v. Robertson*, 507 F.2d 1148, 1158-59 (D.C. Cir. 1974); *Seidner v. United State*s, 260 F.2d 732, 734 (D.C. Cir. 1958); *United States v. Pitts*, No. 19 Crim. 49 (D.D.C. July 30, 2019) (Sullivan, J.); *United States v. Suggs*, No. 07 Crim. 152 (D.D.C. Nov. 6, 2015) (Huvelle, J.); *United States v. Jackson-White*, No. 13 Crim. 91 (D.D.C. July 21, 2013) (Berman Jackson, J.); *United States v. Clarke*, No. 06 Crim. 102, ECF No. 410 (D.D.C. Mar. 20, 2009) (Bates, J.); *United States v. Moore*, 209 F. Supp. 2d 180, 181 (D.D.C. 2002); *United States v. Church*, No. 95 Crim. 173, ECF No. 49 (D.D.C. Dec. 19, 1995) (Kessler, J.). This practice is also consistent with the local rules. The district court's civil rules "govern all proceedings in the United States District Court for the District of Columbia" and allow for the participation of *amici*. *See* D.D.C. Local Civ. R. 1.1(a), 7(o). Even apart from those rules, "federal district courts possess the inherent authority to appoint amici curiae[.]" *In re App. of FBI for an Order Requiring the Prod. of Tangible Things*, No. 13 Br. 158, 2013 WL 12335411, at *2 (FISA Ct. Dec. 18, 2013); *see also Jin*, 557 F. Supp. 2d at 136.

controls that request.  Under Rule 48(a), the Government's motion should be denied on two separate grounds.

*First*, "the requirement of judicial approval entitles the judge to obtain and evaluate the prosecutor's reasons."  *United States v. Ammidown*, 497 F.2d 615, 620 (D.C. Cir. 1973).  Here, the Government's statement of reasons for seeking dismissal is pretextual.  The Government claims there is insufficient evidence to prove materiality and falsity, but even giving it the benefit of every doubt—and recognizing its prerogative to assess the strength of its own case—this contention "taxes the credulity of the credulous."  *Maryland v. King*, 569 U.S. 435, 466 (2013) (Scalia, J., dissenting).  The Government's ostensible grounds for seeking dismissal are conclusively disproven by its own briefs filed earlier in this very proceeding.  They contradict and ignore this Court's prior orders, which constitute law of the case.  They are riddled with inexplicable and elementary errors of law and fact.  And they depart from positions that the Government has taken in other cases.  While Rule 48(a) does not require the Government to bare its innermost secrets, it does require a statement of its reasons for dismissal.  *See Ammidown*, 497 F.2d at 620 (explaining that this requirement "prevent[s] abuse of the uncontrolled power of dismissal previously enjoyed by prosecutors").  Leave of court should not be granted when the explanations the Government puts forth are not credible as the real reasons for its dismissal of a criminal charge.

*Second*, the Court should deny leave because there is clear evidence of a gross abuse of prosecutorial power.  Rule 48(a) was designed to "guard against dubious dismissals of criminal cases that would benefit powerful and well-connected defendants."[3]  In other words, the rule

---

[3] Thomas Ward Frampton, *Why Do Rule 48(a) Dismissals Require "Leave of Court"*, 73 STAN. L. REV. ONLINE (forthcoming 2020), https://perma.cc/AJF6-XNS2.

empowers courts to protect the integrity of their own proceedings from prosecutors who undertake corrupt, politically motivated dismissals. *See id.*; *see also Ammidown*, 497 F.2d at 620-622. That is what has happened here. The Government has engaged in highly irregular conduct to benefit a political ally of the President. The facts of this case overcome the presumption of regularity. The Court should therefore deny the Government's motion to dismiss, adjudicate any remaining motions, and then sentence the Defendant.

The Court has also asked me to address whether it should issue an order to show cause why Flynn should not be held in criminal contempt for perjury. Flynn has indeed committed perjury in these proceedings, for which he deserves punishment, and the Court has the authority to initiate a prosecution for that crime. I respectfully recommend, however, that the Court not exercise that authority. Rather, it should take Flynn's perjury into account in sentencing him on the offense to which he has already admitted guilt. This approach—rather than a separate prosecution for perjury or contempt—aligns with the Court's intent to treat this case, and this Defendant, in the same way it would any other.

## BACKGROUND

### A.    The FBI Investigates Russian Election Interference

In July 2016, the organization WikiLeaks made public a trove of e-mails taken from the Democratic National Committee ("DNC"). *See* Ex. 1, OFFICE OF THE INSPECTOR GEN., U.S. DEP'T OF JUSTICE, OVERSIGHT AND REVIEW DIV. 20-012, *REVIEW OF FOUR FISA APPLICATIONS AND OTHER ASPECTS OF THE FBI'S CROSSFIRE HURRICANE INVESTIGATION* (2019), at 3. U.S. intelligence officials had previously identified the Russian government as responsible for the hack and later assessed that "Russia was considering further intelligence operations to impact or disrupt" the upcoming elections. *Id.*

Four days after WikiLeaks released the hacked DNC e-mails, an official of a friendly foreign government spoke with a U.S. government counterpart to arrange an in-person meeting about an "'urgent matter.'" *Id.* at 5. The foreign official reported that, at a May 2016 meeting, an advisor to then-candidate Donald Trump's campaign divulged that Russia contacted the campaign to offer the anonymous release of information damaging to Trump's opponent. *See id.* at 5–6. The tip did not indicate who from the campaign received the Russian overture or how the campaign reacted to the offer. *See id.* at 6, 13. This information was promptly relayed to the FBI Headquarters and later to the Department of Justice. *See id.* at 6, 23–24. FBI senior leadership deemed the information "'serious'" and "'really disturbing,'" and concluded that it warranted an investigation. *Id.* at 7-8. "[A] foreign power allegedly colluding with a presidential candidate or his team members was a threat to our nation that the FBI was obligated to investigate under its counterintelligence mission." *Id.* at 8.

On July 31, 2016, the FBI opened a counterintelligence investigation, codenamed Crossfire Hurricane, "'to determine whether individual(s) associated with the Trump campaign are witting of and/or coordinating activities with the Government of Russia.'" *Id.* at 10. One objective of the investigation was to determine who, if anyone, from the campaign may have "been in a position to have received the alleged offer of assistance from Russia." *Id.* at 13. To that end, the Crossfire Hurricane team identified individuals affiliated with the Trump campaign who had ties or a history of travel to Russia. *See id.* The team opened separate counterintelligence investigations into these individuals as part of the overall Crossfire Hurricane investigation. *See id* at 13-14.

One individual who fit the criteria for investigation was Flynn. He had been advising Trump from the early stages of the 2016 campaign.[4] He had traveled to Russia as recently as December 2015 and had ties to state-affiliated Russian entities, including RT (formerly known as Russia Today) television network, the Kremlin's "principal international propaganda outlet."[5] *See* ECF No. 79-6 at 2; Ex. 1 at 14; ECF No. 198-3 at 2–3. A retired Lieutenant General and former Director of the Defense Intelligence Agency, Flynn also held a top-secret security clearance. *See* ECF No. 150 at 27–28; ECF No. 198-3 at 3. The investigation of Flynn, called Crossfire Razor, aimed to determine whether Flynn was "being directed and controlled by and/or coordinating activities with" Russia, which could constitute "a federal crime or threat to the national security." ECF No. 198-3 at 2–3.

In November 2016, Trump was elected President.[6] A transition team began assembling personnel for the incoming administration, and it was announced that Flynn would serve as National Security Advisor.[7]

---

[4] *See* Mark Hosenball & Steve Holland, *Trump Being Advised by Ex-U.S. Lieutenant General Who Favors Closer Russia Ties*, REUTERS (Feb. 26, 2016, 6:06 PM), https://perma.cc/KZK9-98MZ; Bryan Bender & Shane Goldmacher, *Trump's Favorite General*, POLITICO (July 8, 2016, 5:51 AM), https://perma.cc/E6SQ-TVFY; Benjamin Oreskes, *Fiery Flynn: Trump 'Will Lead from the Front*,*'* POLITICO (July 18, 2016, 11:21 PM), https://perma.cc/C3L5-MUGK.

[5] OFFICE OF THE DIR. OF NAT'L INTELLIGENCE – INTELLIGENCE COMMUNITY ASSESSMENT, *ASSESSING RUSSIAN ACTIVITIES AND INTENTIONS IN RECENT US ELECTIONS* (2017), https://perma.cc/8BVK-6E68 (hereinafter "ICA"), at 3. The U.S. intelligence community also noted that RT "has actively collaborated with WikiLeaks." *Id.*

[6] The Crossfire investigation continued into the transition period. *See* Ex. 1 at 23-25. The FBI had been "'trying to move very quietly'" in its investigative approach to avoid disrupting the investigative efforts or potentially impacting the presidential election. *Id.* at 32.

[7] Bryan Bender, *Trump Names Mike Flynn National Security Adviser*, POLITICO (Nov. 17, 2016, 9:40 PM, updated Nov. 18, 2016, 12:06 PM), https://perma.cc/W8LS-Q6L3.

### B.    Flynn Makes Backchannel Requests of Russia

Meanwhile, the broader U.S. intelligence community "assess[ed] with high confidence that Russian President Vladimir Putin ordered an influence campaign in 2016 aimed at the US presidential election."[8]  The outgoing administration determined that those activities warranted deterrent sanctions and other punitive diplomatic measures against Russia, and President Barack Obama announced those measures on December 29, 2016 (the "sanctions").  *See* ECF No. 4 at 2 ¶ 3(a).[9]  The sanctions were a major news story; the *Wall Street Journal* described them as "one of the biggest diplomatic confrontations between Washington and Moscow since the end of the Cold War."[10]  Russian officials' immediate response was to promise retaliation.[11]  The next day, however, President Putin announced that Russia would take no responsive action.[12]  *See* ECF No. 4 at 3 ¶ 3(f).  U.S. officials were surprised by this muted response.  *See* ECF No. 198-4 at 3 ("the minimal response from the Russians . . . was not 'what was expected'"); ECF No. 198-6 at 4.  So were journalists, who covered the lack of an anticipated "tit-for-tat" as an unexpected

---

[8] ICA, at 1.

[9] *See Statement by the President on Actions in Response to Russian Malicious Cyber Activity and Harassment*, THE WHITE HOUSE (Dec. 29, 2016), https://perma.cc/BV3Q-Z4E7.  *See also* Exec. Order No. 13,757, 3 C.F.R. § 13757 (2016); Felicia Schwartz, *U.S. Cyberattack Response: Sanctions, Expulsions, Promises of Covert Moves*, WALL ST. JOURNAL (Dec. 29, 2016, 3:37 PM), https://perma.cc/92S3-FZTR.

[10] Carol E. Lee & Paul Sonne, *U.S. Sanctions Russia Over Election Hacking; Moscow Threatens to Retaliate*, WALL ST. JOURNAL (last updated Dec. 29, 2016, 8:42 PM), https://perma.cc/84U4-Q9UM.

[11] *See* Nathan Hodge, *Kremlin Says Russia Plans Retaliation Following New U.S. Sanctions*, WALL ST. JOURNAL (last updated Dec. 29, 2016, 7:59 PM), https://perma.cc/BX43-HM3K.

[12] Statement of the President of the Russian Federation, Kremlin (Dec. 30, 2016), https://perma.cc/5DCR-M9KD.

twist.[13]  President-Elect Trump praised Putin for his "[g]reat move" in a tweet, stating that he "always knew [Putin] was very smart!"[14]

The U.S. intelligence community worked to understand the Russian response, *see* ECF No. 198-4 at 3; ECF No. 198-6 at 4, and they discovered the reason.  Flynn and Russian Ambassador Sergey Ivanovich Kislyak had engaged in various late-December telephone calls. *See* ECF No. 198-4 at 3; ECF No. 198-6 at 4.  They discussed, among other topics, general foreign policy issues and planning for communications between the future Trump administration and the Kremlin.  But with respect to two topics, the calls went further: as detailed below, Flynn asked Russia to take particular actions with respect to two different major international controversies.  Both requests were at odds with official U.S. policy at the time.  U.S. intelligence had access to these conversations, which quickly came to the attention of FBI leadership and the Crossfire Hurricane team.[15]  *See, e.g.*, ECF No. 198-4 at 3; ECF No. 198-5 at 2–3; ECF No. 198-6 at 4.

First, in a call with Kislyak on December 22, 2016, Flynn "informed the Russian Ambassador about the incoming administration's opposition to," and "requested that Russia vote against or delay," a proposed United Nations resolution concerning Israeli settlements, ECF No.

---

[13] *See, e.g.*, Laura Smith-Spark & Matthew Chance, *Putin: Russia Won't Expel US Diplomats*, CNN (last updated Dec. 30, 2016, 9:05 PM), https://perma.cc/3NMZ-UTMK ("extraordinary"; "truly unexpected") (quoting former CNN Moscow bureau chief and Russia analyst); Neil MacFarquhar, *Vladimir Putin Won't Expel U.S. Diplomats as Russian Foreign Minister Urged*, N.Y. TIMES (Dec. 30, 2016), https://perma.cc/8B7F-B3ZY ("remarkable"; "unexpected"; a "surprise announcement").

[14] Donald J. Trump (@realDonaldTrump), TWITTER (Dec. 30, 2016, 2:41 PM), https://twitter.com/realDonaldTrump/status/814919370711461890.

[15] Transcripts of some, but not all, of these calls were declassified and made public on May 29, 2020, 22 days after the filing of the Government's Motion to Dismiss.  *See* Ex. 2, Compilation of Transcripts of Calls between Michael Flynn and Sergey Kislyak.

4 at 4 ¶ 4(c)—a position contrary to that of the U.S. government at the time.[16]  The next day, reporting results of consideration "at the highest level in Russia," Kislyak told Flynn that Russia "will try to help" to "postpone the vote" but would have to favor the resolution if a vote occurred.  Ex. 2 at 3, 5 (12/23/16 Tr.).  Flynn told Kislyak that this response was "great" and "all we can ask for at this point in time."  *Id.* at 5 (12/23/16 Tr.).

Flynn and Kislyak also discussed the U.S. sanctions against Russia for its election interference.  On December 29, the day the sanctions were announced, Flynn "requested that Russia not escalate the situation and only respond to the U.S. Sanctions in a reciprocal manner."  ECF No. 4 at 3 ¶ 3(d).  Specifically, Flynn said to Kislyak:

> [M]ake sure that you convey this, okay? . . . [W]hat I would ask Russia to do is . . . if anything—because I know you have to have some sort of action—to, to only make it *reciprocal*.  Make it reciprocal. . . . [D]on't go any further than you have to.  Because I don't want us to get into something that has to escalate . . . you know, on a tit for tat.  You follow me, Ambassador?

Ex. 2 at 9 (12/29/16 Tr.) (emphasis in original).  Flynn reiterated this request in different terms over the course of that conversation.[17]  He told Kislyak not to "allow this administration to box us in," and that "what we can do is, when we come in, we can then have a better conversation

---

[16] On December 23, 2016, the United States abstained from voting on the United Nations resolution at stake.  *See* Press Release, UN Security Council, Israel's Settlements Have No Legal Validity, Constitute Flagrant Violation of International Law, Security Council Reaffirms: 14 Delegations in Favour of Resolution 2334 (2016) as United States Abstains (Dec. 23, 2016) (on file at https://perma.cc/ND2B-2UE4).  *See also* Jennifer Williams, *Obama Just Took a Parting Shot at Israel—and Trump—at the UN*, Vox (Dec. 23, 2016 5:37PM ET), https://perma.cc/V7HJ-TCBN.  The press described the decision to abstain as a "stunning" measure that broke with the country's decades-long position on the matter.  *Id.*

[17] *See* Ex. 2 at 10 (12/29/16 Tr. (". . . I really don't want us to get into a situation . . . where we do this and then you do something bigger, and then you know, everybody's got to go back and forth and everybody's got to be the tough guy here, you know?"), *id.* (". . . [W]e don't need that right now . . . we need cool heads to prevail . . ."), *id.* (". . . [I]f you have to do something, do something on a *reciprocal basis*, meaning you know, on a sort of an even basis.") (emphasis in original), *id.* (". . . [L]et's keep this at a level that . . . is even-keeled, okay?")).

about where, where we're gonna go . . . regarding our relationship." *Id.* at 9–10 (12/29/16 Tr.). Subsequent investigation indicated that Flynn's request for Russia to reciprocate, rather than escalate, was planned immediately beforehand over the course of multiple communications among Flynn and other transition team officials. *See* ECF No. 79-3 at 26-27.[18]   Kislyak acknowledged Flynn's request and said he would seek to "get the people in Moscow to understand it." Ex. 2 at 10 (12/29/16 Tr.).

Although Russian officials had initially promised to retaliate in response to the sanctions, on or about December 30, President Putin announced that Russia would not do so at that time.

---

[18] "During the rollout of the sanctions," Flynn kept "daily contact" with incoming Deputy National Security Advisor and transition team member K.T. McFarland, who was then in Mar-a-Lago with President-Elect Trump and other "senior" transition team members, including Steve Bannon and Reince Priebus.  ECF No. 79-3 at 26.  President-Elect Trump and his transition team "were concerned that these sanctions would harm the United States' relationship with Russia." *Id*.  Kislyak texted Flynn on the "evening of December 28, 2016" asking Flynn to "'kindly call me back,'" but "Flynn did not respond to the text message that evening." *Id*.  Someone from the Russian Embassy also called Flynn the next morning, but they did not speak.  *Id*.  Later that day, after receiving a "link to a New York Times article about the sanctions" from a transition team member and a call from McFarland, Flynn texted a transition team member "who was assisting McFarland" asking, "[t]ime for a call???" *Id*. at 26-27.  When the transition team member "responded that McFarland was on the phone with [another senior transition team official]," Flynn "responded, 'Tit for tat w Russia not good.  Russian AMBO reaching out to me today.'" *Id*. at 27.  Per Flynn's recollection, he "chose not to communicate with Kislyak about the sanctions until he had heard from the transition team at Mar-a-Lago." *Id*.  First, Flynn spoke for 20 minutes with a transition team member "who advised on foreign policy and national security matters." *Id*.  Then, Flynn and McFarland spoke for almost another 20 minutes "to discuss what, if anything, to communicate to Kislyak about the sanctions," as well as the sanctions' "potential impact on the incoming Trump Administration's foreign policy goals" and the Mar-a-Lago transition team members' desire that Russia not "escalate the situation." *Id*.  Both McFarland and Flynn "understood that Flynn would relay a message to Kislyak in the hopes of making sure the situation would not get out of hand." *Id*.  Prior to speaking with Flynn, McFarland had "exchang[ed] emails with multiple Transition Team members and advisors about the impact the sanctions would have on the incoming Administration," and "discussed the sanctions" with Bannon and possibly others, whom McFarland "believed she told . . . that Flynn was scheduled to talk to Kislyak later that night." *Id*. at 26-27.

*See* ECF No. 4 at 3 ¶ 3(f).[19]  The next day, Kislyak called Flynn "and informed him that Russia had chosen not to retaliate in response to [Flynn's] request." *Id*. at 3 ¶ 3(g).  The transcript of the December 31 conversation reads in relevant part as follows:

> KISLYAK: . . . I have a small message to pass to you from Moscow and uh, probably you have heard about the decision taken by Moscow about action and counter-action.
>
> FLYNN: [Y]eah, yeah well I appreciate it, you know, on our phone call the other day, you know, I, I appreciate the steps that uh your president has taken.  I think that it is [sic] was wise.
>
> KISLYAK: I, I just wanted to tell you that our conversation was also taken into account in Moscow and . . .
>
> FLYNN: Good[.]
>
> KISLYAK: Your proposal that we need to act with cold heads, uh, is exactly what is uh, invested in the decision.
>
> FLYNN: Good[.]

Ex. 2 at 13 (12/31/16 Tr.).

Intelligence and national security officials who learned of these conversations or otherwise had access to them regarded them as irregular and worrisome.  *See* ECF No. 198-4 at 5; Ex. 3, *Interview of: James Clapper Before the H. Permanent Select Comm. on Intelligence*, 115th Cong. 5 (2020) (statement of James Clapper, Dir., Nat'l Intelligence).  Members of an incoming administration customarily avoid engaging in unilateral diplomacy with foreign officials before taking office, and it would have been particularly unusual for an incoming official secretly to urge a hostile country to undermine current U.S. policy.  *See* Ex. 4, PARTNERSHIP FOR PUBLIC SERVICE, PRESIDENTIAL TRANSITION GUIDE (4th ed. 2020), at 7 (noting the "custom that there is only one president at a time, especially in contacts with foreign

---

[19] *See* n.11, *supra*.

leaders").  Russia was a geopolitical adversary that had just interfered with the American electoral process, yet Flynn was quietly making conciliatory overtures that undercut the just-announced measures intended to convey the seriousness with which the United States regarded that incursion.  Flynn himself recognized that his request to the Russians "could be perceived as getting in the way of the Obama Administration's foreign policy," and he therefore purposefully omitted reference to the request when he later documented the call in a text message to McFarland.  ECF No. 79-3 at 29.

FBI investigators considered how to respond to the new intelligence in the recordings, *see* ECF No. 198-8 at 2–3, including through discussions with experienced DOJ and intelligence officials, *see, e.g.*, ECF No. 198-4 at 3–4.  The primary focus of those discussions was resolving the counterintelligence concerns at the core of the FBI's Crossfire investigations.

### C.    Flynn Lies to White House Officials

Further developments increased the concerns arising from the Flynn-Kislyak calls.  On January 12, 2017, a *Washington Post* columnist reported that Flynn had "phoned" Kislyak "several times" the day the sanctions were announced.[20]  That news report upset President-Elect Trump, who expressed anger to incoming Chief of Staff Reince Priebus.  *See* ECF No. 79-6 at 15.  Priebus then contacted Flynn, who "felt a lot of pressure" because Priebus "had spoken to the 'boss'," and conveyed to Flynn that he "needed to 'kill the story'."  *Id.*  In response, Flynn said to McFarland "words to the effect of, 'I want to kill the story'," and directed her to deny to the *Post* that he had discussed sanctions with Kislyak, which she did.  *See id.*

---

[20] Ex. 5, David Ignatius, *Why Did Obama Dawdle on Russia's Hacking*, WASH. POST (Jan. 12, 2017), at 3 .

Other incoming officials repeated that denial in the ensuing days. In a January 13, 2017 briefing, incoming Press Secretary Sean Spicer publicly stated that the post-Christmas call between Flynn and Kislyak "centered around the logistics" of setting up a "call" between Putin and Trump and "[t]hat was it, plain and simple."[21] On January 15, Priebus and Vice President-Elect Mike Pence were asked about the calls during national television interviews. Both vouched that they had talked to General Flynn, who had assured them that the sanctions never came up in his conversation with Kislyak.[22]

These developments added new dimensions, as well as newfound urgency, to the FBI's ongoing investigations and the intelligence community's counterintelligence concerns. *See* ECF No. 198-4 at 4-5, 8; ECF No. 198-5 at 3–4, 7–9; ECF No. 198-6 at 5–6. Flynn had lied to multiple incoming White House officials and concealed the true nature of his contacts with the Russian government. *See id*. In addition to that obvious concern, the Russians would likely have evidence of those lies—and as a result could have secret leverage over the incoming National Security Advisor. *See* ECF No. 198-4 at 5.

---

[21] Ex. 6, Sean Spicer, Trump Presidential Transition Team News Briefing via Teleconference (Jan. 13, 2017), at 5.

[22] Ex. 7, *Meet The Press 01/15/17*, NBC NEWS (last updated Jan. 15, 2017, 11:48 AM), at 12 (". . . I have talked to General Flynn. None of that came up. The subject matter of sanctions or the actions taken by the Obama [sic] did not come up in the conversation."); Ex. 8, *Face the Nation transcript January 15, 2017: Pence, Manchin, Gingrich*, CBS NEWS (Jan. 15, 2017, 2:06 PM), at 6 ("I talked to General Flynn about that conversation . . . . They did not discuss anything having to do with the United States' decision to expel diplomats or impose censure against Russia. . . [W]hat I can confirm, having spoken to him about it, is that those conversations that happened to occur around the time that the United States took action to expel diplomats had nothing whatsoever to do with those sanctions."); Ex. 9, *Mike Pence on Rep. Lewis' comments, US-Russia relation; Brennan on Russia dossier, global hotspots facing Trump*, FOX NEWS (last updated Mar. 20, 2017), at 5 ("I talked to General Flynn yesterday, and the conversations that took place at that time were not in any way related to the new U.S. sanctions against Russia or the expulsion of diplomats.").

### D.    Flynn Lies to the FBI

Flynn took office as National Security Advisor on Inauguration Day.  At a January 23 briefing, Press Secretary Spicer stated he had spoken again with Flynn the previous day and reiterated that sanctions were not among the topics he had discussed with Kislyak.[23]  At that point, the FBI determined that it was necessary to interview Flynn.  The Deputy Director spoke with him by phone on January 24.  *See* ECF No. 198-12 at 2.  Citing "the significant media coverage and public discussion about his recent contacts with" Kislyak,[24] the Deputy Director told Flynn it was important for FBI agents "to hear directly from him what he said and how he felt about the conversations."  *Id*.  Flynn agreed to meet "quickly, quietly, and discretely [sic]," offering to see agents that same day without involving the White House Counsel.  *Id.*

About two hours later, two FBI agents interviewed Flynn in the White House.  *See* ECF No. 198-14 at 3-4.  They came prepared to "refresh [Flynn's] recollection" if he "said he did not remember something they knew he said," in which case they would employ "the exact words Flynn used" during the calls.  *Id.* at 4.  Flynn, who was "'relaxed and jocular,'" treated the agents "as allies." *Id*.  Throughout the interview, Flynn, a career military intelligence official, projected a "very 'sure' demeanor" and exhibited no "indicators of deception."  *Id*.  Both agents took handwritten notes and memorialized Flynn's responses afterward in an official memorandum. *See id;* ECF No. 198-13; ECF No. 198-7.

Flynn first described his past contacts with Russian officials and Russia-affiliated entities, including interactions with Kislyak.  *See* ECF No. 198-7 at 2–3.  He said that during the

---

[23] *See* Ex. 10, Sean Spicer, White House Press Secretary, Daily Briefing with Reporters (Jan. 23, 2017), at 27.

[24] *See, e.g.*, Carol E. Lee et al., *U.S. Eyes Michael Flynn's Links to Russia*, Wall St. Journal (Jan. 22, 2017, 8:29 PM), https://perma.cc/DU7J-VMBW.

transition Kislyak was the only member of the Russian Government with whom he had substantive conversations, and named Russia among four countries he considered "primary threats to the U.S." *Id.* at 3. Flynn's initial account of his discussions with Kislyak during the transition included describing that Kislyak text-messaged him on December 28 and the fact that they subsequently talked on December 29, the day the sanctions were imposed. *Id.* at 4.[25] In describing that call, Flynn mentioned several other topics that arose, but not the sanctions discussion. *Id.*

The agents then prompted Flynn to discuss whether he recalled "any other" contact with Kislyak or other Russians; Flynn responded by volunteering his recollections of a "closed door meeting with Kislyak and Jared Kushner" that took place after the election. *Id.* at 4. These exchanges then followed:

UN Vote

- The agents more specifically prompted Flynn "if he recalled any discussions with Kislyak about a United Nations (UN) vote surrounding the issue of Israeli settlements." *Id.* at 4. Flynn said "'[y]es, good reminder'" and explained that on December 22 he had made calls to "a litany of countries" in connection with the UN vote, including "maybe" to Kislyak, "to attempt to get a sense of where countries stood on the UN vote, specifically, whether they intended to vote for or abstain." *Id.* at 4 −5.

- The agents prompted Flynn to address "if he made any request of Kislyak to vote in a particular way or take any action." *Id.* at 5. "Flynn stated he did not[]," reiterating that "his calls were about asking where countries would stand on a vote, not any requests of, 'hey if you do this.'" *Id.*

- The agents once more prompted Flynn to address "if he made any comment to Kislyak about voting in a certain manner, or slowing down the vote, or if Kislyak described any

_____

[25] Flynn told the agents that he had poor cellular reception in the Dominican Republic and was not checking his phone regularly while on vacation and that he "did not see the text until approximately 24 hours later," at which point he got back to Kislyak. ECF No. 198-7 at 4. *Compare with* ECF No. 79-3 at 26, discussed at n.18 *supra* (describing Flynn's contemporaneous calls and text message exchanges about sanctions with transition team members, including McFarland, while in the Dominican Republic).

Russian response to a request by Flynn." *Id.* "Flynn answered, 'No[]'," and again stated that "the conversations were along the lines of where do you stand, and what's your position." *Id.*

<u>Sanctions</u>

- The agents "asked Flynn if he recalled any conversation with Kislyak surrounding the expulsion of Russian diplomats or closing of Russian properties in response to Russian hacking activities surrounding the election." *Id.* at 5. "Flynn stated that he did not," reiterated that his conversation was about different topics, and noted that he "was not aware of the then-upcoming actions[.]" *Id.*

- The agents asked Flynn more specifically "if he recalled any conversation with Kislyak in which the expulsions were discussed, where Flynn might have encouraged Kislyak not to escalate the situation, to keep the Russian response reciprocal, or not to engage in a 'tit-for-tat.'" *Id.* at 6. "Flynn responded, 'Not really. I don't remember. It wasn't, 'Don't do anything.'" *Id.* Flynn further added that the "U.S. Government's response was a total surprise" to him. *Id.*

- The agents next switched gears and tried asking Flynn "if he recalled any conversation with Kislyak in which Kislyak told him the Government of Russia had taken into account the incoming administration's position about the expulsions, or where Kislyak said the Government of Russia had responded, or chosen to modulate their response, in any way to the U.S.'s actions as a result of a request by the incoming administration." *Id.* at 6. "Flynn stated it was possible that he talked to Kislyak on the issue, but if he did, he did not remember doing so." *Id.*

- After he "reflected" further, Flynn "stated he did not think he would have had a conversation with Kislyak about the matter, as he did not know the expulsions were coming. Flynn stated he did not have a long drawn out discussion with Kislyak where he would have asked him to 'don't do something.'" *Id.*

These answers were false. As he later admitted under oath on multiple occasions, Flynn remembered his discussions with Kislyak and chose to lie repeatedly to avoid discussing them with the FBI. *See* ECF No. 4 at 2–5 ¶¶ 3–4; ECF No. 16 at 18–19; ECF No. 103 at 15–16.

## E. Flynn is Fired for Lying

After the interview, the FBI agents briefed their superiors and DOJ officials. *See* ECF No. 129-14 at 1; ECF No. 198-4 at 7; ECF No. 198-14 at 5. DOJ officials who examined the discrepancies between Flynn's account and the content of the calls, or were otherwise informed

of them, found it very unlikely Flynn could have forgotten his recent discussions with Kislyak. *See* ECF No. 198-4 at 5; ECF No. 198-5 at 6.

DOJ notified the White House of the counterintelligence concerns surrounding Flynn the day after his interview.   *See* ECF No. 198-4 at 7–8; ECF No. 198-5 at 7–9.   DOJ officials informed White House Counsel Don McGahn and one of his colleagues about the Flynn-Kislyak conversations during in-person meetings on January 26 and 27, explaining that the discrepancy between the calls and White House officials' public remarks "created a compromise situation for Flynn."   ECF No. 198-5 at 7–10; *see also* ECF No. 198-4 at 8.   The White House lawyers were "shocked" and seemed to "fully appreciate[] the seriousness" of the matter.   ECF No. 198-4 at 8–9; ECF No. 198-5 at 9.   McGahn also asked whether Flynn was under criminal investigation or should be fired.   *See* ECF No. 198-5 at 8–9; ECF No. 198-4 at 8.   DOJ helped arrange for the transcripts of the calls to be reviewed by White House officials in the following days.   *See* ECF No. 198-4 at 10-11; ECF No. 198-5 at 10-12.   Reviewing the transcripts in the presence of the FBI's Deputy Director, "McGahn and Priebus concluded that Flynn could not have forgotten the details of the discussions of sanctions and had instead been lying about what he discussed with Kislyak."   ECF No. 79-6 at 23.   In addition, "McGahn and Priebus concluded that Flynn should be terminated and recommended that course of action to the President."   *Id.*

Shortly thereafter, on February 13, Flynn resigned.   *See* Ex. 11, Letter from Lt. Gen. Michael T. Flynn, U.S. National Security Advisor (Feb. 13, 2017); ECF No. 79-6 at 24. According to remarks by President Trump, the resignation took place at his request.[26]   Spicer announced that the President had concluded that Flynn should resign "based on a trust issue"

---

[26] *Remarks by President Trump in Press Conference*, WHITE HOUSE (Feb. 16, 2017), https://perma.cc/CK4M-NLHS.   *See also* Ex. 12.

arising from his having "misled" the Vice President and other officials.[27]  Flynn's termination did not diminish the personal and political goodwill between him and Trump.  On Flynn's final day, the President hugged him and said, "You're a good guy. We'll take care of you."  ECF No. 79-6 at 24.  In his resignation letter, Flynn thanked Trump "for his personal loyalty."  Ex. 11 at 2. The next day, Trump began working personally to avert any criminal investigation of Flynn's conduct.  In a one-on-one conversation with the FBI Director, Trump stated of Flynn: "I hope you can see your way clear to letting this go, to letting Flynn go.  He is a good guy.  I hope you can let this go."  ECF No. 79-6 at 26.  Trump has repeatedly and publicly made clear ever since that his personal wish is for Flynn to avoid criminal liability.  *See infra*, Section II.B.

### F.  Flynn Pleads Guilty, Repeatedly Admitting Under Oath that He Lied to the FBI

The Crossfire Hurricane investigation continued and, in May 2017, came under the auspices of the newly created Office of the Special Counsel.  In November 2017, Flynn agreed to cooperate with the Special Counsel's investigation, obtaining as consideration the opportunity to face but a single false statement charge (under 18 U.S.C. § 1001) and a conditional promise by the Government to file a "substantial assistance" motion in connection with his sentencing on that charge.  *See* ECF No. 160-21.  The premise of that cooperation was that Flynn could provide "value" to the "broader investigation."  *Id*. at 1–3.  *See also* ECF No. 160-22 at 1, 3.  In particular, the Government indicated that Flynn could assist the investigation by providing truthful information about his communications during the transition "with foreign officials, including Russian officials."  ECF No. 160-22 at 2.  The information sought specifically included information about Flynn's December 29 call with Kislyak.  *See id.* at 4.  Flynn was

---

[27] Ex. 12 at 4.

interviewed by the Special Counsel's Office at least sixteen times, including four interviews before pleading guilty on December 1, 2017, and a dozen more interviews thereafter, between January and September 2018.  *See* ECF No. 129-17.[28]

On November 30, 2017, Flynn agreed to plead guilty to making false statements to federal investigators, in violation of 18 U.S.C. § 1001(a)(2).  *See* ECF No. 1; ECF No. 3.  Under penalty of perjury, Flynn endorsed a Statement of the Offense admitting that his repeated statements to the FBI that he did not remember his discussions with Kislyak concerning the U.S. sanctions were false, and that he knew so at the time.  *See* ECF No. 4 at 2–3 ¶ 3.  He also admitted that his repeated statements to the FBI that he did not remember his discussions with Kislyak concerning the earlier UN resolution were false, and that he knew so at the time.  *See id.* at 4–5 ¶ 4.  Flynn confirmed that his lies "had a material impact on the FBI's ongoing investigation into the existence of any links or coordination between individuals associated with the Campaign and Russia's efforts to interfere with the 2016 presidential election," *i.e.*, the Crossfire Hurricane investigation.  *Id.* at 1–2 ¶ 2.  Flynn further admitted making additional materially false statements and omissions in FARA filings relating to his work for the principal benefit of the Republic of Turkey, though he was not charged for that conduct.  *See id.* at 5 ¶ 5; *see also* ECF No. 1.  Finally, Flynn's endorsement of the Statement of the Offense specifically

---

[28] The statements Flynn made during at least some of these interviews were memorialized in FBI FD-302s.  No documentation of these interviews is currently in the record, though several are cited in the Special Counsel's report, which has been docketed as ECF No. 79 and attachments. *See* ECF No. 79-3 at 25-29; ECF No. 79-6 at 10-12 (citing "Flynn 11/16/17 302" "Flynn 11/17/17 302" "Flynn 11/20/17 302" "Flynn 11/21/17 302" and "Flynn 1/19/18 302"). References to "Flynn 1/19/17 302" are a "typographical error" and should say "1/19/1<u>8</u>," *see* ECF No. 122 at 2.  In addition to the interviews conducted by the Special Counsel's Office, the United States Attorney's Office for the Eastern District of Virginia interviewed Flynn on at least eight additional occasions between June 2018 and June 2019.  *See* ECF No. 129-17.

noted that he had made these admissions "knowingly and voluntarily and because [he is], in fact, guilty of the crime charged." ECF No. 4 at 6.

On December 1, 2017, Flynn entered a plea of guilty before Judge Rudolph Contreras. *See* ECF No. 16. The Government read in open court the key portions of the agreed-upon Statement of the Offense. *Id.* at 14–18. That document recounted that Flynn's statements to the FBI were "material false statements and omissions." *Id.* at 14. Flynn was asked if the facts alleged were "true and correct," and stated orally, under oath, that they were. *Id.* at 18-19. Flynn was asked, "Did you, in fact, do what the government has stated that it can prove at trial?" *Id.* at 19. Under oath, Flynn said "[y]es." *Id.* Judge Contreras engaged in a lengthy colloquy with Flynn to ensure that the plea was knowing and voluntary, including asking if anyone had "forced, threatened, or coerced [Flynn] in any way." *Id.* at 29–30. Flynn said "[n]o." *Id.* Flynn also responded in the negative when asked whether "any threats or promises other than the promises made in the plea agreement" were made to induce his waiver of rights or his guilty plea. *Id.* at 8. Flynn responded affirmatively when asked whether he was entering the guilty plea "voluntarily and of [his] own free will" and that he was "entering this plea of guilty because [he was] guilty and for no other reason." *Id.* at 30. Flynn's counsel also represented that they were unaware of any reason why Flynn should not plead guilty. *Id.* The Court then accepted Flynn's guilty plea, finding that it was made "voluntarily" and had "an adequate factual basis." *Id.* at 30–31.

Shortly thereafter, the case was reassigned from Judge Contreras to this Court.[29] *See* ECF No. 9. In preparation for sentencing, Flynn stated that he "does not take issue with the

---

[29] This Court then issued its standing order requiring that the Government produce to Flynn favorable evidence material to his guilt or punishment. *See* ECF No. 10. Flynn has received tens

description of the nature and circumstances of the offense contained in the Government's sentencing memorandum and the Presentence Investigation Report" and "recognizes that his actions were wrong and [] accepts full responsibility for them." ECF No. 50 at 7-9. But Flynn also argued for a lesser sentence on the ground that the FBI had interviewed him informally, without counsel, and without warning him that lying was a crime under § 1001. *See id*. In response, the Government urged the Court to reject any such "attempt to minimize" Flynn's conduct because his false statements were knowing, "voluntary," "intentional," and unquestionably "material" to the FBI's efforts to protect national security. ECF No. 56 at 1, 3–5. The Government explained why none of the circumstances of Flynn's voluntary interview would have induced him to tell multiple falsehoods unwittingly, and why it is inconceivable that he did not know the legal consequences of doing so. *See id*. at 4. For example, the Government observed that the FBI had informed Flynn "about the topic of the interview" beforehand and gave him "multiple opportunities to correct his false statements by revisiting key questions" during the interview, including by "us[ing] the exact words the defendant had used [in the calls with Kislyak] in order to prompt a truthful response." *Id*. at 3. The Government noted that Flynn spent most of his career "steeped in the importance of accurate information to decision making in areas of national security," and his obligation to be truthful with the investigators did not depend on a prior warning or the presence of counsel. *Id*. at 4–5. In the Government's own words, "[a] sitting National Security Advisor, former head of an intelligence agency, retired

---

of thousands of pages of documents from the Government pursuant to that order and its discovery obligations under the Federal Rules of Criminal Procedure. *See, e.g.*, ECF No. 107 at 4-5; ECF No. 123; ECF No. 133-15.

Lieutenant General, and 33-year veteran of the armed forces knows he should not lie to federal agents." *Id.* at 4.

Flynn came before this Court for sentencing on December 18, 2018, and the proceeding included "an extension . . . of the plea colloquy" before Judge Contreras. ECF No. 103 at 5. Concerned that Flynn's memorandum in aid of sentencing contained statements inconsistent with his acceptance of responsibility, the Court asked him numerous questions under oath "to ensure that [Flynn] entered his guilty plea knowingly, voluntarily, intelligently, and with fulsome and satisfactory advice of counsel." ECF No. 103 at 5–7. Flynn and his then-counsel assured the Court at length that all of that was true. *See id.* at 7–16. After being warned by the Court that "any false answers will get you in more trouble," *see id.* at 7, Flynn confirmed that he was aware at the time of the interview that lying to FBI investigators was a federal crime, that he was guilty of that offense, that he accepted responsibility for his criminal acts, that he did not wish to challenge the circumstances of his interview, that he did not believe his rights were violated because the FBI interviewed him without a lawyer present, that he had no concerns that he had entered into his guilty plea before he or his attorneys were able to review information that could have helped his defense, that he did not wish to withdraw his guilty plea in light of recent revelations that certain FBI officials involved in his interview were being investigated, and that he understood that by maintaining his guilty plea he would forever give up his right to challenge the circumstances of his interview. *See id.* at 8–11, 15–16.

In reliance on these representations, this Court found that Flynn "entered his guilty plea while competent and capable," and concluded "that there was and remains . . . a factual basis for Mr. Flynn's plea of guilty." *Id.* at 16. The Court then stated that it regarded Flynn's offense as "very serious," involving as it did "[a] high-ranking senior official of the government making

false statements to the [FBI] while on the physical premises of the White House."  *Id.* at 24; *see also id.* at 32 (same).[30]  As a result of those and other "aggravating circumstances," the Court warned Flynn that "I cannot assure you that if you proceed today you will not receive a sentence of incarceration."  *Id.* at 32–33.  At Flynn's request, and because Flynn was still due to provide testimony for the Government in connection with an upcoming prosecution, the Court and the parties agreed to postpone sentencing to allow Flynn to complete his then-intended cooperation.  *Id.* at 47–48.

### G.     Flynn Stops Cooperating

The trial at which Flynn was to testify for the Government was scheduled for July 2019.  *See* ECF No. 88 at 1.  The defendants were others involved with Flynn's false FARA filings.  In May, the Office of the Special Counsel completed its investigation, a report of which was docketed in this matter.  *See* ECF No. 79.  At that time, supervision of the Flynn prosecution was transferred to the United States Attorney's Office for the District of Columbia.  *See* ECF No. 79-9 at 49.

In June 2019, Flynn hired new counsel.  *See, e.g.*, ECF No. 87; ECF No. 90; ECF No. 91; ECF No. 93.  He immediately pursued a more contentious, adversarial strategy.  *See, e.g.,* ECF No. 107. Flynn's intended testimony in the FARA matter did not occur as planned, prompting the Government to later inform this Court that Flynn was no longer providing substantial assistance and instead had "hindered" its prosecution of that case. ECF No. 150 at 25; *see also id.* at 22–25.  Flynn then challenged the Government's compliance with its obligations to turn

---

[30] The Court separately inquired of the Government what other charges could have been brought but were not, including "[h]ypothetically, could he have been charged with treason?"  ECF No. 103 at 36.  The Court explained that it explored this line of questioning for the limited purpose "of understanding the benefit, if any that Mr. Flynn has received in the plea deal."  *Id.* at 40.  The Court emphasized that it "wasn't suggesting he's committed treason."  *Id.*

over exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), and this Court's standing order.  *See* ECF No. 109; ECF No. 122; ECF No. 129; ECF No. 135.  Flynn's briefing asserted a host of alleged "improprieties regarding the circumstances leading up to his guilty plea," including, as this Court summarized it, "allegations of misconduct by the FBI, DOJ, and the Special Counsel's Office—that, in [Flynn's] view, call into question the entire investigation, raise ethical concerns, warrant findings of civil contempt, and demand dismissal."  ECF No. 144 at 16.

In a 92-page opinion issued on December 16, 2019, this Court exhaustively evaluated and rejected Flynn's arguments, including an argument that his false statements to the FBI were not material.  *See id*.  As the Government persuasively argued, those false statements were "clearly" capable of influencing—and in fact did influence—the FBI's investigation into alleged coordination with the Russian government.  *See* ECF No. 132 at 10–11.  The Court reasoned that, by witholding truthful information about not just whether but also why he had certain communications with Kislyak, Flynn's misrepresentations "fundamentally influenced the FBI's investigative activity going forward."  *Id.* at 11.

The parties prepared again to proceed with sentencing.  *See* ECF No. 150; ECF No. 156; ECF No. 163.  The Government again explained at length to this Court how the underlying facts clearly support Flynn's guilt of the charged offense.  *See* ECF No. 150 at 5–9.  However, in January 2020, Flynn moved to withdraw his guilty plea, relying in part on alleged ineffective assistance of his prior counsel.  *See* ECF No. 160-2.  In connection with that motion, he filed a sworn declaration that unequivocally contradicted his prior sworn admissions about the facts of his offenses and his sworn representations to this Court about the circumstances of his guilty plea.  *See* ECF No. 160-23.  For example, Flynn stated in his new affidavit that he "did not lie"

to the FBI agents during his interview, is "innocent of this crime," and wishes to withdraw his guilty plea. *Id.* at 1-2 ¶¶ 5 & 9. Flynn also asserted that he agreed to plead guilty "because of the intense pressure from the Special Counsel's Office, which included a threat to indict my son Michael, and the lack of crucial information from my [former] counsel." *Id.* at 8 ¶ 34; *see also id.* at 7 ¶ 28, 9 ¶ 37.

At the same time, Flynn filed a motion asking this Court to dismiss the charge against him, again raising scattershot allegations of impropriety by the FBI and DOJ.[31]  *See* ECF No. 162. He relied in significant part on a December 2019 report issued by the DOJ's Inspector General that reviewed certain aspects of the investigation into Russian election interference. *See id.* at 6–18. The Government explained in response that none of the report's findings provided any basis for dismissal—including because the report "does not identify errors or misconduct pertaining to the investigation of the defendant"—and added that Flynn's remaining allegations "have previously been rejected by this Court or are unrelated to the charge to which the defendant pleaded guilty." ECF No. 169 at 5–6; *see also id.* 1–3, 5–8.

Finally, on April 24 and 30, Flynn supplemented his motion to dismiss with four additional exhibits. The first two are e-mails between Flynn's former attorneys and the Government, heavily redacted, that purportedly show that the prosecution struck a "side deal" not to prosecute Flynn's son that had to "be kept secret" and was a "material term of the plea agreement," reprising the "threat" argument he made previously. ECF No. 181 at 1; *see also* ECF No. 181-1; ECF No. 181-2. The other exhibits are internal FBI e-mails, notes, text

---

[31] The Government has not yet responded to Flynn's motion to withdraw his plea. Briefing was suspended pending resolution of outstanding antecedent disputes between Flynn and his former counsel. *See* Minute Order Feb. 10, 2020; Minute Order Feb. 27, 2020; Minute Order Mar. 27, 2020; Minute Order May 7, 2020.

messages, and a draft of a memorandum that would have closed the Crossfire Razor investigation, *see* ECF No. 189; ECF No. 189-1; ECF No. 190, all of which Flynn offered in further support of previously raised claims that "partisan" DOJ and FBI officials "conspired to destroy" him by tricking him into lying to the agents who interviewed him.  ECF No. 181 at 2.

### H.    The Government Reverses Course

On May 7, the Government moved to dismiss the case against Flynn.  *See* ECF No. 198. The only signatory was a political appointee, then-Acting United States Attorney for the District of Columbia Timothy Shea.  *Id.* at 20.  Earlier the same day, a career prosecutor who had worked on the case since before charges were filed withdrew from it.  *See* ECF No. 197.

The motion's fundamental premise is that the Government now "does not believe it can prove" that Flynn committed the offense to which he (a) pleaded guilty; (b) admitted his factual guilt under penalty of perjury on oath on three separate occasions; and (c) no doubt admitted in numerous debriefings during the course of his cooperation, *see* ECF No. 4; ECF No. 16; ECF No. 103; ECF No. 129-17.    Specifically, the Government now asserts that Flynn's false statements were not "material" to anything the FBI had a legitimate basis to investigate.  *See* ECF No. 198 at 2, 13–18.    It also claims that "evidentiary problems" would prevent the Government from proving that Flynn knowingly lied.  *Id.* at 18–19.

### ARGUMENT

### I.    THE COURT HAS AUTHORITY TO DENY THE GOVERNMENT'S MOTION FOR LEAVE TO DISMISS

The text and history of Rule 48(a) demonstrate that the Court plays a limited but vital role in determining whether to grant the Government leave to dismiss a pending criminal charge, regardless of whether that motion is opposed or supported by the defendant.  This role is consistent with constitutional separation of powers principles, the Judiciary's independent

25

interest in the integrity of its own proceedings, and the need to protect the public from gross abuses of prosecutorial discretion. Where, as here, there is clear evidence that prosecutors have offered pretextual reasons for dismissal, and there is clear evidence of such gross prosecutorial abuse, the Court can and should deny leave under Rule 48(a).

### A.    The Text of Rule 48(a)

Interpretation of the Federal Rules of Criminal Procedure begins with their plain text. *See Pavelic & LeFlore v. Marvel Entm't Grp.*, 493 U.S. 120, 123 (1989). Rule 48(a) provides that "the government may . . . dismiss an indictment, information, or complaint."[32] But it also imposes an important condition on that prosecutorial prerogative: obtaining "leave of court." This condition is commonplace in federal procedural rules. *See, e.g.*, Fed. R. Civ. P. 15(a)(2), 30(a)(2), 31(a)(2). And in all its applications, it transforms an otherwise self-executing or ministerial process into one requiring "judicial permission." *Black's Law Dictionary* (11th ed. 2019). By its terms, a "leave of court" requirement thus "obviously vest[s] some discretion in the court." *Rinaldi v. United States*, 434 U.S. 22, 30, n.15 (1977) (discussing Rule 48(a)). As the D.C. Circuit has observed, the "requirement of judicial leave . . . gives the court a role in dismissals following indictment." *Ammidown*, 497 F.2d at 620-21.

Therefore, the question here is not *whether* Rule 48(a) vests this Court with discretion, but rather how much discretion and under what circumstances it may properly be exercised to deny leave. Flynn and the Government have argued that judges have such discretion only when the defendant opposes a Rule 48(a) motion, and have none when the defendant consents. *See* Br. for Michael at 17-26, *In re Flynn*, No. 20-5143 (D.C. Cir. May 19, 2020) ("Flynn Mandamus

---

[32] Fed. R. Crim. P. 48(a) ("The government may, with leave of court, dismiss an indictment, information, or complaint. The government may not dismiss the prosecution during trial without the defendant's consent.").

Br."); Br. for the United States at 14, *In re Flynn*, No. 20-5143 (D.C. Cir. June 1, 2020) ("Govt. Mandamus Br.").  That asymmetric interpretation assumes a categorical limitation on Rule 48(a) that appears nowhere in its text.  Further, it renders the phrase "leave of court" meaningless in the overwhelming majority of cases involving Rule 48(a) motions.  The proper interpretation of Rule 48(a) instead adheres to its plain text, which vests federal judges with a measure of discretion *whenever* the government seeks "leave of court" to dismiss criminal charges, even when the defendant joins in that application.

### B.    The History of Rule 48(a)

This plain text interpretation of Rule 48(a) is confirmed by a study of the rule's history, which demonstrates that the "leave of court" requirement was included in Rule 48(a) to authorize judges to act in the precise circumstances presented here.  *See United States v. Cowan*, 524 F.2d 504, 505 (5th Cir. 1975) ("[H]istory has its claims, and we think it is appropriate to review it.").

Before the passage of Rule 48 in 1944, federal prosecutors enjoyed the unreviewable prerogative to enter a *nolle prosequi*—that is, to dismiss a pending charge.  *See id.*  At times, this power was wielded in ways that "savor[ed] altogether too much of some variety of prestige and influence (family, friends, or money) that too often enables their possessors to violate the laws with impunity; whereas persons lacking them must suffer all the penalties."  *United States v. Woody*, 2 F.2d 262, 262 (D. Mont. 1924).  Over time, the corrupt dismissal of criminal cases against powerful, politically connected defendants sparked a judicial backlash.  As Judge Leon R. Yankwich observed in 1941, "[t]he people of the United States may be done as great a disservice by discontinuing as by continuing a prosecution.  The community tests criminal justice by what judges do.  We are responsible for the errors which the zealous prosecutor induces us to

27

commit."  Hon. Leon R. Yankwich, *Increasing Judicial Discretion in Criminal Proceedings*, 1 F.R.D. 746, 751, 752 (1941).

That same year, the Supreme Court appointed an Advisory Committee to create rules of criminal procedure.  Leading members of the Committee pushed for a judicial check on the corrupt, politically motivated dismissal of criminal charges; this was the fundamental reason given for limiting prosecutorial power to dismiss cases.  *See* Frampton, *Rule 48(a) Dismissals*. Due to internal divisions, the Committee initially proposed only that prosecutors be required to offer a statement of reasons for dismissal.  *Id*.  This would have brought sunshine and accountability to decisions once cloaked in secrecy.  But the Supreme Court prodded the Committee to consider an even more robust approach—a rule that recognized the Judiciary's independent concern with ensuring the integrity of its own proceedings.  To signal its view, the Court sent a missive to the Committee citing *Young v. United States*, 315 U.S. 257 (1942), which held that a confession of error by the government in a criminal case, though entitled to deference, remains subject to an independent judicial evaluation.  In reaching that conclusion, *Young* explained that "the public interest" is "foremost in every criminal proceeding," and is "entrusted to our consideration and protection as well as that of the enforcing officers."  *Id.* at 259.  By citing *Young* to the Committee in response to its draft of Rule 48(a), the Supreme Court hinted that the rule needed to accord judges a role in policing the dismissal of criminal charges.

Notwithstanding that guidance, the Committee's final draft required only that prosecutors submit a statement of reasons for dismissal.  *See* Frampton, *Rule 48(a) Dismissals*.  This time, the Supreme Court acted more decisively, rejecting the Committee's recommendation in favor of a requirement that prosecutors obtain "leave of court."  Given its plain meaning, the rule penned by the Supreme Court thus created judicial discretion to deny motions to dismiss—and did not

distinguish (as it might have done) between opposed and unopposed motions.  This text reflects a considered judicial effort to "guard against dubious dismissals of criminal cases that would benefit powerful and well-connected defendants."  *Id.* ("The Court . . . armed the district judge with a powerful tool to halt corrupt or politically motivated dismissals of cases.").  There is no historical support for the countertextual claim that Rule 48(a)'s "leave of court" requirement exists solely to allow judges to protect criminal defendants from prosecutorial harassment.  *See Cowan*, 524 F.2d at 512 ("[T]he history of the Rule belies the notion that its only scope and purpose is the protection of the defendant . . . We think it manifestly clear that the Supreme Court intended to clothe the federal courts with a discretion broad enough to protect the public interest in the fair administration of criminal justice.").

> ### C.    The Role of Constitutional Separation of Powers Principles

Following the enactment of Rule 48(a), courts appreciated that the discretion it vested must be exercised in a manner consistent with the separation of powers.  *See Ammidown*, 497 F.2d at 621.  This analysis included a recognition that Rule 48(a) is "a power to check power," *Cowan*, 524 F.2d at 513—and that the Constitution "enjoins upon its branches separateness but interdependence, autonomy but reciprocity."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring).  As the Fifth Circuit framed the issue in an influential opinion, "we must balance the constitutional duty of government prosecutors, as members of the Executive Branch, to 'take care that the laws (are) faithfully executed' with the constitutional powers of the federal courts."  *United States v. Hamm*, 659 F.2d 624, 628 (5th Cir. 1981).

The interests of the Executive Branch loom large in the application of Rule 48(a).  "The Executive's primacy in criminal charging decisions is long settled."  *Fokker*, 818 F.3d at 742. "Where to prosecute and what charge to file or bring before a grand jury are decisions that

generally rest in the prosecutor's discretion." *United States v. Batchelder*, 442 U.S. 114, 124 (1979). In the ordinary course, "decisions to dismiss pending criminal charges—no less than decisions to initiate charges and to identify which charges to bring—lie squarely within the ken of prosecutorial discretion." *Fokker*, 818 F.3d at 742. And judicial authority in this sphere is limited, since "[f]ew subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought." *Newman v. United States*, 382 F.2d 479, 480 (D.C. Cir. 1967).

As the Supreme Court recognized in promulgating Rule 48(a), however, the Executive's primacy in this sphere does not wholly displace the constitutional interests of the Judiciary. Those interests are substantial. "The legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality and nonpartisanship." *Mistretta v. United States*, 488 U.S. 361, 407 (1989). Simply put, "justice must satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 14 (1954). "It follows that public perception of judicial integrity is 'a state interest of the highest order.'" *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 445-46 (2015) (citation omitted). Courts thus maintain a strong stake in the "untainted administration of justice," *Mesarosh v. United States*, 352 U.S. 1, 14 (1956), and the Supreme Court has recognized a "vital state interest in maintain[ing] the integrity of the judiciary and the rule of law," *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 889 (2009).

These interests are imperiled if the Executive Branch seeks the dismissal of criminal charges for corrupt, politically motivated reasons that undermine confidence in the integrity of judicial process, or if it seeks dismissal as part of a campaign to harass criminal defendants by filing, dismissing, and re-filing charges against them. Rule 48(a) rests on the premise that judges

may constitutionally guard against these forms of abuse in their own courts.  *See Rinaldi*, 434 U.S. at 30; *Ammidown*, 497 F.2d at 620-622; *Cowan*, 524 F.2d at 513.

Rule 48(a) thus "turns what was once solely the prerogative of the executive into a shared responsibility between the executive and judicial branches of government."  *United States v. N. V. Nederlandsche Combinatie Voor Chemische Industrie*, 75 F.R.D. 473, 475 (S.D.N.Y. 1977). The lion's share of responsibility remains vested in the Executive Branch, which enjoys a strong presumption of regularity, broad discretion in deciding whether to bring or dismiss criminal charges, and deference when a court decides whether dismissal serves the public interest.  *See Fokker*, 818 F.3d at 741-42; *Ammidown*, 497 F.2d at 620-21.

But while "the court does not have primary responsibility," Rule 48(a) requires that it serve as more than merely "a rubber stamp for the prosecutor's decision."  *Ammidown*, 497 F.2d at 620, 622.  Consistent with the text of Rule 48(a), and as confirmed by its history, the court's role is to guard against gross abuse of prosecutorial power.  *Ammidown*, 497 F.2d at 622.  Faced with "clear evidence" that prosecutors have failed to perform their official duties in good faith, courts may pierce the presumption of regularity and deny leave of court under Rule 48(a) if doing so is necessary to vindicate fundamental judicial interests.  *See, e.g., Fokker*, 818, F.3d at 741 (quoting *United States v. Armstrong*, 517 U.S. 456, 465 (1996)).  Applying the power conferred by Rule 48(a) in that manner honors the Constitution's separation of powers and protects the other interests (those of the public and the Judiciary itself) implicated when the Government seeks to drop a criminal charge.[33]

---

[33] Where prosecutors seek dismissal of charges *before* a defendant has entered a guilty plea, the case-specific application of Rule 48(a) may raise heightened separation of powers concerns, since denial of leave would raise questions about continuance of the prosecution over protest by the Executive.  *See In re Aiken Cty.*, 725 F.3d 255, 265 (D.C. Cir. 2013); *In re United States*, 345

### D.    The Scope of the Court's Discretion to Deny Leave Under Rule 48(a)

Guided by Rule 48(a)'s text and history, as well as separation of powers principles, there are two grounds for denying leave of court.  *First*, "the requirement of judicial approval entitles the judge to obtain and evaluate the prosecutor's reasons."  *Ammidown*, 497 F.2d at 622.  Those reasons must be real and credible; where they are demonstrably pretextual, the court may deny leave under Rule 48(a).  *Second*, courts may deny Rule 48(a) motions based on clear evidence of gross prosecutorial abuse.  *See id.*

### 1.    Denial Based on a Deficient, Pretextual Statement of Reasons

It is black letter law that prosecutors who seek to dismiss criminal charges under Rule 48(a) must provide a statement of the reasons and factual basis supporting that request.  *See, e.g.*, *Ammidown*, 497 F.2d at 620 ("[I]n the exercise of its responsibility, the court will not be content with a mere conclusory statement by the prosecutor that dismissal is in the public interest, but will require a statement of reasons and underlying factual basis."); Wright & Miller, 3B *Fed. Prac. & Proc. Crim.* § 802 (4th ed. 2020) ("Since the court must exercise sound judicial discretion in considering a request for dismissal, it must have sufficient factual information supporting the recommendation.").

---

F.3d 450, 453-54 (7th Cir. 2003).  In contrast, separation of powers concerns have significantly less force in the post-plea setting, where "all that is left for the trial court to do is sentence the defendant, a task that is firmly in the district judge's wheelhouse."  Frampton, *Rule 48(a) Dismissals*.  This may explain why the Supreme Court's decision in *Rinaldi*—which arose in a post-trial setting—did not raise constitutional concerns.  And it is consistent with *Ammidown*, which highlighted the "sentencing authority reserved to the judge" as a significant consideration in "leave of court" analysis under Rule 48(a).  *See Ammidown*, 497 F2d at 62.  Thus, while the Executive's unreviewable power to decide whether to charge includes the qualified power to dismiss a charge after it is brought, *see Fokker*, 818 F.3d at 737, the separation of powers concerns in the latter context reach their nadir in a post-plea setting, *see Ammidown*, 497 F2d at 62.

This requirement serves several purposes. To start, a judge cannot responsibly exercise the discretion vested in her by Rule 48(a) without understanding the actual basis for the prosecutor's decision. *See United States v. Derr*, 726 F.2d 617, 619 (10th Cir. 1984) ("[T]o honor the purpose of the rule, the trial court at the very least must know the prosecutor's reasons for seeking to dismiss the indictment and the facts underlying the prosecutor's decision."); *United States v. Fastow*, 300 F. Supp. 2d 479, 482 (S.D. Tex. 2004); *United States v. Becker*, 221 F. Supp. 950, 953 (W.D. Mo. 1963); *United States v. Shanahan*, 168 F. Supp. 225, 229 (S.D. Ind. 1958). In a similar vein, appellate courts cannot properly review district court decisions on Rule 48(a) motions unless they contain "a reasoned exercise of discretion," *Ammidown*, 497 F.2d at 622, which is possible only if the prosecutor offers a statement of reasons for the dismissal.

More broadly, through this requirement, Rule 48(a) "prevent[s] abuse of the uncontrolled power of dismissal previously enjoyed by prosecutors." *Id.* at 620. The rule thus achieves the transparency and accountability objectives that the Advisory Committee sought to ensure in requiring prosecutors to provide a statement of reasons, rather than an unexplained *nolle prosqui*. *See* Fed. Crim. Rules Handbook, FCRP 48 (Nov. 2019 update) ("Rule 48 contemplates public exposure by the government of its reasons for dismissing a case in order to prevent prosecutors from abusing their powers."); *United States v. Heaton*, 458 F. Supp. 2d 1271, 1271 (D. Utah 2006); *United States v. Nixon*, 318 F. Supp. 2d 525, 529 (E.D. Mich. 2004). The Third Circuit elaborated on this point in *In re Richards*, emphasizing the "independent rights, interests, and duties that a court may protect through using Rule 48(a) as a 'sunshine' provision." 213 F.3d 773, 788 (3d Cir. 2000). Those interests include ensuring that judicial processes "are not being abused" where there appear to be "improprieties attending the Government's petition to dismiss [a] prosecution." *Id.* at 788-89. Indeed, a court may even hold a hearing on a Rule 48(a) motion

when the "checkered course of the case" suggests a need for further clarification of the legal and factual considerations at stake in deciding whether to grant leave. *Id.* at 788.

Rule 48(a) thus requires more than a conclusory statement that dismissal is in the public interest. Prosecutors must describe the reasons and factual basis for their request. In other words, they must set forth "the real grounds upon which the application is based." *United States v. Rosenberg*, 108 F. Supp. 2d 191, 204-05 (S.D.N.Y. 2000) (quoting *United States v. Greater Blouse, Skirt & Neckwear Contractors Ass'n*, 228 F. Supp. 483, 486-87 (S.D.N.Y. 1964)); *see also Ammidown*, 497 F.2d at 620 (requiring that "the reasons advanced for the proposed dismissal are substantial"). Although prosecutors enjoy a strong presumption of regularity, that presumption can be overcome by clear evidence that the reasons they have set before the Court are not their real grounds, but are instead merely pretextual. *See id.* Accepting a demonstrably pretextual explanation for dismissal would undermine a core purpose of Rule 48(a) and facilitate an abuse of judicial process. The requirement that the Government explain its reasons to the court is never a pointless formality or an opportunity to mislead; it is an obligation to provide real, credible reasons. *See, e.g.*, *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019); *Foster v. Chatman*, 136 S. Ct. 1737, 1755 (2016); *Batson v. Kentucky*, 476 U.S. 79, 97 (1986); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977). A failure to comply with that condition justifies denying "leave of court" to dismiss criminal charges under Rule 48(a).

### 2.    Denial Based on Gross Prosecutorial Abuse

Consistent with the history and purpose of Rule 48(a), a judge may also deny leave of court based on clear evidence of gross prosecutorial abuse. Here as well, the presumption of

regularity is overcome and Rule 48(a) empowers a court to protect both the Judiciary itself and the public against corrupt or otherwise abusive exercises of power.

Although the specific factual issues that arise may be different, the fundamental basis for denial of leave is the same in both opposed and unopposed motions.  When a prosecutor files an *opposed* Rule 48(a) motion, the defendant often alleges impropriety.  In that context, a court reviews the prosecutor's filing "primarily to guard against the prospect that dismissal is part of a scheme of 'prosecutorial harassment' of the defendant through repeated efforts to bring—and then dismiss—charges." *Fokker*, 818 F.3d at 742.  The inquiry rests on the premises set forth above: prosecutors may not act in a grossly abusive manner.  Though "[d]ismissal followed by renewed prosecution, in and of itself, is not an indication of prosecutorial harassment," *United States v. Doody*, No. 01 Crim. 1059, 2002 WL 562644, at *4 (S.D.N.Y. Apr. 16, 2002), the court must consider "the propriety or impropriety of the Government's efforts to terminate the prosecution—the good faith or lack of good faith of the Government in moving to dismiss," *United States v. Salinas*, 693 F.2d 348, 351 (5th Cir. 1982).  That is why judges in this district, and in many others as well, have evaluated opposed Rule 48(a) motions by assessing evidence of prosecutorial abuse and bad faith.  *See, e.g.*, *United States v. Johnson*, 20 F. Supp. 3d 144, 148 (D.D.C. 2013); *United States v. Florian*, 765 F. Supp. 2d 32, 36 (D.D.C. 2011); *United States v. James*, 861 F. Supp. 151, 155–56 (D.D.C. 1994).[34]

The same standard applies to *unopposed* Rule 48(a) motions, which may undermine the integrity of judicial process and harm the public interest if based on gross abuses of prosecutorial

---

[34] *See also United States v. Rojo-Alvarado*, No. 19 Crim. 257, 2019 WL 4482712, at *3 (W.D. Okla. Sept. 18, 2019); *United States v. Tamini*, No. 2:17 Crim. 381, 2018 WL 6978094, at *2 (D. Nev. Nov. 29, 2018); *United States v. Patel*, No. 18 Crim. 5264, 2018 WL 4144449, at *2 (W.D. Wash. Aug. 30, 2018); *United States v. Alvarado-Velasquez*, 322 F. Supp. 3d 857, 860 (M.D. Tenn. 2018); *United States v. Toyota Motor Corp.*, 278 F. Supp. 3d 811, 813 (S.D.N.Y. 2017).

power. Several authorities have given "examples" of such abuse, including "the prosecutor's acceptance of a bribe, personal dislike of the victim, and dissatisfaction with the jury impaneled." *United States v. Smith*, 55 F.3d 157, 159 (4th Cir. 1995). And as discussed above, the history of Rule 48(a) evinces an overriding concern with one particular form of abuse: the corrupt, irregular dismissal of criminal charges against the politically well-connected precisely because they are well-connected. *See, e.g.*, *Woody*, 2 F.2d at 262 (warning that such dismissals "incite, if they do not justify, the too common reproach that criminal law is for none but the poor, friendless, and uninfluential").

In *Ammidown*, the D.C. Circuit confirmed that Rule 48(a) "gives the court a role" when "the defendant concurs in the dismissal," albeit limited—in all the ways set forth above—to "guarding against abuse of prosecutorial discretion." 497 F.2d at 620. That decision is fully consistent with the near-unanimous view of other appellate courts as set forth in thorough and well-reasoned opinions, many of which cite and rely on *Ammidown*. *See, e.g.*, *United States v. Jacobo-Zavala*, 241 F.3d 1009, 1012 (8th Cir. 2001); *United States v. Goodson*, 204 F.3d 508, 512 (4th Cir. 2000); *Smith*, 55 F.3d at 160; *United States v. Pimentel*, 932 F.2d 1029, 1033 n.5 (2d Cir. 1991); *United States v. Wallace*, 848 F.2d 1464, 1468 (9th Cir. 1988); *United States v. Strayer*, 846 F.2d 1262, 1265 (10th Cir. 1988); *United States v. Carrigan*, 778 F.2d 1454, 1463 (10th Cir. 1985); *Hamm*, 659 F.2d at 629–30; *but see In re United States*, 345 F.3d 450 (7th Cir. 2003).[35] These cases make clear that Rule 48(a) does not allow judicial second-guessing of

---

[35] Several authorities have given "examples" of such bad faith or gross abuse, including "the prosecutor's acceptance of a bribe, personal dislike of the victim, and dissatisfaction with the jury impaneled." *Smith*, 55 F.3d at 159. As indicated by use of the word "examples," these "were clearly not intended to constitute an exclusive list." *Nixon*, 318 F. Supp. 2d at 529. And certainly that list includes the core evil that led to the end of unchecked prosecutorial power in favor of the check imposed by Rule 48(a): namely, the corrupt dismissal of criminal charges

prosecutors' policy decisions—even when those decisions seem strange or unwise—but rather is limited to abuses that cross the line. Put differently, Rule 48(a) is aimed only at prosecutorial "misconduct that smacks of impropriety." *United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 137 (2d Cir. 2017).

The Government may assert that the D.C. Circuit's decision in *Fokker* holds otherwise. That would be mistaken. The D.C. Circuit's decision in *Fokker* neither overturned nor disapproved of *Ammidown*, nor did it split from the many holdings by courts of appeals that district courts may deny Rule 48(a) motions based on clear evidence of bad faith or gross prosecutorial abuse. Indeed, *Fokker* said nothing specifically addressing those issues—which were not before it because that case did not arise in the context of a Rule 48(a) motion. Rather, *Fokker* considered Rule 48(a) only in the course of describing district courts' authority to reject motions to defer time under the Speedy Trial Act while a charge called for by a deferred prosecution agreement is pending. *See* 818 F.3d at 743-45. And in discussing Rule 48(a), *Fokker* largely repeated familiar points: charging decisions (including dismissal) are entrusted to the Executive Branch; judicial authority is therefore limited in reviewing Rule 48(a) motions; judges may not base decisions denying "leave of court" on a mere disagreement with prosecutorial charging policy; and a "principal object" of Rule 48(a) is to guard against prosecutorial harassment. *See* 818 F.3d at 740-42. At the same time, *Fokker* properly recognized that "clear evidence" may overcome "the presumption of regularity" that prosecutors enjoy with

---

under circumstances that "savor altogether too much of some variety of prestige and influence (family, friends, or money) that too often enables their possessors to violate the laws with impunity; whereas persons lacking them must suffer all the penalties." *Woody*, 2 F.2d at 262; *see also id.* (warning that such dismissals "incite, if they do not justify, the too common reproach that criminal law is for none but the poor, friendless, and uninfluential").

respect to charging decisions. *Id.* at 742 (citation omitted).  *Fokker*'s *dicta* is therefore best read as refining rather than rejecting *Ammidown*'s comprehensive, influential analysis of Rule 48(a).[36]

*    *    *    *    *

In sum, there are two grounds on which the Court may deny leave under Rule 48(a): *first*, if there is clear evidence that the statement of reasons supporting the motion to dismiss is merely pretextual; and *second*, if there is clear evidence of gross prosecutorial abuse in relation to the dismissal motion. Only in rare cases would denial of a Rule 48(a) motion on either ground ever be justified, particularly given the substantial deference owed to the Executive.  But as the D.C. Circuit has made clear, that deference is not blind and this Court is not a "rubber stamp." *Ammidown*, 497 F.2d at 620.  Where the Government engages in corrupt, irregular conduct that threatens the legitimate interests of the Judiciary, it has no right to leave of court under Rule 48(a).

## II.    THE COURT SHOULD DENY THE GOVERNMENT'S MOTION FOR LEAVE TO DISMISS

Both grounds for denying leave of court under Rule 48(a) are present in this case.  The reasons offered by the Government are so irregular, and so obviously pretextual, that they are deficient.  Moreover, the facts surrounding the filing of the Government's motion constitute clear evidence of gross prosecutorial abuse.  They reveal an unconvincing effort to disguise as legitimate a decision to dismiss that is based solely on the fact that Flynn is a political ally of President Trump.

---

[36] In addition, both *Ammidown* and *Fokker* arose in pre-plea settings, where separation of powers concerns respecting the application of Rule 48(a) are heightened.  *See supra* 30 n.1.  Neither of them addressed the operation of Rule 48(a) in a post-plea setting, where separation of powers concerns in denying "leave of court" are at their nadir—and where the dismissal of criminal charges would unwind a judicially supervised and approved finding of guilt and potentially implicate "the sentencing authority reserved to the judge."  *Ammidown*, 497 F.2d at 622.

### A.    The Government's Statement of Reasons is Deficient under Rule 48(a)

In its statement of reasons for seeking leave of court, the Government asserts "that the evidence is insufficient to prove its case beyond a reasonable doubt."  ECF No. 198 at 20; *see also id.* at 2, 12.  Specifically, it contends that it cannot prove that Flynn "knowingly and willfully made a false statement," *id.* at 18, and that those lies were "material," *id.* at 13, 18.

Even recognizing that the Government is entitled to deference in assessing the strength of its case, these claims are not credible.  Indeed, they are preposterous.  For starters—and most unusually—they are directly and decisively disproven by the Government's own briefs filed just months ago in this very proceeding.  They are also plainly inconsistent with prior orders of this Court, which constitute law of the case.  Finally, they depend on misstatements of law, distortions of fact, and departures from positions that DOJ has repeatedly taken in cases not involving the President's political allies.  Short of a direct admission, it is difficult to imagine stronger proof that the reasons given by the Government in support of dismissal are pretextual.

While this Court's role is limited, it is "not required to exhibit a naiveté from which ordinary citizens are free." *United States v. Stanchich*, 550 F. 2d 1294, 1300 (2d Cir. 1977) (Friendly, J.). Precedent teaches that a request for leave under Rule 48(a) must be accompanied by reasons that are real and credible. Even bending every inference in the Government's favor, its filing here falls short. Granting leave of court under these circumstances would defeat the Supreme Court's central purpose in inserting the "leave of court" requirement into Rule 48(a).

### 1.    Materiality

The heart of the Government's motion is a claimed, eleventh-hour doubt on its part that Flynn's lies were "material" to an FBI investigation. ECF No. 198 at 2, 12-18, 20.  This claim is not credible.

At the time of Flynn's interview with the FBI, it was conducting a counterintelligence investigation into possible coordination between individuals associated with the Trump campaign and the Russian government. Flynn was a Trump advisor with ties to the Kremlin's "principal international propaganda outlet," *see* ICA at 3, who had made unusual backchannel requests to Russia's most senior government official in the U.S., then concealed those communications from high-level U.S. officials. When the FBI repeatedly asked Flynn about those communications, he chose to lie about them – just as he had lied to various senior White House officials. That is about as straightforward a case of materiality as a prosecutor, court, or jury will ever see. In asserting otherwise, the Government struggles mightily to argue that Flynn's false statements neither affected nor could have affected the FBI's investigation of his and his colleagues' potential ties to the Russian government. Even taken on their terms, these contortions are riddled with legal and factual errors (and are contradicted by the Government's position in other cases). But more fundamentally, under the governing law—as stated by the D.C. Circuit, this Court in this very case, the Government's prior briefs in this case, and the Government's briefs in many other recent cases—the facts on which the Government relies to undermine materiality are irrelevant.

A false statement is material under 18 U.S.C. § 1001 when it has "a natural tendency to influence, or is capable of influencing, either a discrete decision or any other function of the agency to which it was addressed." *United States v. Moore*, 612 F.3d 698, 701 (D.C. Cir. 2010). Critically, the test is objective. It first looks to "qualities of the statement . . . that transcend the immediate circumstances in which it is offered and inhere in the statement itself." *Id.* at 702. It then asks whether a statement of that kind is "capable of affecting" the "general function" that a federal agency was performing when the statement was made to it. *United States v. Verrusio*,

762 F.3d 1, 21 (D.C. Cir. 2014) ("monitoring compliance with [ethics] rules" is a general function of a Congressional ethics committee); *Moore*, 612 F.3d at 702 ("identifying the recipients of packages" is a general function of Postal Services). What matters is the statement's potential effects on the agency's general function, not its actual effects under the particular circumstances at hand. *United States v. Hansen*, 772 F.2d 940, 949 (D.C. Cir. 1985) (Scalia, J.).

The application of that standard here is straightforward. While serving as the National Security Advisor, Flynn repeatedly lied about the nature and extent of his communications with a senior official of a hostile foreign power that was being sanctioned by the U.S. government for interfering with the U.S. presidential election. He did so to FBI agents carrying out the FBI's "general function" of conducting investigations into potential threats to national security. Lies about such communications could "adversely affect the ability of the [FBI] to perform this function." *Moore*, 612 F.3d at 702.

Under settled law, no more is needed. Thus, as the Government previously argued, and as this Court then held, the materiality standard—requiring only that the statement have a "natural tendency to influence, or [be] capable of influencing"—is amply satisfied here. ECF No. 144 at 50 (quoting *Moore*, 612 F.3d 698, 701); *see also* ECF No. 132 at 10-11. No federal prosecutor worth her salt would so much as hesitate to reach that conclusion, let alone abruptly dismiss criminal charges out of fear that she could not establish it before a jury. And there is no other case in which DOJ has ever adopted as its own a more stringent—and legally unsound—definition of the materiality element.

In fact, the evidence supporting materiality here is far stronger than the law requires: Flynn's lies not only potentially but *actually* affected the course of the FBI's investigation into contacts between the Trump campaign and Russia. As the Government's own submissions in

this case observed, Flynn's false statements "were absolutely material" because they prevented the FBI from learning "why [his] communications with the Russian Ambassador occurred," "raised questions about why the defendant would lie to the FBI about such communications," and "fundamentally influenced the FBI's investigative activity going forward."  ECF No. 132 at 10-11.  These conclusions are supported by both evidence and common sense—and though none of them is strictly necessary to a finding of materiality, they confirm how powerful the proof of that element is in this case.  Not only did the Government all make these arguments, but the Court has already agreed with them.  It determined (correctly) that Flynn's false statements were material because a "'lie distorting an investigation already in progress'" "could impact the FBI's decision to act and follow leads."  ECF No. 144 at 53 (quoting *Hansen*, 772 F.2d at 949).

In short, pursuant to an active investigation into whether President Trump's campaign officials coordinated activities with the Government of Russia, one of those officials lied to the FBI about coordinating activities with the Government of Russia. It is hard to conceive of a more material false statement than this one.

The Government ties itself in knots trying to disprove its own earlier filings, delving deep into the supposed "particular circumstances of this case" to cobble together a convoluted narrative of immateriality.  ECF No. 198 at 12; *but see Moore*, 612 F.3d at 701 ("[T]he question of materiality is not to be answered by reference only to the specific circumstances of the case at hand.").  This highly unusual effort, and the strained maneuvers accompanying it, afford strong evidence that the Government's stated reasons regarding materiality are pretextual.

The Government devotes considerable ink to "predication," and to the "open" or "closed" status of Crossfire Razor.  This is pure misdirection.  Whether the Flynn-specific offshoot of the broader Crossfire investigation was formally "open" or "closed" prior to the FBI learning of

Flynn's calls with Kislyak—"new information" that would have warranted "the FBI [to] consider reopening the investigation" in any event, ECF No. 198-2 at 5—was a matter of bureaucratic happenstance that had no bearing on whether the FBI could or should interview Flynn about his contacts with Kislyak.  A predicated investigation is *never* a prerequisite for the FBI to conduct a voluntary interview, a step the relevant guidelines authorize for more tentative activities such as proactive short-term "assessments" to evaluate potential national security threats.  *See* Ex. 13, DEP'T OF JUSTICE, THE ATTORNEY GENERAL'S GUIDELINES FOR DOMESTIC FBI OPERATIONS, 17-20 (2016), at 17-19, 20, 21; Ex. 14, FED. BUREAU OF INVESTIGATION, DOMESTIC INVESTIGATIONS AND OPERATIONS GUIDE § 18.5, at 18-5 (2016), at § 18.5.  Satisfaction of the Government's "predication threshold" is needed only for more intrusive measures such as undercover operations and electronic surveillance.  *See* Ex. 14 at §§ 18.6, 18.7; Ex. 13 at 19; *but see* ECF No. 198 at 16 (resting on the premise that the interview somehow "sidestepped" this "modest but critical protection").  Further, those are internal guidelines only; the Government routinely argues in other cases that they give rise to no rights on the part of defendants.  *See, e.g.*, Br. for the United States at 31, *United States v. Cooks*, 589 F.3d 173 (5th Cir. 2009) (No. 07-11151) ("It is well-established that Department of Justice guidelines and policies do not create enforceable rights for criminal defendants.").  And the abandoned case closure memorandum would have had little practical significance even if finalized, given that it reflected no definitive conclusion about Flynn's role and, as noted, was expressly subject to reopening in the event of new information.  ECF No. 198-2 at 5.

　　All of this empty formalism and bureaucratese is inexplicable as anything other than sleight of hand to camouflage the straightforward questions "of purely historical fact" that form a materiality inquiry: (1) "what statement was made?"; (2) "what decision was the agency trying to

make?"; and (3) how, in general, could the former affect the latter? *United States v. Gaudin*, 515

U.S. 506, 512 (1995).[37]  For the reasons given above, the answer to each of these questions is

clear—and, under the law as correctly stated by the Government in its earlier briefs, does not

turn at all on any of the "predication" issues that undergird the Government's motion to dismiss.

Another way for this experienced Court to assess the transparent disingenuousness of the

Government's arguments about predication is to imagine the Government's own response in any

other case to a request for the information it says is fatal to Flynn's.  Suppose any other

defendant in a false statement case demanded disclosure of whether the agency at one point

thought about closing the investigation.  Or demanded production of the facts on which the

investigation was predicated.  Or demanded to know what the investigating agents subjectively

believed at various points.  Even if the defendant had not already pled guilty before one judge

and reaffirmed that allocution under oath before another, the Government would scoff at those

demands, and this Court would summarily deny them.

The Government also asserts, as though it matters, that Flynn was not guilty of any

separate, underlying crime or wrongdoing, and that truthful answers (had he given them) could

---

[37] The same is true of any variation in describing the investigation of Flynn as having a "counterintelligence" or "criminal" focus.  These labels had no practical significance to whether the FBI could legitimately seek a voluntary interview with Flynn.  *See* Ex. 13 at 7-8 ("[T]hese Guidelines do not require that the FBI's information gathering activities be differentially labeled as 'criminal investigations,' 'national security investigations,' or 'foreign intelligence collections,' or that the categories of FBI personnel who carry out investigations be segregated from each other based on the subject areas in which they operate. Rather, all of the FBI's legal authorities are available for deployment in all cases to which they apply to protect the public from crimes and threats to the national security and to further the United States' foreign intelligence objectives.").  Moreover, any uncertainty whether Flynn's apparent violation of the Logan Act could eventually be subject to criminal prosecution—an issue on which the Department of Justice had not come to any conclusion at the time of the interview, *see* ECF No. 198 at 5—does not affect the obvious counterintelligence reasons to conduct the interview.

only have made that clear.[38]  It is inconceivable that the Government believes the materiality of

Flynn's statements turns on this.  It is wrong as a matter of established law well known to the

Government.  *See, e.g.*, *United States v. Dale*, 782 F. Supp. 615, 625–26 (D.D.C. 1991).  It is

also at odds with fundamental principles of investigations.  A deliberate material falsehood that

draws suspicion onto an innocent party, raises new questions, or prevents an investigator from

running a lead to ground is no less capable of "influencing the course of" an investigation simply

because the person who commits the crime has not committed another.  *United States v.*

*Safavian*, 649 F.3d 688, 691-92 (D.C. Cir. 2011).  There is no other case in which the DOJ has

taken the position that an interviewee can lie with impunity to federal investigators so long as he

has committed no other provable crimes.  And it would be particularly baffling for the DOJ to

maintain this position with respect to counterintelligence investigations, which are often

prophylactic and preventive.

Much of the Government's brief implies that the FBI interviewers had the sole, nefarious

purpose of getting Flynn to lie—rather than gathering information—because the FBI already

knew what Flynn and Kislyak had said to one another.  *See* ECF No. 198 at 17.  Even putting

aside the fact that such an allegation does not raise a cognizable defense, the Government's

narrative is riddled with plot holes.  For example, as agreed before the interview, when Flynn

claimed to have forgotten aspects of the calls, the agents decided to help him out: they

deliberately "refresh[ed] [Flynn's] recollection" by repeatedly prompting him with "the exact

---

[38]  *See* ECF No. 198 at 13 (the FBI "lacked sufficient basis to sustain its initial
counterintelligence investigation"); *id.* at 13-14 ("The calls were entirely appropriate on their
face"); *id.* at 14 ("Nor was anything said on the calls themselves to indicate an inappropriate
relationship between Mr. Flynn and a foreign power."); *id.* at 16 ("Whether or not Mr. Flynn had
been entirely candid with the future Vice President or Press Secretary did not create a predicate
for believing he had committed a crime or was beholden to a foreign power.").

words Flynn used" in his conversations with Kislyak when he failed to bring up or claimed to have forgotten aspects of their conversations. ECF No. 198-14 at 4.[39] If the agents were deviously trying to trick Flynn into lying, they did a terrible job. The agents also repeatedly provided him with opportunities to set things straight and offered a roadmap to the truth with questions employing his own words. And of course, even if the agents anticipated that Flynn might lie in the interview (and then keep on lying), he could easily have sidestepped that "trap" by telling the truth. One doesn't need to be a senior national security official entrusted with the Nation's secrets to know not to lie to the FBI.

More fundamentally, it is never a defense to a false statement charge that "the government was not actually deceived." *See Safavian*, 649 F.3d at 691-2; *Moore*, 612 F.3d at 701–02; *United States v. Lupton*, 620 F.3d 790, 806 (7th Cir. 2010); *United States v. McBane*, 433 F.3d 344, 350–51 (3d Cir. 2005); *United States v. Sarihifard*, 155 F.3d 301, 306 (4th Cir. 1998). The Government itself regularly (and emphatically) rejects arguments just like this one when raised by defendants who are not confidantes of the President. *See, e.g.* Consolidated Resp. of the United States to the Def.'s Pretrial Mots. at 43, *United States v. Kim*, 808 F. Supp.

---

[39] *Compare* ECF No. 198-7 at 6 (agents asked Flynn "if he recalled any conversation with Kislyak in which the expulsions were discussed, where Flynn might have encouraged Kislyak not to *escalate* the situation, to keep the Russian response *reciprocal*, or not to engage in a '*tit-for-tat*'") *with* Ex. 2 at 9 (12/29/16 Tr. ("[W]hat I would ask Russia to do is . . . to only make it *reciprocal* . . . . I don't want us to get into something that has to *escalate* . . . you know, on a *tit for tat*") (emphasis added)). *Compare also* ECF No. 198-7 at 6 (agents "asked Flynn if he recalled any conversation with Kislyak in which Kislyak told him the Government of Russia had *taken into account* the incoming administration's position about the expulsions, or where Kislyak said the Government of Russia had responded, or chosen to modulate their response, in any way to the U.S.'s actions as a result of a request by the incoming administration") *with* Ex. 2 at 13 (12/31/16 Tr. ("probably you have heard about the decision taken by Moscow about action and counter-action . . . . I just wanted to tell you that our conversation was also *taken into account* in Moscow and . . . Your proposal that we need to act with cold heads, uh, is exactly what is uh, invested in the decision") (emphasis added).

2d 44 (D.D.C. 2011) (No. 10 Crim 225) ("The defendant . . . argu[es] that, because the FBI agents asked him questions the answers to which the United States already knew, [his] prosecution is inconsistent with the statute and fundamentally unfair. . . . There is no such defense to a false statements charge.").[40]  In fact, the Government made this very point in a brief filed three days before its Rule 48(a) motion was docketed.  *See* Br. for the United States at 32, *United States v. Brettschneider*, No. 19-2423 (2d Cir. May 4, 2020) (explaining that even a statement known by the agency to be false "prior to its solicitation is material because it can still be underline(capable) of influencing the agency's decision-making process").  Once again, the Government's request for leave of court under Rule 48(a) presumes the suspension of settled law for this case, but not for any others—all in a way pointedly contradicted by the Government's own prior briefs here and elsewhere, as well as hornbook criminal law.  This is powerful evidence of an improper, pretextual filing.

The Government relegates the then-ongoing broader Crossfire Hurricane investigation to a footnote.  *See* ECF No. 198 at 18 n.6.  It previously told this Court—correctly—that Flynn's false statements "went to the heart of that inquiry," which alone was sufficient to establish materiality.  ECF No. 132 at 10; *see also* ECF No. 144 at 52-53.  And when Flynn pleaded guilty, he admitted his lies materially impacted "the FBI's ongoing investigation into . . .

---

[40] *See also, e.g.*, Consolidated Br. for the United States as Appellee at 153, *United States v. Allen*, No. 19-3034 (10th Cir. May 8, 2020) ("[A] statement can be material even if the decision-maker had already arrived at her conclusion before the statement is made." (quotation marks omitted)); *id.* at 154 ("When statements are aimed at misdirecting agents and their investigation, even if they miss spectacularly or stand absolutely no chance of succeeding, they satisfy the materiality requirement of 18 U.S.C. § 1001."); Br. for United States at 17, *United States v. McBane*, 433 F.3d 344 (3d Cir. 2005) (No. 04-3215) (arguing that the defendant's statements were material because they "had a natural tendency which could have influenced the actions of a 'reasonable decision-maker,'" even though they were "not capable of influencing the decision or subsequent actions of the Special Agents" in the case, who had already gathered all the material facts).

coordination between individuals associated with the Campaign and Russia's efforts to interfere with the 2016 presidential election," *i.e.*, the Crossfire Hurricane investigation. ECF No. 4 at 1-2. Now, however, the Government says there is no connection with that investigation, advancing contentions that contradict its earlier filing and are not credible on their face.

*First,* it asserts that the "FBI consistently justified the interview of Flynn based on its no longer justifiably predicated counterintelligence investigation of him alone." ECF No. 198 at 18 n.6. But the investigation of Flynn was part and parcel of the overarching investigation, all the way down to its parallel codename and cross-referenced opening documentation. *See* ECF No. 198-2 at 2-4 (describing the actions taken by the "CH investigative team" to investigate Flynn). As the Government is well aware, but somehow fails to mention in its filing, any information relevant to one part of the investigation was potentially relevant to the other.

*Second*, the Government asserts that the broader investigation was concerned with "the Trump campaign and its possible coordination with Russian officials to interfere with the 2016 presidential election back prior to November 2016" and that the Flynn "interview had nothing to do with this subject matter." ECF No. 198 at 18 n.6. But while Flynn's false statements related to events after the election, the FBI agents asked about *all* of Flynn's contacts with any Russians throughout the relevant time period.[41]

In any event, here too the Government's premise is irrelevant. Even arbitrarily limiting the focus to the discussion of post-election calls, truthful information about Flynn's dealings with Russian officials on behalf of the transition team could easily have yielded investigative leads, or

---

[41] ECF No. 198-7 at 4 ("The interviewing agents asked Flynn if he had any other text, email, or personal meetings with Kislyak or other Russians."); *see also id*. at 2-3 (Flynn described a call with Kislyak in "early [2016]" when "Flynn said he was not really part of the Trump campaign"); *id.* at 4 ("Flynn volunteered that after the election, he had a closed door meeting with Kislyak and Jared Kushner at Trump Tower in New York City.").

ruled out investigative dead ends, that "were capable of influencing the course of the FBI's investigation." *Safavian*, 649 F.3d at 691-92; *see also United States v. Stadd*, 636 F.3d 630, 639 (D.C. Cir. 2011) (accurate information "would have led [the decisionmaker] to inquire further"); *Hansen*, 772 F.2d at 950 (accurate information "would have prompted investigation or action"). To provide just a few examples, had Flynn truthfully described the calls, those answers would have prompted follow-up questions such as: Which other transition team members, if any, did he consult with about the requests?  What did they say to him?  What reasons, if any, did Flynn and his transition colleagues have for thinking the Russians would be receptive to the requests?[42] Why had Flynn apparently lied to others in the administration, leading to the false public denials by Vice President-Elect and others regarding the content of the calls?  There is no rational view of the law of materiality pursuant to which Flynn's false statements regarding his post-election calls with Kislyak can be described as immaterial.  And once again, the Government has not exhibited in any other cases the qualms it claims to have here.

In sum, Flynn's falsehoods were material under applicable law; the Government repeatedly recognized as much in its prior statements and filings, as did Flynn in his guilty plea; and this Court (twice) agreed with that position, which is now law of the case.  Notwithstanding all that, the Government seeks to dismiss its own charge purportedly on the ground that both it and the Court were wrong about materiality—relying entirely on arguments and facts that

---

[42] This is not speculation.  After Flynn agreed to cooperate and give truthful responses, the Special Counsel's Office interviewed him, apparently asked precisely these sorts of questions, and based on his responses was able to follow these leads and learn (at a minimum) additional context for understanding the calls.  *See* ECF No. 79-3 at 25-29; ECF No. 79-6 at 10-12.  *See also* ECF No. 160-22 at 2, 4 (notes indicating that the Special Counsel regarded additional context for the Dec. 29 call as valuable to its investigation).

collapse (or fall away as irrelevant) under even cursory scrutiny and that the Government itself has found unavailing in countless other cases and numerous times in this very case.

The Government may permissibly exercise its discretion for sound reasons even if doing so benefits a friend and political ally of the President (who, as noted, tried unsuccessfully to persuade the FBI Director at the time to "let this go," ECF No. 79-6 at 26).  But the Government may not enlist a court in dismissing a case solely because the defendant is a friend and political ally of the President—and where the ostensible reasons advanced for dismissal amount to a thin and unpersuasive disguise.  Only by acting as a rubber stamp could the Court presume that all of this is regular and that the Government's reasons here are anything but pretextual.  Unfortunately, what is actually happening in this case is precisely what Rule 48(a) was intended to guard against.  If the Executive wishes for the Judiciary to dismiss criminal charges—as opposed to issuing a pardon or taking other unilateral action—the reasons it offers must be real and credible.  Its professed concerns about materiality are neither.

### 2.    Falsity

As a fallback, though with virtually no explanation for its reversal, the Government says that it now doubts its ability to prove Flynn knowingly lied to the FBI. *See* ECF No. 198 at 2, 18-19.  This claim is even more implausible than its claim regarding materiality.

In fact, the Government does not even have to prove Flynn's guilt.  He has pled guilty.  If his motion to withdraw that plea is reinstated after this Court denies the Government's motion to dismiss, it will fail.  A plea of guilty "is a grave and solemn act to be accepted only with care and discernment," *Brady v. United States*, 397 U.S. 742, 748 (1970), and Flynn's plea has been accepted by two judges in this district.  It may be withdrawn, but only upon a showing of a "fair and just reason," Fed. R. Crim. P. 11(d), and dissatisfaction with how the case has progressed

does not suffice.  A change of heart is no reason to permit withdrawal of a plea.  *See, e.g., United States v. Gonzalez*, 970 F.2d 1095, 1100 (2d Cir. 1992) ("The fact that a defendant has a change of heart prompted by his reevaluation of either the Government's case against him or the penalty that might be imposed is not a sufficient reason to permit withdrawal of a plea.").

In any case, Flynn's guilt is plain.  He has repeatedly admitted that he knowingly lied to the FBI about his conversations with Kislyak.  He did so under oath when he pleaded guilty, and did it again under oath when he reaffirmed his plea on December 18, 2018.  ECF No. 4; ECF No. 16 at 4, 18-19, 30; ECF No. 103 at 7-8, 16.  When he executed his plea agreement, he adopted in writing, under penalty of perjury, a detailed inventory of all the facts that he knew—and lied to obscure—during the FBI interview.  *See* ECF No. 4 at 2-5 ¶¶ 3-4, 6; ECF No. 16 at 4, 14-19.  He also appears to have given extensive accounts of these false statements to the Office of the Special Counsel over the course of numerous interviews conducted before and after his plea.

Flynn has freely admitted his guilt (and agreed to cooperate with the Government) because his guilt could hardly be more provable.  Even absent Flynn's confessions, the proof that he lied is straightforward.  We know exactly what Flynn said to Kislyak: transcripts document their whole exchange.[43]  We know exactly what Flynn said to the FBI: the interviewing agents have a clear account of how Flynn described those calls, and the details of that account are corroborated by their contemporaneous notes.  *See* ECF No. 198-7; ECF No. 198-13.  This record of what Flynn said on his calls with Kislyak, and what he later told the FBI about those calls, proves that Flynn lied when he denied, or denied recalling, requests that he personally made of Russia, through Kislyak.  And those false disavowals are more than sufficient to support

---

[43]With the exception of the December 22 call in which Flynn and the Government have both admitted he "requested that Russia vote against or delay the [UN] resolution," ECF No. 4 at 5 ¶ 4(d), those transcripts are now a matter of public record.  *See* Ex. 2.

a conviction for perjury—as the Government explained in detail when opposing Flynn's *Brady* motion, *see* ECF No. 132 at 4-6, and as this Court agreed, *see* ECF No. 144 at 42-49.

In its motion to dismiss, the Government tosses out a grab-bag of justifications to explain its sudden reservations. But these assertions do not add up and frankly make no sense.

The Government first suggests that it might struggle to disprove Flynn's statements because he supposedly "offered either equivocal . . . or indirect responses, or claimed to not remember the matter in question." ECF No. 198 at 18. That is inaccurate. Flynn told outright lies and made categorical denials about specific issues in response to specific questions. And, again, Flynn admitted under penalty of perjury and subsequently under oath that he "then and there knew" the facts that he now claims to have forgotten during an interview in which the FBI agents repeatedly prodded him with the specific goal of jogging his memory. ECF No. 4 at ¶¶ 3-4. *See* ECF No. 16 at 15-17; ECF No. 198-14 at 4.

Flynn's position and the circumstances surrounding his underlying misstatements also make it extremely implausible that the Government genuinely doubts its ability to prove that any of these statements was a lie. Flynn is no ordinary defendant. He was the National Security Advisor to the President. His job was to remember things—lots of things, and secrets most of all. The Government could easily overcome any last-minute assertions by Flynn that he forgot, within just a month, having personally solicited specific, valuable favors from Russia (by his own account, one of the United States' "primary threats," *see* ECF No. 198-7 at 3), all in a manner that undermined the policies of the sitting President.

That is true for at least five reasons. *First*, prior to talking to Kislyak, Flynn "spoke with McFarland for almost 20 minutes to discuss what, if anything, to communicate to Kislyak about the sanctions," and they "both understood that Flynn would relay a message to Kislyak in hopes

of making sure the situation would not get out of hand," including because the "Transition Team members in Mar-a-Lago did not want Russia to escalate the situation." *See* ECF No. 79-3 at 27. *Second*, Russia acted on Flynn's request and in direct response to it. *See* ECF No. 4 at ¶ 3(f). *Third*, two days after Flynn made the request, Kislyak confirmed to Flynn that Russia had acted on it by telling him "that Russia had chosen not to retaliate in response to his request." ECF No. 4 at ¶ 3(g). *See also* Ex. 2 at 13 (12/31/16 Tr.). *Fourth*, Flynn reported to McFarland on his discussion with Kislyak of Russia's response to the sanctions, and specifically "told [her] that he believed his phone call had made a difference." ECF No. 79-3 at 29. *Fifth*, as discussed above, Russia's response was a surprise and a big news event that President Trump—Flynn's new boss—publicly praised on Twitter. *Finally*, there was major discussion for days before the FBI interview (in the media and the White House) about what Flynn did or did not ask the Russians on the calls in question. *See*, *e.g.*, Ex. 5. The Government's professed anxiety about proving that Flynn remembered the calls reeks of pretext; there are limits to deference and here they are blatantly exceeded.[44]

The Government also waves vaguely at "inconsistent FBI records" concerning Flynn's interview. Yet the motion to dismiss does not explain what records, or what inconsistencies, the Government actually has in mind. And anything it might seize upon would involve tangential nitpicking; as the Government has explained before and as this Court agreed, Flynn made

---

[44] If the Court has any questions about the extent of Flynn's recollection, it should ask the Government to produce the documentation of the interviews Flynn voluntarily gave the Special Counsel's Office. The record shows that on November 16-17, 20, and 21, 2017, and January 19, 2018, Flynn discussed both sets of calls with the Office of the Special Counsel, as well as the circumstances surrounding the calls. *See* ECF No. 79-3 at 25. Whatever Flynn remembered in November 2017 and January 2018 (almost a year after the Kislyak calls), he surely remembered in January 2017 (approximately a month after the calls).

multiple false statements that are reflected in and consistent across both sets of notes and the FD-302. *See* ECF No. 132 at 4-6; ECF No. 144 at 42-43. Elsewhere, the Government has noted that certain questions that appear in the agents' detailed FD-302 are not readily apparent from their contemporaneous handwritten notes. *See* Govt. Mandamus Br. at 6-7. But as the Government knows well, there is nothing remotely unusual about that. FBI agents always rely on a mix of notes and their own memories in drafting an FD-302—as the Court has already explained in this very case—and the latter will by design be more complete and more detailed. *See* ECF No. 144 at 41. ("[T]he notes of FBI agents are not verbatim transcripts of the interview.") There is not a shred of evidence in the record that contradicts the recollections memorialized in the FD-302. Viewed against the transcripts of the calls with Kislyak, the documents in the docket confirm what Flynn has repeatedly admitted, under oath and under penalty of perjury: he knowingly lied to the FBI investigators, just as he had lied to the Vice President, the President's Chief-of-Staff, and the Press Secretary.

Finally, the Government says it fears testimony that the interviewing FBI agents did not see any signs that Flynn was lying. *See* ECF No. 198 at 18 (citing ECF No. 198-14 at 4).[45] This is not a serious argument. The subjective views of the agents, including whether they believed the defendant was lying or telling the truth, are irrelevant to a false statements case. *See Brogan v. United States*, 522 U.S. 398, 402 (1998) ("[M]aking the existence of this crime turn upon the credulousness of the federal investigator (or the persuasiveness of the liar) would be exceedingly

---

[45] The Government also cites a passing statement by Comey "that the case was a 'close one'" in support of its novel claim that there are reasonable doubts regarding whether Flynn lied. ECF No. 198 at 18 (referencing ECF No. 198-6 at 10). This is an obvious makeweight. Comey also stated, "I think there is an argument to be made that he lied." ECF No. 198-6 at 10. But more importantly, Comey was not present during the interview, *see* ECF No. 198-14, and his secondhand personal opinion has no probative value and is almost certainly inadmissible.

strange . . . ."); *Safavian*, 649 F.3d at 691-92.  In any event, the agents' view here was simply that "if he (Flynn) was a liar, he was a good one."  ECF No. 129-14 at 1.  Even if that were admissible, it would hardly be helpful to Flynn.  The premise of this facet of the Government's motion is also absurd.  Although the Government insinuates throughout its filing that the interviewing agents were villains who went "fishing for falsehoods" to "manufacture" a federal crime, ECF No. 198 at 13; *see also id.* at 17, on this one point the agents are re-cast as trustworthy witnesses for Flynn's defense.  No competent lawyer thinks this way—yet the Government's lawyers, who know exactly what they are doing, nonetheless resort to putting these "reasons" before the Court in hopes that it will rubber stamp their motion.

The truth is clear: nothing about the falsity of Flynn's statements has changed since the Government told this Court that the evidence was "consistent and clear that the defendant made multiple false statements to the agents."  ECF No. 132 at 4-5.  In reliance on the Government's representations—and after "[h]aving carefully reviewed" the very same body of evidence—this Court "agree[d] with the government" that the evidence and Flynn's own admissions "make clear that Mr. Flynn made those false statements."  ECF No. 144 at 42-43.  That all remains true today.  There is no new evidence suggesting that Flynn did not make statements, or that the statements were not in fact false, or that the National Security Advisor forgot having personally solicited and secured high-value favors on a matter of great international concern from a hostile foreign power just one month earlier.  The Government's newly asserted justifications for doubting its ability to prove that Flynn lied are so irregular and implausible that the Court would undermine the integrity of these proceedings—and offend a core purpose of Rule 48(a)—if it granted leave on this basis.

## B.    The Court Should Deny Leave Based on Gross Prosecutorial Abuse

Clear evidence of gross prosecutorial abuse constitutes an independent basis for denying the Government's motion.  Here, that evidence takes two principal forms.  It first consists of the many red flags in the Government's own filing that demonstrate pretextual reasoning—and reveal the highly irregular (and improper) fabrication of standards that not only apply nowhere else, but are routinely rejected by DOJ itself.  I have catalogued that evidence above.  The second body of evidence arises from a review of additional circumstances surrounding this case and the filing of the Government's motion to dismiss.    Taken together, these facts overcome the presumption of regularity to which the Government is ordinarily entitled.

Flynn was an early adviser and crucial political ally to President Trump during the last presidential election.[46]  The events that gave rise to Flynn's conviction took place while he was serving President Trump as an adviser to the transition team and during Flynn's brief stint as an official in President Trump's White House.  There is evidence of coordination between Flynn and other senior transition team members, including those located at the President's property at Mar-a-Lago, immediately before Flynn engaged in the conversations that he lied about to the FBI.  *See* ECF No. 79-3 at 26-27.  *See also* n.18, *supra*.

Former FBI Director Comey testified under oath before Congress that on February 14, 2017, one day after Flynn resigned as National Security Advisor, the President had an unusual one-on-one conversation with him in the Oval Office, requesting as follows: "I hope you can see your way clear to letting this go, to letting Flynn go.  He is a good guy.  I hope you can let this go."  ECF No. 79-6 at 26.[47]

---

[46] *See* n.4, *supra*.

[47] *See also Statement for the Record, S. Select Comm. on Intelligence*, 115th Cong. 5 (2017) (statement of James B. Comey).

President Trump has since engaged in running public commentary about Flynn's criminal case through the media and on Twitter. In total, he has tweeted or retweeted about Flynn at least 100 times from March 2017 to present.[48] This commentary has made clear that the President has been closely following the proceedings, is personally invested in ensuring that Flynn's prosecution ends, and has deep animosity toward those who investigated and prosecuted Flynn.

On March 31, 2017, for example, President Trump tweeted that "Mike Flynn should ask for immunity in that this is a witch hunt (excuse for big election loss), by media & Dems, of historic proportion!"[49] In a June 2018 interview, the President offered commentary on the facts of the case: "I feel badly for General Flynn. He's lost his house. He's lost his life. And some people say he lied, and some people say he didn't lie. I mean, really, it turned out maybe he didn't lie. So how can you do that?"[50] He then made similar comments the next month: "[Y]ou look at Flynn, it's a shame but the FBI didn't think he was lying."[51]

On December 18, 2018, when Flynn was first set for sentencing before this Court, the President tweeted: "Good luck today in court to General Michael Flynn. Will be interesting to see what he has to say, despite tremendous pressure being put on him, about Russian Collusion in our great and, obviously, highly successful political campaign. There was no Collusion!"[52]

---

[48] TRUMP TWITTER ARCHIVE, http://www.trumptwitterarchive.com/archive/Flynn/ttff (last visited June 7, 2020). One of Trump's most recent tweets, posted just last week, is a retweet of Senator Tom Cotton stating that the Court is "abusing [its] judicial power for political purposes." Thomas Cotton (@SenTomCotton), TWITTER (June 1, 2020, 3:09 PM), https://twitter.com/SenTomCotton/status/1267548948937441281.

[49] Donald J. Trump (@realDonaldTrump), TWITTER (Mar. 31, 2017, 6:04 AM), https://twitter.com/realDonaldTrump/status/847766558520856578.

[50] *Remarks by President Trump in Press Gaggle*, WHITE HOUSE (June 15, 2018), https://perma.cc/KNV6-VVN7.

[51] *Hannity: Episode dated 16 July 2018* (Fox News television broadcast July 16, 2018).

[52] Donald J. Trump (@realDonaldTrump), TWITTER (Dec. 18, 2018 6:41 AM), https://twitter.com/realdonaldtrump/status/1074993036831191045.

In June 2019, Flynn's former counsel were replaced. In response, President Trump tweeted his approval of one of Flynn's new lawyers: "General Michael Flynn, the 33 year war hero who has served with distinction, has not retained a good lawyer, he has retained a GREAT LAWYER, Sidney Powell. Best Wishes and Good Luck to them both!"[53]

In March 2020, President Trump tweeted that he was "strongly considering a Full Pardon" for Flynn.[54]  On April 29-30, roughly a week before the Government filed its motion to dismiss, President Trump opined that Flynn's case is a "scam[]" and that Flynn has been "tormented" and "persecuted" by "dirty, filthy cops at the top of the FBI" (as well as certain news outlets).[55]  President Trump also stated that these individuals and entities "were trying to force [Flynn] to lie," mentioning "written statements where they were trying to force him into a position where we can get him on a lie or can we get him this way or that way"[56]— advancing a narrative that the Government now espouses in its motion to dismiss.  *Compare with* ECF No. 198 at 8 n.2, 13-14.

These tweets were issued against the background of a severe breakdown in the traditional independence of the Justice Department from the President.  As Professor Jack Goldsmith notes,

---

[53]Donald J. Trump (@realDonaldTrump), TWITTER (June 13, 2019, 5:21 AM), https://twitter.com/realDonaldTrump/status/1139115655532298240.

[54]Donald J. Trump (@realDonaldTrump), TWITTER (Mar. 15, 2020, 12:29 PM), https://twitter.com/realdonaldtrump/status/1239242219019735042.

[55]*Remarks by President Trump in a Meeting with Governor Murphy of New Jersey*, WHITE HOUSE (Apr. 30, 2020), https://perma.cc/PBT5-7QHF ; Donald J. Trump (@realDonaldTrump), TWITTER (Apr. 30, 2020, 6:47 AM), https://twitter.com/realdonaldtrump/status/1255825998521741312; Donald J. Trump (@realDonaldTrump), TWITTER (Apr. 30, 2020, 6:47 AM), https://twitter.com/realdonaldtrump/status/1255826177350144001; Donald J. Trump (@realDonaldTrump), TWITTER (May 14, 2020, 10:37 PM), https://twitter.com/realdonaldtrump/status/1261138690929295361.

[56]*Remarks by President Trump in a Meeting with Governor Murphy of New Jersey*, WHITE HOUSE (Apr. 30, 2020), https://perma.cc/PBT5-7QHF.

"every presidency since Watergate has embraced policies for preserving DOJ and FBI independence from the President in certain law enforcement and intelligence matters."[57]   One component of that independence is "resistance to politicized influence."[58]   Yet President Trump has overtly claimed and exercised the "absolute right to do what I want to do with the Justice Department."[59]   The Attorney General stated earlier this year that President Trump's "public statements and tweets" about pending cases "make it impossible to do my job and to assure the courts and the prosecutors in the department that we're doing our work with integrity."[60]

The President has repeatedly opined on specific issues in this case.  He has made clear his view that Flynn should not be prosecuted or punished for his crimes.  And he has publicly repudiated settled, foundational norms of prosecutorial independence.  Everything about this is irregular.

The Executive Branch had the unreviewable discretion to never charge Flynn with a crime because he is a friend and political ally of President Trump.  President Trump today has the unreviewable authority to issue a pardon, thus ensuring that Flynn is no longer prosecuted and never punished for his crimes because he is a friend and political ally.  But the instant the Executive Branch filed a criminal charge against Flynn, it forfeited the right to implicate this Court in the dismissal of that charge simply because Flynn is a friend and political ally of the President.  Avoiding *precisely* that unseemly outcome is why Rule 48(a) requires "leave of court."

---

[57] Jack Goldsmith, *Independence and Accountability at the Department of Justice*, LAWFARE (Jan. 30, 2018), https://perma.cc/NST4-UPCX.

[58] *Id.*

[59] *Excerpts from Trump's Interview with the Times*, N.Y. Times (Dec. 28, 2017), https://perma.cc/5YA8-RY5H.

[60] *Transcript of Attorney General Bill Barr's Exclusive Interview with ABC News*, ABC NEWS (Feb. 13, 2020), https://perma.cc/HZ2C-7R6S.

The Court should deny the Government's motion for leave to dismiss, adjudicate all pending or renewed motions, and proceed to sentencing.

### III.    THE COURT SHOULD CONSIDER THE DEFENDANT'S PERJURY IN SENTENCING ON THE FALSE STATEMENTS OFFENSE, RATHER THAN ISSUING AN ORDER TO SHOW CAUSE

This Court has the authority pursuant to 18 U.S.C. § 401, Federal Rule of Criminal Procedure 42, and its inherent judicial authority to initiate a prosecution for criminal contempt based on Flynn's perjury.   And there is ample evidence in the record that Flynn committed perjury in these proceedings, which would support the issuance of an Order to Show Cause to commence such a prosecution.   I respectfully recommend, however, that the Court instead consider this conduct in fashioning the appropriate sentence for the false statement offense to which the defendant has pleaded guilty.   This approach—rather than a separate prosecution for contempt—aligns with this Court's previously stated intent to treat this case, and this defendant, in the same way it would any other.[61]

#### A.    This Court Has Authority to Initiate a Prosecution of the Defendant for Criminal Contempt

Since the founding of the United States, its courts have possessed broad authority to punish contemptuous behavior on their own accord.  *See In re McConnell*, 370 U.S. 230, 233 (1962).  This authority is essential to both the integrity of the justice system and the separation of powers, "ensuring that the Judiciary has a means to vindicate its own authority without complete dependence on other Branches."  *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 795–96 (1987).  Accordingly, under 18 U.S.C. § 401, a court has the "power to punish" any "contempt of its authority," including "misbehavior of any person in its presence."   Although

---

[61] *See* ECF No. 94 at 7.

courts have been directed to use the least possible power needed to vindicate their authority and obtain relief, *see United States v. Wilson*, 421 U.S. 309, 319 (1975), they are empowered to impose fines or imprisonment, or both, for those purposes, *see* 18 U.S.C. § 401.

Under Federal Rule of Criminal Procedure 42, which governs application of the contempt power set forth in § 401, *see Wilson*, 421 U.S. at 315 n.6, "[a]ny person who commits criminal contempt may be punished for that contempt after prosecution on notice." Fed. R. Crim. P. 42(a). A court may initiate such a prosecution by "request[ing] that the contempt be prosecuted by an attorney for the government, unless the interest of justice requires the appointment of another attorney." *See id.* 42(a)(2).[62] The court has the authority to prosecute the charge even where the government declines to do so. *Id.*

To establish contempt under 18 U.S.C. § 401(1), the prosecuting attorney must prove four elements: (*i*) misbehavior of a person; (*ii*) in or near to the presence of the court; (*iii*) which obstructs the administration of justice; and (*iv*) is committed with the required degree of criminal intent. *United States v. McGainey*, 37 F.3d 682, 684 (D.C. Cir. 1994). There is ample evidence

---

[62] Here, appointing a private prosecutor in the first instance would be in the interest of justice because the Government has already indicated that it would decline to prosecute, asserting before the D.C. Circuit that Flynn "cannot be prosecuted for contempt under Section 401(1)." Gvt. Mandamus Br. at 28–29. *See also Young*, 481 U.S. at 795–96 ("If the Judiciary were completely dependent on the Executive Branch to redress direct affronts to its authority, it would be powerless to protect itself if that Branch declined prosecution."); *United States v. Arpaio*, 887 F.3d 979, 981–82 (9th Cir. 2018) (concluding the court had "the authority to appoint counsel under Federal Rule of Criminal Procedure 42" and that "independent of any authority under Rule 42(a)(2), [the court] ha[d] inherent authority to appoint a special counsel to represent a position abandoned by the United States on appeal"); *In re Special Proceedings*, 373 F.3d 37, 42 (1st Cir. 2004) (finding district court was "entitled to appoint [a private attorney] without asking the government to handle the case if [it] permissibly found that 'the interest of justice require[d]' it"); *In re Slovenec*, 799 F. Supp. 1441, 1447-48 (W.D.N.Y. 1992) (interpreting motion to dismiss criminal contempt charges by the government as a declination to prosecute defendants and appointing independent counsel to prosecute contempt).

in the record that Flynn's conduct satisfies each of the four elements to support the issuance of an Order to Show Cause.

### 1.    The Defendant Engaged in Misbehavior in the Presence of the Court

Making false statements to the Court can constitute "misbehavior of a person" punishable as contempt.  *See In re Michael*, 326 U.S. 224, 227-28 (1945); *Ex Parte Hudgings*, 249 U.S. 378, 382 (1919).  To support a determination of criminal contempt, the false statement must meet "the essential elements of perjury under the general law."  *In re Michael*, 326 U.S. at 228.  As relevant here, to support a contempt prosecution, Flynn must have made a false statement to the Court "that he did not, at the time, believe . . . to be true," *Young v. United States*, 212 F.2d 236, 240 (D.C. Cir. 1954), that was material to the issue to be determined by the Court, *see In re Sealed Case*, 162 F.3d 670, 673 (D.C. Cir. 1998).

There is irrefutable evidence in the record that Flynn made material false statements to this Court in his Declaration in Support of his Supplemental Motion to Withdraw Plea of Guilty, ECF No. 160-23, on two topics: (*i*) whether he knowingly made materially false statements to the FBI, *id.* at 2-7 ¶¶ 9, 23, 29; and (*ii*) whether the FBI induced him to enter a plea by threatening to prosecute his son.  *Id.* at 2 ¶ 9; *see also id.* at 8 ¶ 34; *id.* at 9 ¶ 37.  The statements in Flynn's Declaration on these subjects directly contradict Flynn's prior testimony under oath during his plea colloquies: if this Court concludes, as it should, that Flynn spoke the truth during the plea colloquies, he necessarily lied in his Declaration.[63]  Under federal law, a defendant who makes two or more material declarations under oath before a U.S. court that "are inconsistent to

---

[63] The reverse is equally true: if his Declaration were truthful, Flynn lied during his plea colloquies; such a finding would also support a perjury prosecution.

the degree that one of [those declarations] is necessarily false" has committed perjury, even without proof as to which statement is false.  18 U.S.C. § 1623(c).

Flynn truthfully admitted the criminal conduct underlying the offense of conviction on three occasions: first in executing the Statement of the Offense, where he affirmed under penalty of perjury that every word of the Statement was true and correct, *see* ECF No. 4 at 1–5 ¶¶ 1–5; *id.* at 6; again when he entered his guilty plea, testifying under oath that he knowingly made materially false statements to the FBI on January 24, 2017, *see* ECF No. 16 at 18-19; and a third time on December 18, 2018, when he reaffirmed under oath his factual guilt, ECF No. 103 at 10–14; *see also* ECF No. 1 at 1–2; ECF No. 3 at 10.  In his Declaration, Flynn attempted to turn the factual tables, declaring under penalty of perjury that he "did not lie" to the FBI agents in his interview, but was "honest with them to the best of [his] recollection at the time."  ECF No. 160-23 at 2 ¶ 9.  Flynn similarly asserted that "[a]lthough [he] may have had an incomplete memory of the many details of certain conversations when speaking to the agents, [he] did not consciously or intentionally lie." *Id.* at 7 ¶ 29.  These material and irreconcilable declarations under oath provide more than sufficient evidence to support an Order to Show Cause.

Likewise, Flynn repeatedly testified truthfully under oath that his plea was knowing, voluntary, and intelligent, and that it was not the product of threats or coercion of any kind. Before Judge Contreras on December 1, 2017, Flynn affirmed that he was entering his plea "knowingly, voluntarily, and intelligently," and no one had "forced, threatened, or coerced [him] in any way." *See* ECF No. 16 at 29.  Flynn further testified that the plea agreement represented the entire understanding he had with the Government, and that there were no other promises or "side oral agreements." *See id.* at 20, 29.  At the hearing before this Court where he reaffirmed his guilt under oath, Flynn confirmed in response to a series of questions "that he entered his

guilty plea knowingly, voluntarily, [and] intelligently." *See* ECF No. 103 at 7-10, 15-16. Moreover, Flynn endorsed under penalty of perjury the Statement of the Offense, which states that "[n]o threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully." *See* ECF No. 4 at 6.[64]

Flynn again has directly contradicted his prior sworn statements by now declaring under penalty of perjury that he "agreed to plead guilty … because of the intense pressure from the Special Counsel's Office." ECF No. 160-23 at 8 ¶ 34. *See also id.* at 9 ¶ 36 ("I accepted the plea agreement to stop the pain and threats to my family'"), 11 ¶ 46 ("I allowed myself to succumb to the threats from the government to save my family"). Flynn declared that his former attorneys advised him that his son "could or would face indictment" if he did not plead guilty, but "would be left in peace" if Flynn accepted the plea. *Id.* at 7 ¶ 28, 9 ¶ 37. Flynn further asserted that, after he signed the plea agreement on November 30, 2017, his former attorneys informed him that his "son would not be further targeted" if he stood by the plea. *Id.* at 10 ¶ 40.[65]

This false testimony is material because it goes to the core of the issues to be decided by the Court, including whether Flynn committed the underlying criminal conduct and whether his plea was voluntary. Flynn's perjury "ha[d] a natural tendency to influence, or was capable of influencing, the decision of the tribunal in making a [particular] determination" on those issues.

---

[64] *See also* ECF No. 3 at 10 (affirming that "[n]o threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Agreement fully… I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this Agreement.").

[65] *See also* ECF No. 160-2 at 1 ("The government leveraged the threat of charges against Mr. Flynn's son to induce that agreement. Yet the government's decision not to charge his son was not reduced to writing as part of the plea agreement; it was a secret, side deal between counsel.").

*United States v. Hansen*, 772 F.2d 940, 949 (D.C. Cir. 1985) (internal quotations and citations omitted).

Flynn's false statements in his sworn Declaration to the Court also satisfy the requirement that the misbehavior occur "in or near to the presence of the court."  *See Laughlin v. United States*, 151 F.2d 281, 285 (D.C. Cir. 1945) (finding contempt based on filing of motions and an affidavit, because even if "some of his acts were committed out of the immediate presence of the judge[, this] did not deprive the court of the right to deal summarily with the wrongful conduct").

## 2.    The Defendant's Perjury Obstructed Justice

There is also ample evidence that Flynn's perjury obstructed the administration of justice, as required by 18 U.S.C. § 401(1).  *See In re McConnell*, 370 U.S. 230, 233-34 (1962); *see also In re Brown*, 454 F.2d 999, 1004 (D.C. Cir. 1971).  As a general matter, obstruction may entail, among other things, "delaying proceedings, making more work for the judge, inducing error, [or] imposing costs on parties."  *United States v. Oberhellmann*, 946 F.2d 50, 52 (7th Cir.1991) (citing *In re McConnell*, 370 U.S. at 234); *see also United States v. Ortlieb*, 274 F.3d 871, 876 (5th Cir. 2001) (same); *United States v. Peoples*, 698 F.3d 185, 191 (4th Cir. 2012) ("[I]t suffices if the defendant's conduct interrupted the orderly process of the administration of justice by distracting court personnel from, and delaying them in, completing their duties").

Perjury warrants punishment as contempt when it includes an "element of obstruction to the Court in the performance of its duty."  *In re Michael*, 326 U.S. at 228 (quoting *Ex parte*

*Hudgings*, 249 U.S. at 383).[66]  Courts have found perjury obstructive where it did not merely attempt to mislead but sought to block further inquiry.  For instance, courts have found obstruction in the sham inability to remember, or in persistent perjury, intended to prevent effective examination.  *United States v. Appel*, 211 F. 495, 495–96 (S.D.N.Y. 1913) (Hand, J.) (warning that the court "must in protection to itself hold that [the testimony] is false and that he was attempting to prevent any effective examination").  Courts have similarly held in contempt defendants whose perjury contradicted an earlier guilty plea and "was so conspicuously unbelievable as to indicate a deliberate attempt to conceal the truth," *Collins v. United States*, 269 F.2d 745, 751 (9th Cir. 1959), or formed a "pattern of conduct that reflects a complete disregard for the judicial process," *Okada v. Whitehead*, No. 8:15-cv-01449-JLS-KES, 2017 WL 3442798, at *4 (C.D. Cal. July 28, 2017) (granting referral for criminal contempt proceedings where the defendant "repeatedly obstructed the judicial process by submitting false testimony and refusing to adhere to judicial orders" as "allowing this subterfuge to go unsanctioned would be unconscionable").

Here, the evidence demonstrates that Flynn's conduct obstructed the Court in the performance of its duty.  As Flynn admits, he elected to plead guilty before the Court and then reaffirmed his guilt in a separate court proceeding—testifying under oath in court not once, but twice that he had lied to the FBI, and that his plea was voluntary and not the product of threats of any kind—when he felt it was in his interest to do so because he expected he "would be sentenced to probation."  ECF No. 160-23 at 10 ¶ 42.  It was only after he was taken "completely by surprise" by the Court's warning that he might face more serious consequences that Flynn

---

[66] *See also Clark v. United States*, 289 U.S. 1, 11–12 (1933) ("[O]bstruction to judicial power will not lose the quality of contempt though one of its aggravations be the commission of perjury.").

changed his mind and submitted sworn statements irreconcilably contradictory to his prior testimony in an effort to undo his plea. *Id.* at 10 ¶ 41. Flynn's false testimony not only derailed the proceedings—forcing the Court to suspend the briefing schedule and cancel the sentencing hearing, *see* Minute Order of Feb. 10, 2020—but also reflected brazen gamesmanship challenging the integrity of the judicial system.

A guilty plea "is a grave and solemn act to be accepted only with care and discernment," and for very good reason. *Brady*, 397 U.S. at 748. A plea of guilty "is itself a conviction. Like a verdict of a jury it is conclusive." *Kercheval v. United States*, 274 U.S. 220, 223 (1927). Thus, "[e]ntry of a plea is not some empty ceremony, and statements made to a federal judge in open court are not trifles that defendants may elect to disregard. A defendant has no legal entitlement to benefit by contradicting himself under oath." *United States v. Stewart*, 198 F.3d 984, 987 (7th Cir. 1999). Indeed, Rule 11 expressly warns, and requires judges to warn defendants—as the Court warned Flynn here, *see* ECF No. 16 at 4-14—that statements made in connection with guilty pleas can give rise to perjury charges, reflecting the weight placed on truthfulness in those proceedings.

A defendant cannot be permitted to abuse this solemn and careful process by opportunistically entering a plea, gauging the reaction of the court, and then, if dissatisfied with that reaction, falsely claiming that the initial plea was a lie—all in an attempt to require further court proceedings or escape a conviction. Such self-serving gamesmanship obstructs the administration of justice by vitiating the plea process and wasting courts' and prosecutors' time

and resources.  The Court has its own compelling interest, independent of the Executive branch, in ensuring that parties do not abuse and manipulate its essential functions.[67]

Here, Flynn did not simply seek to withdraw his plea, but did so by mounting a frontal assault on the integrity of the investigation.  This was deliberately obstructive and forms part of a "pattern of conduct … [that] reflects a complete disregard for the judicial process."  *Okada*, 2017 WL 3442798, at *4.  Flynn's apparent attempt to manipulate the system is particularly stark given the circumstances.  While he describes himself now as a helpless "fish-out-of water," *see* ECF No. 160-23 at 6 ¶ 23, as a former National Security Advisor and three-star general advised by experienced and sophisticated counsel, he ranks among the savviest of criminal defendants to come before any court.  To ensure the protection of his constitutional rights, this Court provided Flynn with a second plea colloquy, at which he reiterated that he had committed the offense, that he understood the consequences of pleading guilty, that he did not need the advice of independent counsel, and that he wished to plead guilty.  ECF No. 103 at 7-10, 15-16.  And Flynn was necessarily attuned to the importance of truthful testimony before the Court, since the underlying offense to which he pleaded guilty was the making of false statements.

Nonetheless, Flynn now asserts that he falsely affirmed his guilt under oath to the Court on multiple occasions and that his declaration in support of his motion to withdraw his plea is truthful.  That assertion is implausible, but in any event, it would simply mean that Flynn lied

---

[67] *See, e.g.*, *Michaelson v. United States ex rel. Chicago, St. P., M., & O.R. Co.*, 266 U.S. 42, 65–66 (1924) (the contempt power "is essential to the administration of justice"); *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 450 (1911) (the contempt power is "a necessary and integral part of the independence of the judiciary," without which, "what the Constitution now fittingly calls 'the judicial power of the United States' would be a mere mockery").

when he pleaded guilty and affirmed the Statement of Facts.[68]  Those statements effectively halted the prosecution, and, if false, would have led to a wrongful conviction and required the Court needlessly to expend judicial resources taking his pleas.[69]  Under either scenario, Flynn's false statements blocked the inquiry and obstructed the administration of justice.

### 3.    The Defendant Acted with the Requisite Criminal Intent

While there is a general consensus that a conviction under § 401 requires the defendant to act with "some kind of wrongful intent," *see* Crim. Resource Manual § 769 (U.S. Dep't of Justice 2020) (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949)), there is disagreement about the nature of the requisite intent. *Cf. Ortlieb*, 274 F.3d at 876 (requiring specific intent to obstruct justice), *with*, *e.g. United States v. Browne*, 318 F.3d 261, 266 (1st Cir. 2003) (requiring only that the defendant volitionally act in a manner that "may foreseeably disrupt or interfere with court proceedings, whether or not that was the subjective intent of the contemnor").

Under either interpretation, Flynn acted with the required intent because his conduct "was self-evidently intended to show contempt for the court."  *See In re Sealed Case*, 627 F.3d 1235, 1238 (D.C. Cir. 2010).  According to the Government, the record shows Flynn "pleaded guilty with the intent to resolve the allegations against him on the best terms he thought possible at the time."  *See* Br. for the United States at 30, *In re: Flynn*, No. 20-5143 (D.C. Cir. June 1, 2020).

---

[68] *See, e.g.*, ECF No. 160-23 at 6 ¶ 23 ("I should have stood my ground firmly [in the proffer session] for what I knew to be the truth—that I did not lie to the agents[.]"), 10 ¶ 42 ("Regretfully, I followed my lawyers' strong advice to confirm my plea even though it was all I could do to not cry out 'no' when this Court asked me if I was guilty."), ¶ 46 (making a "profound apology to this Court").

[69] *Cf. United States v. Watt*, 911 F. Supp. 538, 547 (D.D.C. 1995) (perjury before a grand jury may constitute an obstruction of justice under 18 U.S.C. § 1503 because such "false testimony could cause undue delay, import unnecessary confusion into the grand jury process, and potentially lead to an erroneous indictment.").

But the law does not permit a defendant to disavow his guilty plea as a lie merely because he now fears he misjudged his possible sentence. *Cf. United States v. Lomack*, 219 F. App'x 574, 576–77 (7th Cir. 2007) ("The fact that a defendant underestimated his sentence at the time of his plea is generally not a fair and just reason to permit him to withdraw"). Nor does the law permit a defendant to lie under oath in an effort to reduce his prison time or undermine a validly obtained conviction. *Cf. Stewart*, 198 F.3d at 987 (rejecting perjurious attempt to withdraw plea that amounted to little more than "a claim of privilege to commit a crime for personal convenience"). A false eleventh-hour disavowal of a plea and a trumped-up accusation of government misconduct constitute obstruction of the administration of justice.

### B.    This Court Should Punish the Defendant's Perjury by Factoring It into the Sentence for the False Statements Offense to Which He Has Pleaded Guilty

As set forth above, there is more than sufficient evidence in the record to support the issuance of an Order to Show Cause why Flynn's false statements do not constitute criminal contempt. That the Court possesses such authority, however, does not mean that the interests of justice require the Court to wield it. Given the case's posture, with the defendant having entered a guilty plea and awaiting sentencing, the better course is the course typically taken: to decline to issue an Order to Show Cause and consider the contemptuous conduct in sentencing on the offense of conviction.

This Court has appropriately indicated that it wishes to treat this defendant and this case like any other. *See e.g.*, ECF No. 94 at 7. In cases like these, involving plea-related perjury, courts typically vindicate the interests of the judicial branch by factoring a defendant's

contemptuous conduct into the sentence imposed on the offense of conviction,[70] not by holding the defendant in criminal contempt for perjury.[71] There is much to be gained—for the judicial system and for our country—by treating the defendant like any other defendant, and this case like any other case, to the greatest extent possible.

The Department of Justice has a solemn responsibility to prosecute this case—like every other case—without fear or favor and, to quote the Department's motto, solely "on behalf of justice." It has abdicated that responsibility through a gross abuse of prosecutorial power, attempting to provide special treatment to a favored friend and political ally of the President of the United States. It has treated the case like no other, and in doing so has undermined the public's confidence in the rule of law. I respectfully suggest that the best response to Flynn's perjury is not to respond in kind. Ordering a defendant to show cause why he should not be held in contempt based on a perjurious effort to withdraw a guilty plea is not what judges typically do. To help restore confidence in the integrity of the judicial process, the Court should return regularity to that process. And the Court can best do that by denying the government's Rule

---

[70] As the Court is aware, the United States Sentencing Guidelines account for perjurious and obstructive conduct through adjustments to the applicable offense level and advisory sentencing range. *See* United States Sentencing Commission*, Guidelines Manual* § 3C1.1 (authorizing upward adjustment for obstruction of justice), *see also* § 3E1.1 (authorizing elimination of reduction for acceptance of responsibility when the obstruction enhancement applies).

[71] *See, e.g.*, *United States v. Varela-Rivera*, 551 F. App'x 583 (1st Cir. 2014) (affirming enhancement for perjury in attempt to withdraw plea); *United States v. Vargas-Gutierrez*, 464 F. App'x 492 (6th Cir. 2012) (upholding sentence enhancement where the district court found that the defendant had falsely maintained his innocence at hearing following his motion to withdraw his prior guilty plea); *United States v. Alvarado*, 615 F.3d 916 (8th Cir. 2010) (affirming enhancement based on statements to court in connection with attempt to withdraw plea that contradicted admissions during plea hearing); *United States v. DeLeon*, 603 F.3d 397 (7th Cir. 2010) (affirming enhancement based on false testimony in motion to withdraw plea); *United States v. Carroll*, 412 F.3d 787 (7th Cir. 2005) (affirming enhancement for perjury at unsuccessful plea withdrawal hearing based on contradictions with sworn plea allocution); *United States v. Adam*, 296 F.3d 327, 335 (5th Cir. 2002) (same); *United Stated v. Martinez*, 169 F.3d 1049, 1056 (7th Cir. 1999) (same).

48(a) motion to dismiss, adjudicating any pending motions, proceeding to sentencing, and factoring the defendant's contemptuous conduct into the appropriate punishment.

## CONCLUSION

For the foregoing reasons, the court-appointed *amicus curiae* respectfully submits that the Government's motion to dismiss should be denied and no Order to Show Cause why Flynn should not be held in criminal contempt should issue.

Dated:  New York, NY                                       Respectfully submitted,
        June 10, 2020


                                                             /s/ John Gleeson
                                                            John Gleeson[72]
                                                            DEBEVOISE & PLIMPTON LLP
                                                            919 Third Avenue
                                                            New York, New York 10022
                                                            (212) 909-6000
                                                            jgleeson@debevoise.com

                                                            *Court-appointed* Amicus Curiae


Marshall L. Miller                             David A. O'Neil (D.C. Bar No. 1030615)
Joshua Matz                                    DEBEVOISE & PLIMPTON LLP
Michael Skocpol                                801 Pennsylvania Avenue NW
KAPLAN HECKER & FINK LLP                       Suite 500
350 Fifth Avenue                               Washington, DC 20004
Suite 7110                                     (202) 383-8000
New York, New York 10118                       daoneil@debevoise.com
(212) 763-0883
mmiller@kaplanhecker.com
jmatz@kaplanhecker.com

---

[72] On May 18, 2020, the Court ordered that I be admitted *pro hac vice* to appear in this matter, be conferred full privileges to file and receive papers through the Court's CM/ECF system in this proceeding, and be excused from the local counsel requirement of Local Criminal Rule 44.1(c)(1). *See* Minute Order of May 18, 2020.

mskocpol@kaplanhecker.com

Daniel Aun
Elizabeth Nielsen
Tara P. Ganapathy
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000
daun@debevoise.com
enielsen@debevoise.com
tganapathy@debevoise.com